Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Joshua Paul Davis (State Bar No. 193254)
Nicomedes Sy Herrera (State Bar No. 275332)
Demetrius X. Lambrinos (State Bar No. 246027)
James G. Dallal (State Bar No. 277826)
V Chai Oliver Prentice (State Bar No. 309807)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email: jsaveri@saverilawfirm.com
        swilliams@saverilawfirm.com
        jdavis@saverilawfirm.com
        nherrera@saverilawfirm.com
        dlambrinos@saverilawfirm.com
        jdallal@saverilawfirm.com
        vprentice@saverilawfirm.com

*Interim Counsel for Direct Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION<br><br>This document relates to ALL DIRECT PURCHASER ACTIONS | Master File No. 3:17-md-02801-JD<br><br>Case No. 3:14-cv-03264-JD<br><br>**DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**<br><br>Date:       June 7, 2018<br>Time:       10:00 a.m.<br>Courtroom:   11, 19th Floor |

I, Joseph R. Saveri, declare as follows:

      1.    I am a member in good standing of the California bar. I am the founder and partner of the

Joseph Saveri Law Firm, Inc. ("JSLF"), interim class counsel for the direct purchaser plaintiffs

Master File No. 3:17-md-02801-JD
Case No. 3:14-cv-03264-JD

1

DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

("DPPs" or the "Settlement Class"). I submit this declaration in support of DPPs' Motion for Attorneys' Fees and Reimbursement of Expenses (the "Motion"). I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to them.

2.      The Motion is being filed in compliance with this District's *Procedural Guidelines for Class Action Settlement*[1] and *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010). The Motion is being publicly filed at least fourteen (14) days before the deadline for objecting to the proposed settlements described below (the "Settlements"). DPPs have also complied with the notice program approved by the Court in its March 2, 2018 Order. (Dkt No. 2017) These efforts, in addition to other efforts to provide notice of the Settlements beyond what the Court approved, are explained and certified in DPPs' Motion for Final Approval and its supporting papers that are being filed at the same time as this Motion.

3.      As interim lead class counsel for the DPPs ("Lead Counsel"), I have directed and overseen on a day-to-day basis the work of the attorneys and staff of JSLF in addition to the attorneys and staff of the other counsel of record for the DPPs (collectively, "Counsel"). I have been personally involved in all phases of this case, including the substantial pre-filing investigation which resulted in the first private case challenging the capacitor cartel to be filed anywhere in the world.

4.      In 2016, DPPs negotiated and signed five settlement agreements between DPPs and former defendants Fujitsu Limited; Nitsuko Electronics Corporation ("Nitsuko"); NEC TOKIN Corporation and NEC TOKIN America, Inc.; Okaya Electric Industries Co., Ltd. and Okaya Electric America, Inc.; and ROHM Co., Ltd. and ROHM Semiconductor U.S.A., LLC (collectively, the "Previously Settling Defendants").

5.      The Court granted preliminary approval of those settlements and approved DPPs' notice plan on January 27, 2017. Dkt. 1455. After the Court conducted a final approval and fairness hearing on April 6, 2017, the Court granted final approval of these five separately negotiated settlements (the "First Round Settlements"). Dkts. 1607, 1647, 1713. The monetary consideration provided to the settlement class in these five first-round settlements totaled $32,600,000.

---

[1] Available at https://www.cand.uscourts.gov/ClassActionSettlementGuidance.

6.      As a result of Counsel's substantial efforts, DPPs have secured settlements with two additional defendant corporate families in this action: Hitachi Chemical Co., Ltd., Hitachi AIC, Inc., and Hitachi Chemical Co. America, Ltd. (collectively, "Hitachi Chemical"); and Soshin Electric Co., Ltd., and Soshin Electronics of America Inc. (collectively, "Soshin") (all Hitachi Chemical and Soshin entities together, the "Settling Defendants").

7.      Pursuant to the Settlements, the Settling Defendants will pay a cash total of $66,900,000 for the benefit of the Settlement Class. In addition to this substantial monetary benefit, each Settling Defendant has agreed to provide DPPs with valuable cooperation as DPPs continue to pursue their claims against the other defendants.

8.      I personally negotiated each of the Settlements, with the valuable assistance of attorneys from JSLF and other Counsel. The Settlements resulted from hard-fought, arms' length negotiation involving multiple in-person and telephonic meetings. The negotiations were informed by extensive discovery, factual and economic inquiry analysis, the orders of the Court in this litigation, and my years of experience prosecuting and resolving antitrust cases, class actions, and other complex litigation. Antonio Piazza from Mediated Negotiations[2] assisted the parties in reaching their settlements.

9.      It is my opinion and experience as an experienced practitioner with expertise in antitrust class actions that in large multiparty price fixing cases such as this one, a settlement composed of a large cash component and substantial cooperation provides significant immediate benefit to a plaintiff class. That is the case here.

10.     When taken together, the cash and non-monetary components included in the Settlements constitute an excellent result, especially when considering the cooperation that the Settling Defendants will provide DPPs as they prosecute their claims against the remaining defendants. Accordingly, I believe that the proposed settlements will provide substantial benefit to the DPP class.

11.     Since the investigation of the capacitor cartel began, Counsel have provided legal services and incurred out of pocket expenses on a wholly contingent basis without promise of repayment except for what the Court awards Counsel after successful settlements are approved. For the

---

[2] Information about Mediated Negotiations may be found at: www.mediatednegotiations.com.

First Round Settlements, Counsel submitted their time for the period from November 1, 2014 through September 30, 2016. This time included 105,345.8 hours and a total lodestar of $44,444,689.40. For the current Settlements, Counsel is submitting its time from October 1, 2016 through December 31, 2017. As set forth below, Counsel have billed a lodestar of $70,764,474.20 through December 31, 2018.

12.     Taken together, the settlements provide for a total cash payment of $66,900,000. Counsel request a total of $16,725,000 in fees, which amounts to 25% of the total cash value of the Settlements, without regard to the substantial non-cash benefits. Added together with the attorneys' fees the Court awarded Counsel for the First Round Settlement, the amount requested for the current Settlements is 35% of all Counsel's cumulative lodestar in this litigation.

13.     In my opinion, Counsel's requests for an interim fee award and reimbursement of expenses should be granted. The fee request of 25% of the total cash Settlements matches the benchmark for common fund fee awards in this District and is therefore reasonable. There is no reasonable basis for a downwards departure from that benchmark in this case, particularly since the benchmark amount is less than Counsel's lodestar. In addition, Counsel's expenses have been reasonably and necessarily incurred by Counsel for the benefit of DPPs.

14.     To date, Counsel have also incurred expenses in the amount of $12,440,491.97, of which Counsel has only been partially reimbursed for $3 million during the First Round Settlements. (Dkt. No. 1714, at 9-10) The amount reimbursed was less than submitted costs through September 30, 2016. (Dkt. Nos. 1458-1 through 1458-18)

15.     Counsel's current requested reimbursement of $6,690,000 for these Settlements, with the $3 million that the Court approved for the First Round Settlements, only partially reimburses Counsel for their cumulative expenses and assessments incurred through December 31, 2017, which total $12,440,491.97. Counsel would still have a $2,750.491.97 shortfall.

16.     In the following paragraphs, I: (a) summarize the work performed by JSLF and other Counsel to date; (b) detail the procedural history of this litigation; (c) explain the significant litigation risks that Counsel have confronted  over the last two and a half years while prosecuting the DPPs' Section 1 claims against defendants; (d) explain the costs for which reimbursement is requested; and (5)

**DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

provide records of Counsel's attorneys' fees accrued and expenses advanced in this case as of December 31, 2017.

## I.     SUMMARY OF COUNSEL'S WORK PERFORMED

17.     As Lead Counsel, JSLF has dedicated significant money, time, and resources over the last four years leading the prosecution of DPPs' claims. I have tasked myself and my team with day-to-day case management. We have defined and honed DPPs' litigation strategy and executed it. My team and I have made and continue to make all material decisions in this case. I have directed the day-to-day activities of attorneys and professional staff at my law firm as well as other law firms. I have ensured that this litigation has proceeded efficiently, expeditiously and with a minimum of duplication or unnecessary effort.

18.     JSLF's numerous duties and responsibilities have included, but have not been limited to, the following: (a) supervising all work performed; (b) preparing and editing court filings, including documents related to motion practice; (c) interfacing, communicating and negotiating with the United States Department of Justice; (d) interfacing, communicating and coordinating with counsel for the indirect purchaser plaintiffs; (e) interfacing, communicating and coordinating with counsel for the opt-out plaintiffs; (f) practicing before the Judicial Panel on Multidistrict Litigation with respect to late-filed cases; (g) managing discovery, including drafting discovery responses; (h) evaluating and analyzing defendants' discovery responses, including document productions; (i) managing document reviews; (j) selecting and preparing DPPs' expert witnesses and reports; (k) supervising all depositions; (l) preparing for and taking key depositions; (m) identifying and interviewing cooperating witnesses; (n) overseeing and coordinating the work of retained experts; (o) communicating with Settlement Class members and responding to inquiries concerning the status of the case and settlement; (p) conducting settlement negotiations; (q) coordinating notice and claims management issues; and (r) preparing the case for trial.

19.     With the substantial assistance of other Counsel, my team at JSLF and I were able to significantly advance this litigation to the stage where settlements are possible based on the informed analysis of defendants' liability exposure, including sales during the relevant period.

20.   JSLF and other Counsel successfully defended DPPs' pleadings on two motions to dismiss, both times facing multiple legal and factual challenges that required Counsel to develop novel arguments and further investigate and analyze the facts supporting DPPs' claims. Counsel also dedicated significant time and effort to investigating and litigating the impact of the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"), on DPPs' claims. Counsel pursued substantial document discovery against defendants and, with Counsels' assistance following months of meet and confers and follow-ups, defendants ultimately produced approximately seven terabytes of electronically stored information ("ESI") and well over 500 gigabytes of transactional data pertaining to their capacitors sales. Within 18 months, Counsel were able to advance document discovery from the meet and confer stage to putting DPPs in a position to take key merits depositions of defendants' officers, employees and cartel representatives. Under JSLF's direction, Counsel's teams of attorneys were able to process, review, and analyze defendants' voluminous electronically-stored information ("ESI"")— primarily composed of Japanese language documents—by strategically employing innovative approaches and state of the art ESI technologies and methodologies. This refinement and analysis of defendants' ESI allowed Counsel to identify key documents and materials setting forth a comprehensive record of defendants' collusion. It also demonstrates how the cartel's decisions caused damages to the DPPs, including supracompetitive pricing of capacitors. This substantial undertaking has, in a relatively short time period given the challenges of a case of this scope and complexity, enabled DPPs to adduce proof of their claims and obtain substantial settlements from the defendants.

21.   This foregoing is not exhaustive. Counsel each have submitted to the Court summary details of the work each firm has conducted in this case at Lead Counsel's direction. This information is found in the third paragraph of each Counsel's declaration submitted in support of the Motion, Exs. 3-17, *infra*. These are accurate summaries of the work performed under my direction and supported by the daily time entries by each person recording time in the case, each of which I have reviewed.

22.   I have reviewed these portions of Counsels' respective declarations, and I find each of these statements made as to the work performed to be true and accurate.

## II.   FACTUAL AND PROCEDURAL HISTORY

DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

### A.   Inception of the Litigation and Appointment of Leadership

23.   On July 18, 2014, JSLF filed the first Direct Purchaser capacitors price fixing case—the *Chip-Tech* action. On July 22, 2014, JSLF filed the second—the *Dependable* action. Three firms followed our lead and filed cases soon after, though one—the *eIQ* action—was filed in the District of New Jersey.

24.   Between August 2014 to the middle of October 2014, counsel discussed centralization of the litigation in one forum, with a preference to centralize the case in the Northern District of California. The *eIQ* case was voluntarily dismissed in the District of New Jersey and then refiled in the Northern District of California after *eIQ's* attorney agreed to do so. This obviated the need for the capacitors cases to conduct proceedings before the JPML at that time. The cases were eventually consolidated in the Northern District.

25.   I was supported for Lead Counsel for the Direct Purchaser Class. The Court ultimately appointed me for the role. *See* Dkt. 319. The Court's Order recognized that JSLF "invested a great deal of time and effort to investigate and develop" the claims. *Id.* at 1. The Court gave me, as Lead Counsel, "complete authority to conduct all pretrial and trial work" as well as "the final word on and responsibility for all common discovery issues, service of pleadings and filings, stipulations, briefs and arguments, court hearings and appearances, communications with opposing counsel and the Court, expert retention and reports, trial and appeals arising in the course of litigation before this Court . . . , as well as work assignments within their class groups, billing records and fee issues, and overall case strategy, scheduling and management for their putative class." I have carefully and diligently exercised that authority.

### B.   Pleadings and Motions to Dismiss

26.   Following the appointment of me and my law firm as Lead Counsel, Counsel's immediate task was to consolidate the several DPP complaints and supplement the pleadings, where necessary, with the materials provided us by Panasonic, the leniency applicant under the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA"). JSLF drafted the consolidated complaint and supplemented its allegations with information gleaned from Japanese language ACPERA proffer documents analyzed by Counsel's Japanese-capable attorneys and staff. DPPs filed the consolidated class action complaint on December 4, 2014 (Dkt. 401-4).

27.     Defendants jointly and separately moved to dismiss the consolidated class action complaint on December 19, 2014 (Dkt. 479, 480). The Court's May 26, 2015 Order denied in part and granted in part defendants motions. Dkt. 710. The Court partially granted the motion and required DPPs to replead their allegations as to the involvement of U.S. subsidiaries in defendants' conspiracy.

28.     To amend, Counsel continued to analyze the case and synthesize information obtained through formal and informal discovery—in both Japanese and English. As part of this effort, DPPs located documents and other factual matter connecting the dismissed U.S. subsidiaries to their cartel activity of their Japanese defendant parents. Counsel reviewed tens of thousands of pages of documents in doing so. Many were translated and then integrated into the First Amended Consolidated Class Action Complaint, filed on June 16, 2015. Dkt. 742-4.

29.     Soon thereafter and before any defendants could move to dismiss, the Court ordered DPPs to amend again to add Flextronics' claims into the complaint. DPPs filed a Consolidated Second Amended Class Action Complaint on July 22, 2015. Dkt. 799-4, refiled in the public record at Dkt. 1355. A narrower group of defendants moved to dismiss the amended claims bolstered by Counsel's targeted Japanese language document review amendment efforts. On December 30, 2015, the Court denied defendants' motion in most respects, only dismissing DPPs' claims against American Shizuki Corporation. Dkt. 1003.

30.     After more than a year litigating the sufficiency of the pleadings, DPPs' claims were at issue on January 26, 2016. *See id*.

31.     In addition to the Rule 12(b)(6) motions to dismiss, DPPs opposed a Rule 12(b)(2) motion to dismiss by defendant Nippon Chemi-Con ("NCC"), in which the company argued that it did not conduct business in the United States. Dkt. 478. The Court granted DPPs' request for jurisdictional discovery against NCC. Once those materials were produced, Counsel reviewed a voluminous number of documents written in Japanese. DPPs' opposed NCC's 12(b)(2) motion, and the Court ultimately denied the motion. Dkt. 738.

32.     On November 20, 2015, defendant Nissei Electric Co., Ltd.("Nissei") also moved to dismiss pursuant to Rule 12(b)(2). Dkt. 963. The Court granted DPPs' request for jurisdictional

discovery against Nissei and, once produced, Counsel reviewed a voluminous number of documents written in Japanese. DPPs' opposed Nissei's 12(b)(2) motion, and the Court ultimately denied the motion. Dkt. 1546.

33.    After facing three rounds of defendants' motions to dismiss, DPPs' claims largely emerged intact. *See* Dkts. 710, 1003, 1546. DPPs' Third Amended Complaint, filed on September 6, 2017, is the operative pleading. *See* Dkt. 1831.

### C.    FTAIA

34.    Early in the case, the Court expressed to the parties its interest in addressing the FTAIA's effect on the commerce at issue in the case. The Court was uncertain how the briefing would advance procedurally but was certain that the issue should be addressed before class certification. Substantial time and resources were devoted to that effort.

35.    Once a briefing schedule for the FTAIA motions was set, defendants pursued informal discovery against DPPs to determine their position as to what types of capacitors sales would be subject to DPPs' Sherman Act claims. The defendants requested that DPPs concede that sales of capacitors outside the United States to purchasers outside of the United States would not be subject to Plaintiffs' price fixing claims. DPPs were unwilling to concede the Sherman Act's inapplicability to such a large number of capacitors sales, especially when discovery was still underway.

36.    On October 1, 2015, defendants moved for summary judgment, arguing that the FTAIA does not allow defendants' sales of capacitors outside the United States to purchasers outside of the United States to be subject to Plaintiffs' price fixing claims. Dkt. 915-16. In support of their motion, defendants submitted declarations of certain corporate employees that provided summary information as to what sales the respective defendants had in the United States during the proposed Class Period.

37.    DPPs' Counsel took 17 depositions of defendants' respective declarants in less than a months' time, traveling around the United States and even overseas to do so. Preparing for these depositions required significant preparation on counsel's part. Specifically, counsel and DPPs' experts spent a significant amount time reviewing defendants' transactional data to determine whether we could

**DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

reach the same conclusions the defendants did as to the volume of commerce and location of sales. In many cases, that was not possible.

38.     On November 23, 2015, DPPs filed extensive briefing in opposition to defendants' FTAIA motion. DPPs challenged defendants' interpretation of the FTAIA as applied in the limited number of cases addressing it, as well as objecting to defendants' failure to meet their evidentiary burden. Dkt. 967-70.

39.     The Court heard oral argument on defendants' summary judgment motions on January 13, 2016. DPPs argued that defendants' worldwide pricing policies should subject certain foreign sales to the Sherman Act's protections.

40.     On January 14, 2016, the Court ordered the parties to address defendants' evidentiary deficiencies raised by DPPs in their opposition and for the parties to meet and confer further to resolve these and other issues. Dkt. 1032.

41.     The parties could not resolve their differences, and additional briefing on the issues was filed by the parties. Dkt. 1076, 1098.

42.     The Court ultimately entered an Order on September 30, 2016 that preserved DPPs' claims for Capacitors billed or shipped to purchasers in the United States and excluded only the sale of capacitors outside the United States to purchasers outside of the United States. Dkt. 1302.

43.     Soshin moved for summary adjudication. Dkt. 1424. On March 23, 2017, the Court also denied Soshin's motion for summary judgment based on the FTAIA. Dkt. 1424, helping pave the way to the Settlement with Soshin.

**D.     Plaintiffs' Discovery on Defendants**

44.     Discovery begin in January 2015 after the Court partially lifted a stay of civil discovery requested by the Antitrust Division of the Department of Justice ("DOJ").

45.     This case is large and complex. DPPs have pursued discovery to establish the facts underlying DPPs' claims.

46.     DPPs have propounded 80 Requests for Production to all defendants, 187 more Requests for Production to individual defendants or groups of defendant companies, 46 interrogatories to all

defendants, and 60 Interrogatories on jurisdictional and other issues to individual defendants or groups of defendant companies. DPPs have also deposed approximately 100 witnesses (many of whom did not speak English), appearing either in their individual capacity or as corporate representatives. DPPs took 47 of these depositions in the period from October 1, 2016, which is the date marking the end of the period for counsel's time submissions for the First Round Settlements, and December 31, 2017. These depositions took place throughout the United States and in Hong Kong, Tokyo, London, and Reykjavik.

47.     The parties negotiated at length regarding the protocol and scope of document production. DPPs held multiple telephonic meet-and-confer sessions with each defendant to ascertain the location of the company's systems containing potentially relevant material; the entities, individuals, and years of business activity covered by those systems; the existence of backup tapes and any data integrity issues; the whereabouts and completeness of relevant transactional sales data; and a host of related issues.

48.     DPPs reached agreement with defendants for them to search collectively over 100 document custodians' files, and to search for documents about former employee custodians whose data had been purged upon or after separation from the company, by adding that custodian's name as a search term.

49.     DPPs also negotiated and eventually reached agreement with defendants regarding the English and Japanese ESI search terms to be applied to custodian files without the need for court intervention. The parties also reached agreement on an ESI collection protocol whereby defendants would run a multi-page list of several hundred search terms and phrases—each one translated and optimized by Counsel to identify relevant files in both English and Japanese—against their centralized files and the agreed custodians' personal files and then batch and produce the results.

50.     Document production in the case has been sprawling, voluminous, and unending. To date defendants have delivered documents to plaintiffs in just shy of 500 separate productions, each of which DPPs has logged, processed, and uploaded for processing and review. The Court ordered defendants to meet a June 30, 2015 deadline for substantial completion of productions from centralized business files and an October 15, 2015 deadline for substantial completion of productions from custodial

files. Dkt. 730, 735. Plaintiffs had received roughly two-thirds of defendants' productions by mid-December, 2015—two months after the deadline ordered by the Court—but defendants' productions have continued throughout ensuing two years.

51.    In total, DPPs have received from defendants files spanning nearly 40 million unique Bates-numbered pages amounting to over eight terabytes of ESI.

52.    The vast majority of the defendants' productions is in Japanese, though defendants also produced significant amounts of material in English, Chinese, Korean, and other languages.

53.    DPPs, working in concert with IPPs, have worked diligently to strategically examine defendants' voluminous productions. Counsel have made major investments in the project, both in vetting, hiring, and directing a team of 33 multilingual Japanese-language document review attorneys and up to 12 English-language review attorneys, and in selecting an ESI management company offering an innovative document review platform that Plaintiffs used to conduct multiple phases of Technology Assisted Review ("TAR") to focus the initial stages of the review on documents most likely to contain relevant material.

54.    Attorneys from my firm and Counsel, in coordination with IPPs, have efficiently and effectively organized DPPs' review work. Among their other supervisory responsibilities, Counsel have instructed new reviewers about the review, prepared checklists, manuals, and instruction sets, organized teams to work on particular projects, and led weekly document review calls every Monday for over a year to coordinate review efforts.

55.    Review has yielded a large amount of material that supports DPPs' allegations of price fixing. But production of the documents in Japanese has required DPPs to undertake the further major effort of translating the material into English for filing in the record in this litigation. Plaintiffs have devoted major resources to vetting, hiring, and directing translation services, selecting and prioritizing documents for translation, and running quality control on the translators' output. DPPs and IPPs both have submitted requests to translators and have shared their translators to prevent duplication of effort. To date, DPPs and IPPs have amassed several thousand conspiracy-related and other relevant

documents for use in making their case against defendants. Translation efforts are ongoing as the review team continues to identify more relevant material.

56.     DPPs also devoted substantial work to discovery negotiations with defendants regarding their production of transaction-level sales data. Defendants produced more than 500 gigabytes of sales data comprising millions upon millions of lines of transactions amounting to billions of dollars of commerce and tens of billions of capacitor units sold. Working with the data requires the user to make sense of and identify equivalences among some 400,000 unique product codes, and each defendant produced its sales data in a different format and form, covering different time periods, different product mixes, different geographic regions, and at different levels of specificity or generality. Some defendants included separate customer information and product information within their sales data, while others produced it in separate files or not at all. DPPs worked tirelessly in concert with their experts to compose, propound, and demand answers to well over 1,000 questions seeking clarification and confirmation on various aspects of the contents of that data. DPPs drove these disputes to a resolution and then successfully obtained defendants' cooperation in supplementing their data to cover sales in the year 2015.

57.     In other areas where defendants have proven less cooperative, DPPs worked in concert with IPPs to bring matters before the Court. DPPs and IPPs' coordinated letter briefs in this case have covered a wide range of issues, including a dispute over a defendant's obligation to run certain search terms; multiple efforts by defendants to shield key witnesses from deposition in the United States or at all; a dispute over DPPs' request for new custodians to replace certain former employees who defendants failed initially to disclose; certain defendants' attempts to evade producing translations they submitted to the DOJ; Plaintiffs' motion for relief under Rule 37 for certain defendant witnesses' failure to attend their duly-noticed depositions; challenges to claw-backs and privilege assertions well after substantial completion of production, some made during depositions in progress; production of materials from Defendants' internal investigations; production of materials submitted to foreign antitrust regulators; Defendants' assertion that there exists a production cutoff date in the year 2014 that applies to all categories of production; the adequacy of Defendants' privilege logs; the adequacy of

Defendants' responses to interrogatories; and the appropriate scope of 30(b)(6) deposition testimony. DPPs and IPPs have either prevailed on the majority of these motions or otherwise received the relief requested without a ruling by the Court.

### E. Class Certification

58. DPPs moved for class certification for trial purposes on June 15, 2017. Dkt. 1693 & 1766. JSLF attorneys led a team that drew on the discovery record, expert analysis, and the most up-to-date caselaw in moving for certification of a class of approximately 1,900 entities who purchased Capacitors directly from defendants over the course of the 12-year conspiracy. The team selected and presented over 140 exhibits establishing the liability of each participant and the scope of their conduct.

59. The moving papers included supporting declarations by James McClave, an expert econometrician, and Douglas Zona, an expert economist. Dkts. 1693-2 through 1693-6. JSLF attorneys worked closely with these expert witnesses to ensure they had all the information necessary to prepare their reports and render their opinions. Months of regular contact facilitated preparation and service of over 1,000 targeted questions to Defendants about their transaction-level sales data, and advance negotiation with defendants in line with the best practices endorsed by the Sedona Conference enabled the parties to resolve their questions and disputes without the need for formal motions. Dr. McClave and his staff assembled a database encompassing 7 million purchases integrating data productions from sixteen defendants. JSLF attorneys, in part working with counsel skilled in reading Japanese, collected and provided to Dr. Zona over 400 documents relied upon in his report.

60. DPPs filed reply briefs and additional supporting materials on August 3, 2017. Dkt. 1776-3. The Court held a hearing on September 7, 2017. Dkt. 1834. The motion is pending before the Court.

### F. Defendants' Discovery on Plaintiffs

61. Defendants have propounded both document production requests and interrogatories on the four presumptive representative Direct Purchaser Class representatives—Chip-Tech, Ltd. ("Chip-Tech"), Dependable Component Supply Corp. ("Dependable"), eIQ Energy Inc. ("eIQ"), and Walker Component Group, Inc. ("Walker").

62.    Responding to defendants' discovery proved to be time-consuming and laborious work. Identifying, reviewing and, producing documents in response to defendants' document requests has required Counsel to devote a significant amount of work. Defendants' requests were quite broad, as were the ESI search terms they provided. Counsel have spent significant amounts of time collecting materials from Chip-Tech, Dependable, eIQ, and Walker, reviewing them for responsiveness and production to defendants.

63.    Moreover, multiple defendant groups have propounded factual and contention interrogatories that required synthesizing and summarizing hundreds of collusive meetings over many years.

### G.    Coordination and Cooperation with Other Parties, Including the Department of Justice, IPPs, and Opt-Out Plaintiffs

64.    The complex nature of these proceedings has required skill and discipline in managing relationships with the other parties. Throughout the case, DPPs have worked diligently to maintain open lines of communication to ensure effective coordination with the DOJ and the other plaintiffs to avoid duplication of efforts.

65.    These proceedings have also required extensive coordination, communication and cooperation with the United States Department of Justice ("DOJ") Such efforts have included, without limitation, communications and negotiations regarding discovery, deposition scheduling, the deposition of an incarcerated witness, and a stay of discovery to allow the DOJ criminal trial to proceed without abatement of interference.

66.    DPPs have also coordinated closely with counsel for the Indirect Purchaser Plaintiffs ("IPPs"). The close working relationship at all levels among DPP and IPP counsel, from lead attorneys to staff, has enabled both to return the benefits of multiple efficiencies to their respective classes. DPPs and IPPs have coordinated and shared most of the work product from their document review efforts and have been in constant contact to coordinate on translations and ensure no duplication of translation efforts. DPPs and IPPs have also cooperated in allocating responsibility for taking depositions, and have collaborated on many discovery meet and confer initiatives and on letter briefing.

67.     DPPs have also coordinated effectively with counsel for Flextronics and counsel for AASI, Avnet, and Benchmark. As these attorneys have entered the case, JSLF attorneys have promptly provided or offered to provide all production documents and the entire written discovery record. JSLF attorneys have made themselves available to answer questions and coordinate on strategy. At the request of Flextronics, JSLF attorneys also prepared and delivered the sales data pertaining to Flextronics within the database assembled by DPPs' experts. JSLF has coordinated with opt-out counsel to shorten DPPs' allowed time for depositions to permit Flextronics, AASI, Avnet and Benchmark to interrogate deposition witnesses.

### H.     Settlement Negotiations and Agreements

68.     With the current Settlements, DPPs have reached settlement agreements with seven[3] of the 22 defendants named in DPPs' Complaint.  DPPs are also actively engaged in various stages of settlement discussions with a number of other defendants.

69.     As Lead Counsel, I have conducted DPPs' settlement discussions with defendants on the Class' behalf. I have also relied on the input of Counsel, who have negotiated and resolved many of the largest and most important antitrust cases in the United States.

70.     The settlements below were reached only after attorneys at my firm, with the aid of outside consultants and experts, conducted a detailed analysis of the evidence DPPs have on each defendant and evaluated each defendant's respective exposure and their financial condition with respect to their ability to pay settlements or respond to judgment in this case.

### 1.     The Soshin Settlement

71.     DPPs executed a settlement with Soshin on April 27, 2017, following months of negotiations. (Dkt. 1989-2; *see also* Exhibit B to the Declaration of Joseph Saveri dated May 3, submitted in support of DPPs' Motion for Final Approval of these Settlements) Among other things, DPPs analyzed the law of the United States, Japan and other countries with respect to issues which arose during settlement negotiations.

---

[3] In addition, DPPs have recently reached a settlement with the Rubycon defendants.

72.     The settlement provides the Settlement Class $3,900,000 and other valuable consideration, including cooperation. *See id.*

73.     Soshin fully paid its settlement amount on or about March 14, 2018. The settlement funds are being held in an escrow account pending this Court's approval.

### 2.     The Hitachi Chemical Settlement

74.     DPPs executed a settlement with Hitachi Chemical dated November 30, 2017, following months of negotiations. (Dkt. 1989-3; *see also* Exhibit A to the Declaration of Joseph Saveri dated May 3, submitted in support of DPPs' Motion for Final Approval of these Settlements) The settlement agreement was negotiated over a period of nearly five months and required numerous meetings between counsel. DPPs reached settlement with Hitachi Chemical with the assistance of Antonio Piazza, Esq., of Mediated Negotiations, an experienced and well-regarded mediator.

75.     The settlement provides the Settlement Class with $63,000,000 in cash and other valuable consideration, including cooperation. *See id.*

76.     Hitachi Chemical fully paid its settlement amount on or about December 7, 2017. The settlement funds are being held in an escrow account pending this Court's approval.

### I.     Preliminary Approval

77.     After executing the Settlements, DPPs sought preliminary approval for them.

78.     At the January 25, 2018 preliminary approval hearing, the Court granted preliminary approval and directed DPPs to move expeditiously to get notice out to the Direct Purchaser Class. The Court ultimately set a June 7, 2018 final approval hearing. The Court entered the Preliminary Approval Order on March 2, 2018. *See* Dkt. 2075. *See also* Dkt. 2075-1 (approving Long Form Notice); Dkt. 2075-2 (approving Summary Notice); Dkt. 2075-3 (approving Postcard Notice).

### J.     Dissemination of Notice to the Direct Purchaser Class

79.     Immediately after the January 25, 2018 preliminary approval hearing, Lead Counsel directed claims administrator Rust Consulting, Inc. ("Rust") to implement the notice program pursuant to the Preliminary Approval Order. Lead Counsel has been monitoring the notice process closely to ensure that as many Settlement Class members as possible receive notice of the Settlements and to

address inquiries and issues as they arise. The claims administrator prepared and directly mailed two forms of notice. The claims administrator mailed a Postcard Notice to each Settlement Class member that participated in the First Round Settlements by timely submitting a valid claim not subject to further audit. Rust also sent a Long Form Notice to all other potential Settlement Class members with known, valid addresses on file that were (i) pre-populated with the recipient's annual capacitors purchases from each defendant between 2002 and 2015; and (ii) an estimate of the recipient's estimated total award from the Settlements. In our experience, performing this work in advance facilitates the claims progress and encourages participation in class settlements. Settlement Class members receiving the pre-populated claim forms had ample opportunity to submit additional information to Rust if they believed the purchase information on their respective forms was incomplete or incorrect.

80.     On March 9-10, 2018, the claims administrator at our instruction mailed 260 Postcard Notices to Settlement Class members that had submitted valid claims during the First Round of settlements. The claims administrator also mailed an additional 2,781 pre-populated claim forms and the Long Form Notice to Class members.

81.     JSLF also directed the claims administrator to do the following in accordance with the Court-ordered notice plan: (1) publish Summary Notice in the national edition of *The Wall Street Journal* on March 23, 2018; (2) update the Claims Website (www.capacitorsantitrustsettlement.com) to provide Class members and the public information and notice about the claims process; and (3) run banner advertisements on 13 different electronics industry-focused web sites.

82.     Approximately 471 of the mailed claim forms were returned to Rust as undeliverable with no forwarding address received. JSLF directed Rust to conduct a skip trace on each of these returned claim forms using their typical methods. Rust was able to research and identify updated mailing addresses and re-mailed notices and claim forms to the updated addresses on April 13, 2018.

83.     Meanwhile, JSLF personnel began reaching out to Class members by telephone to tell them to expect these claim forms and to return them before the opt-out/objection deadline. JSLF is on schedule personally to call approximately all or nearly all of the Class members that purchased the most capacitors during the Class Period well before the deadline for Class Members to file Claim Forms.

84.     As of the date of this declaration, neither Rust nor JSLF have received any objections to any aspect of the Settlements.

## III.     RISKS OF LITIGATION

85.     Counsel assumed several significant risks when they agreed to work on this case. These include the risk inherent to contingent fee litigation. In particular, Counsel took the risk of devoting large amounts of time and expenses without any promise of repayment.

86.     There were a number of factors specific to this case that, in my opinion, increased the risk. These include the time period and complexity of the case; the international component to the case; the potential difficulties in fact development; the parallel investigation by the DOJ and the related criminal cases; and the uncertainty of the FTAIA's impact on the commerce at issue in the case. It also includes the fact that virtually all of the documentary record in this case is in Japanese or languages other than English. Prosecuting a sprawling, multiyear multi-participant antitrust case where the documentary record is not in English and many of the key witnesses are either unavailable, unwilling to testify or located in Japan, presents particular additional difficulties.

87.     I considered these factors before filing this case on the Class' behalf. It is my understanding that Counsel considered these factors before joining the DPPs.

88.     In order to prosecute this case on behalf of the DPPs class, I have foregone other business opportunities during the pendency of this litigation. I have done so to provide the best possible representation to the class I represent.

## IV.     BENEFIT OF THE SETTLEMENTS TO THE DIRECT PURCHSER CLASS

89.     As noted in the section above regarding class notice, the Direct Purchaser class is not large in number when compared to other settlement classes. Based on the customer information we extracted from defendants' transactional data, it appears the class has approximately 2,000 members.

90.     The Settling Defendants' all-cash payments to the Class together total $66,900,000. This is a large amount of money relative to the Settling Defendants' comparatively minimal individual and collective capacitor sales to U.S. purchasers between 2002 and 2014.

91.     Through reviewing all defendants' transactional data, we estimate that all defendants together sold more than $7 billion in capacitors to U.S. purchasers between 2002 and 2014. Further, based on defendants' representations to DPPs and the U.S. Department of Justice, and further through reviewing all defendants' transactional data, we estimate that the Settling Defendants are responsible for roughly $16.5 million of the cartel's United States sales. The Settlement Fund here represents an amount several times greater than Settling Defendants' combined U.S. sales during that period.

92.     Soshin agreed to pay DPPs $3,900,000. Soshin has produced data to counsel for DPPs that shows its U.S. sales were minimal during the relevant time period.

93.     Hitachi Chemical agreed to pay DPPs $63,000,000. Hitachi Chemical has represented to DPPs and the U.S. Department of Justice that is U.S. sales were $16.5 million from 2002 through 2010. The settlement provides DPPs with over 380% of that figure.

94.     Based on my experience litigating and settling complex antitrust cases like this one, it is my opinion that these proposed Settlements provide an excellent monetary recovery for the Settlement Class and exceed that recovered in many other cases of this type.

95.     It is my experience that settlements tend to motivate other defendants to settle.

96.     It is also my experience that, in complex cartel cases like this one, cooperation from a settling defendant can be very helpful to plaintiffs' continued prosecution of other defendant members of the conspiracy, including at trial.

## V.     ATTORNEYS' FEES AND EXPENSES

### A.     Joseph Saveri Law Firm, Inc.'s Attorneys' Fees and Expenses

97.     Exhibit 1 is JSLF's total hours and lodestar, computed at historical rates, for the period of October 1, 2016 through December 31, 2017 (the "Relevant Period"). This summary was prepared from contemporaneous, daily time records regularly prepared and maintained by JSLF. The lodestar amount reflected in Exhibit 1 is for work performed by my JSLF for the benefit of the Class. JSLF represents DPPs on a contingent basis and has not yet received any payment for any of the fees the firm has accrued in connection with this litigation to date other than the $8,150,000 awarded by the Court for the First Round Settlements that JSLF shared with all Counsel.

98.     JSLF's hourly rates for the firm's attorneys, paralegals, and law clerks included in Exhibit 1 are the usual and customary hourly rates we charge.

99.     Exhibit 2 is a chart outlining the itemized costs and expenses JSLF advanced DPPs. My firm has expended a total of $1,302,067.26 in costs and expenses incurred between October 1, 2016 through December 31, 2017 in connection with the prosecution of this litigation. They were incurred on behalf of DPPs by JSLF on a contingent basis, and have not been reimbursed. The expenses incurred in this action are reflected on JSLF's books and records. These books and records are prepared from expense vouchers, check records and other source materials and represent an accurate recordation of the expenses incurred.

100.    I have reviewed the time and expenses reported by JSLF in this case which are included in this declaration. I affirm that they are true and accurate.

101.    JSLF established a litigation fund to finance the joint prosecution of this case against the defendants ("Litigation Fund"). JSLF alone contributed $1,000,000 to that litigation fund. Counsel have also contributed to the litigation fund in the amounts set forth in their respective submissions.

102.    The Litigation Fund has been used to pay necessary costs and expenses including expert and consulting fees, the costs of document hosting, certification of translations.

103.    In addition to JSLF's costs and expenses from the First Round Settlements, JSLF has incurred a cumulative total of $2,609,961.55 in costs and expenses since November 1, 2014.

**B.      Counsel's Attorney Fees and Expenses**

104.    To assist JSLF in the prosecution of DPPs' claims, I asked the firms and the attorneys listed below to work on the case at my direction. I have frequently worked on other antitrust class actions or other complex litigation matters with the attorneys listed below or their respective firms. Having litigated complex class actions like this one for more than 25 years, I know these firms and their attorneys to be experienced advocates for class plaintiffs, skilled in many aspects of litigation. I have assigned and supervised work based on their particular skills, talents and expertise. I have directed work so as to achieve collaboration and to eliminate duplication and unnecessary effort.

105.     The firms and the attorneys listed below all regularly work on contingent fee class action matters. It is my understanding that, before agreeing to work with JSLF on this case, each of these firms was well aware of the risks involved in contingency litigation in general, and in this case specifically.

106.     Counsel's cumulative lodestar in this case as of December 31, 2017 is $70,764,475.20. Counsels' cumulative costs advanced as of December in this case are $12,440,491.97.

107.     Exhibits 3-17 below detail Class Counsel's time and expenses from October 1, 2017 through December 31, 2017. I have reviewed the daily time records submitted by each of the firms. I have eliminated duplicative and unnecessary work. I have set hourly maximums, consistent with industry practice for certain tasks, like document review. I have not submitted any time billed for administrative matters.  I maintain these records at my firm.

108.     Exhibit 3 is a true and correct copy of the Declaration of Eric L. Cramer in Support of Counsels' Application for Attorneys' Fees. Mr. Cramer is a member of Berger & Montague, P.C. ("B&M") one of the firms serving as Counsel in this litigation. Mr. Cramer has authorized me to submit Exhibit 3 on his behalf. He has attached to his declaration a chart indicating the attorneys and personnel from B&M who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Cramer has also attached to his declaration a chart summarizing all the expenses B&M reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Cramer's declaration details the activities with which B&M's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

109.     Exhibit 4 is a true and correct copy of the Declaration of C. Andrew Dirksen in Support of Counsels' Application for Attorneys' Fees. Mr. Dirksen is a member of Cera LLP ("Cera"), one of the firms serving as Counsel in this litigation. Mr. Dirksen has authorized me to submit Exhibit 4 on his behalf. He has attached to his declaration a chart indicating the attorneys and personnel from Cera who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Dirksen has also attached to his declaration a chart summarizing all the expenses Cera reasonably and necessarily incurred in connection with this

1  litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Dirksen's declaration

2  details the activities with which Cera's attorneys and personnel have been involved in this case on the

3  DPPs' behalf and at my direction.

4        110.   Exhibit 5 is a true and correct copy of the Declaration of Brent W. Johnson in Support of

5  Counsels' Application for Attorneys' Fees. Mr. Johnson is a partner of Cohen Milstein Sellers & Toll

6  PLLC ("CMST"), one of the firms serving as Counsel in this litigation. He has authorized me to

7  submit Exhibit 5 on his behalf. Mr. Johnson has attached to his declaration a chart indicating the

8  attorneys and personnel from CMST who worked on this litigation, the number of hours they worked

9  during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr.

10  Johnson has also attached to his declaration a chart summarizing all the expenses CMST reasonably and

11  necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017.

12  Paragraph 3 of Mr. Johnson's declaration details the activities with which CMST's attorneys and

13  personnel have been involved in this case on the DPPs' behalf and at my direction.

14        111.   Exhibit 6 is a true and correct copy of the Declaration of Roberta D. Liebenberg in

15  Support of Counsels' Application for Attorneys' Fees. Ms. Liebenberg is a member of Fine, Kaplan and

16  Black, R.P.C. ("FKB"), one of the firms serving as Counsel in this litigation. She has authorized me to

17  submit Exhibit 6 on her behalf. Ms. Liebenberg has attached to her declaration a chart indicating the

18  attorneys and personnel from FKB who worked on this litigation, the number of hours they worked

19  during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Ms.

20  Liebenberg has also attached to her declaration a chart summarizing all the expenses FKB reasonably

21  and necessarily incurred in connection with this litigation from October 1, 2016 through December 31,

22  2017. Paragraph 3 of Ms. Liebenberg's declaration details the activities with which FKB's attorneys and

23  personnel have been involved in this case on the DPPs' behalf and at my direction.

24        112.   Exhibit 7 is a true and correct copy of the Declaration of William H. London in Support

25  of Counsels' Application for Attorneys' Fees. Mr. London is a member of Freed Kanner London &

26  Millen LLC ("FKLM"), one of the firms serving as Counsel in this litigation. He has authorized me to

27  submit Exhibit 7 on his behalf. Mr. London has attached to his declaration a chart indicating the

28

attorneys and personnel from FKLM who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. London has also attached to his declaration a chart summarizing all the expenses FKLM reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. London's declaration details the activities with which FKLM's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

113.    Exhibit 8 is a true and correct copy of the Declaration of Daniel G. Girard in Support of Counsels' Application for Attorneys' Fees. Mr. Girard is a member of Girard Gibbs LLP ("Girard Gibbs"), one of the firms serving as Counsel in this litigation. Mr. Girard has authorized me to submit Exhibit 8 on his behalf. He has attached to his declaration a chart indicating the attorneys and personnel from Girard Gibbs who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Girard has also attached to his declaration a chart summarizing all the expenses Girard Gibbs reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Girard's declaration details the activities with which Girard Gibbs' attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

114.    Exhibit 9 is a true and correct copy of the Declaration of Stuart G. Gross in Support of Counsels' Application for Attorneys' Fees. Mr. Gross is a partner of Gross & Klein LLP ("Gross & Klein"), one of the firms serving as Counsel in this litigation. He has authorized me to submit Exhibit 9 on his behalf. Mr. Gross has attached to his declaration a chart indicating the attorney from Gross & Klein who worked on this litigation, the number of hours he worked during the period from October 1, 2016 to December 31, 2017, and his lodestar value. Gross & Klein has not incurred any expenses connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Gross' declaration details the activities with which Gross & Klein's attorney has been involved in this case on the DPPs' behalf and at my direction.

115.    Exhibit 10 is a true and correct copy of the Declaration of Vincent J. Esades in Support of Counsels' Application for Attorneys' Fees. Mr. Esades is an equity member of Heins Mills & Olson,

P.L.C. ("Heins Mills"), one of the firms serving as Counsel in this litigation. Mr. Esades has authorized me to submit <u>Exhibit 10</u> on his behalf. He has attached to his declaration a chart indicating the attorneys and personnel from Heins Mills who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Esades has also attached to his declaration a chart summarizing all the expenses Heins Mills reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Esades' declaration details the activities with which Heins Mills' attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

116.    <u>Exhibit 11</u> is a true and correct copy of the Declaration of Daniel R. Karon Support of Counsels' Application for Attorneys' Fees. Mr. Karon is a member of Karon LLC, one of the firms serving as Counsel in this litigation. He has authorized me to submit <u>Exhibit 11</u> on his behalf. Mr. Karon has attached to his declaration a chart indicating the attorneys and personnel from Karon LLC who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Karon has also attached to his declaration a chart summarizing all the expenses Karon LLC reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Karon's declaration details the activities with which Karon LLC's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

117.    <u>Exhibit 12</u> is a true and correct copy of the Declaration of Gregory Asciolla in Support of Counsels' Application for Attorneys' Fees. Mr. Asciolla is a member of Labaton Sucharow LLP ("Labaton"), one of the firms serving as Counsel in this litigation. Mr. Asciolla has authorized me to submit <u>Exhibit 12</u> on his behalf. He has attached to his declaration a chart indicating the attorneys and personnel from Labaton who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Asciolla has also attached to his declaration a chart summarizing all the expenses Labaton reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017.

Paragraph 3 of Mr. Asciolla's declaration details the activities with which Labaton's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

118.   Exhibit 13 is a true and correct copy of the Declaration of Howard J. Sedran in Support of Counsels' Application for Attorneys' Fees. Mr. Sedran is a partner of Levin Sedran & Berman ("LSB"), one of the firms serving as Counsel in this litigation. He has authorized me to submit Exhibit 13 on his behalf. Mr. Sedran has attached to his declaration a chart indicating the attorneys and personnel from LSB who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Sedran has also attached to his declaration a chart summarizing all the expenses LSB reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Sedran's declaration details the activities with which LSB's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

119.   Exhibit 14 is a true and correct copy of the Declaration of Steven J. Greenfogel in Support of Counsels' Application for Attorneys' Fees. Mr. Greenfogel is Of Counsel to Lite DePalma Greenberg, LLC ("Lite DePalma"), one of the firms serving as Counsel in this litigation. Mr. Greenfogel has authorized me to submit Exhibit 14 on his behalf. He has attached to his declaration a chart indicating the attorneys and personnel from Lite DePalma who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Greenfogel has also attached to his declaration a chart summarizing all the expenses Lite DePalma reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Greenfogel's declaration details the activities with which Lite DePalma's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

120.   Exhibit 15 is a true and correct copy of the Declaration of John D. Radice in Support of Counsels' Application for Attorneys' Fees. Mr. Radice is a member of Radice Law Firm, P.C. ("Radice Law Firm"), one of the firms serving as Counsel in this litigation. He has authorized me to submit Exhibit 15 on his behalf. Mr. Radice has attached to his declaration a chart indicating the attorneys and

personnel from Radice Law Firm who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Radice has also attached to his declaration a chart summarizing all the expenses Radice Law Firm reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Radice's declaration details the activities with which Radice Law Firm's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

121.    Exhibit 16 is a true and correct copy of the Declaration of William G. Caldes in Support of Counsels' Application for Attorneys' Fees. Mr. Caldes is a partner of Spector Roseman & Kodroff, P.C. ("SRK"), one of the firms serving as Counsel in this litigation. Mr. Caldes has authorized me to submit Exhibit 4 on his behalf. Mr. Caldes has attached to his declaration a chart indicating the attorneys and personnel from SRK who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. He has also attached to his declaration a chart summarizing all the expenses SRK reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Caldes' declaration details the activities with which SRKW's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

122.    Exhibit 17 is a true and correct copy of the Declaration of Jason S. Hartley in Support of Counsels' Application for Attorneys' Fees. Mr. Hartley is a member of Stueve Siegel Hanson LLP ("Stueve Siegel"), one of the firms serving as Counsel in this litigation. He has authorized me to submit Exhibit 11 on his behalf. Mr. Hartley has attached to his declaration a chart indicating the attorneys and personnel from Stueve Siegel who worked on this litigation, the number of hours they worked during the period from October 1, 2016 to December 31, 2017, and their respective lodestar values. Mr. Hartley has also attached to his declaration a chart summarizing all the expenses Stueve Siegel reasonably and necessarily incurred in connection with this litigation from October 1, 2016 through December 31, 2017. Paragraph 3 of Mr. Hartley's declaration details the activities with which Stueve Siegel's attorneys and personnel have been involved in this case on the DPPs' behalf and at my direction.

## VI.    EXPENSES

123.    The majority of expenses Counsel have incurred as of December 31, 2017 relate to the work done by DPPs' consultants and experts. A significant amount of that time relates to the analysis of defendants' voluminous capacitors sales transactional data, as well as to develop expert testimony in preparation for class certification. Defendants' transactional data, for the most part, cover more than a decade's worth of sales and transaction information. Significantly, much of it is reported—*e.g.*, data base headers, field descriptions and the like—in Japanese. The data were not produced in a uniform format with uniform fields of information recorded, so many hours were spent learning the data and creating as much uniformity among the various sets as possible. A significant part of the produced data were incomplete or unreadable due to format and age issues that had to be addressed on a defendant-by-defendant basis. In fact, certain defendants made a number of over lapping and duplicative productions of transactional data which imposed additional costs on Counsel.

124.    Counsel have also incurred substantial expense over the last two years for the hosting, processing, and organizing defendants' ESI and transactional data. Counsel had to retain an outside ESI vendor to upload, process, and remotely house defendants' ESI. Those services over time have been quite costly, as have been DPPs' efforts to use specific technology assisted review applications supported by the ESI vendor to find relevant and important documents more quickly and with greater accuracy that would otherwise be possible.

125.    Further, Counsel have incurred sizeable costs in engaging individuals with Japanese language skills to assist them with the prosecution of this action. defendants are almost all Japanese companies or U.S. subsidiaries of Japanese companies. Accordingly, the vast majority of the discovery DPPs pursued has targeted Japanese-speaking officers and employees of the defendants, whose ESI and document are written in Japanese. Counsel was denied access to translations prepared by defendants and provided to the Department of Justice. Key documents had to be translated to English. Depositions of defendants' personnel have nearly all required Plaintiffs to hire concurrent Japanese/English interpreters and have taken at least twice the time they would have taken to complete were they taken in English. Individuals with Japanese language skills are in high demand and come at a significant expense.

126.     I reviewed all costs submitted by Counsel for reimbursement. I did so to ensure their compliance with the instructions set forth in the Court's Order Appointing Interim Lead Counsel (Dkt. 319 at 4-5). I identified for Counsel any costs that were unauthorized or in excess of the Court's guidelines. I directed Counsel to remove these expenses and I informed them that they will not be reimbursed for these costs. The cost summaries attached as Exhibit B to most of Counsels' declarations (Exs. 3-17) are drawn from the respective firms' accounting records for this litigation after the deletions I required were made.

\*          \*          \*

I declare that the foregoing is true and correct and that this Declaration is executed in San Francisco, California on this 3d day of May 2018.

By:     _/s/ Joseph R. Saveri_
        Joseph R. Saveri

**DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**