Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

IN RE:  CAPACITORS ANTITRUST      )
LITIGATION.                       )
                                  )   **No. C 17-md-2801 JD**
_____   )   **No. C 14-3264 JD**
                                      **No. C 17-7046 JD**
                                      **No. C 17-7047 JD**


                                      San Francisco, California
                                      Thursday, June 7, 2018

                  **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**

For Plaintiffs Direct Purchasers:
                         JOSEPH SAVERI LAW FIRM
                         601 California Street, Suite 1000
                         San Francisco, California  94108
                 BY:  **JOSEPH R. SAVERI, ESQUIRE**
                      **NICOMEDES SY HERRERA, ESQUIRE**
                      **DEMETRIUS X. LAMBRINOS, ESQUIRE**
                      **JOSHUA P. DAVIS, ESQUIRE**
                      **JAMES G.D. DALLAL, ESQUIRE**


For Plaintiffs Indirect Purchasers:
                         COTCHETT, PITRE & MCCARTHY LLP
                         San Francisco Airport Office Center
                         840 Malcolm Road
                         Burlingame, California  94010
                 BY:  **ADAM J. ZAPALA, ESQUIRE**


For Plaintiff Flextronics:
                         WILLIAMS MONTGOMERY & JOHN
                         233 South Wacker Drive, Suite 6100
                         Chicago, Illinois 60606
                 BY:  **ERIC R. LIFVENDAHL, ESQUIRE**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGES)**

Reported by:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Official Reporter

**APPEARANCES** (CONTINUED):

For Plaintiffs AASI, Avnet, and Benchmark:
                    BILZIN SUMBERG BAENA PRICE
                     AND AXELROD LLP
                    1450 Brickell Avenue, Suite 2300
                    Miami, Florida 33131-5340
            BY: **ROBERT WILLIAM TURKEN, ESQUIRE**
                **SCOTT N. WAGNER, ESQUIRE**

For Plaintiff Plexus Corporation:
                    CARLTON FIELDS
                    525 Okeechobee Boulevard, Suite 1200
                    West Palm Beach, California  33401-6350
            BY:  **KRISTIN A. GORE, ESQUIRE**

For Defendant Hitachi Chemical:
                    WILSON SONSINI GOODRICH AND ROSATI.
                    1301 Avenue of the Americas, 40th Fl
                    New York, New York 10019
            BY:  **JEFFREY BANK, ESQUIRE**

For Defendant Nissei Electronic Co. LTD.:
                    WILMER CUTLER PICKERING HALE AND DORR
                    60 State Street
                    Boston, Massachusetts 02109
            BY:  **MARGARET O'GRADY, ESQUIRE**

                    WILMER CUTLER PICKERING HALE AND DORR
                    950 Page Mill Road
                    Palo Alto, California 94304
            BY:  **MARK D. FLANAGAN, ESQUIRE**

For Defendants Soshin Electric and Soshin Electronics America
                    BakerHostetler
                    1050 Connecticut Ave., NW Suite 1100
                    Washington, DC 20036
            BY:  **DANYLL W. FOIX, ESQUIRE**

For Defendant Nitsuko Electronics Corporation:
                    LATHAM & WATKINS, LLP
                    505 Montgomery Street, Suite 2000
                    San Francisco, California  94111-6538
            BY:  **KATHERINE M. LARKIN-WONG, ESQUIRE**

(Appearances continued on next page)

1    **<u>APPEARANCES (CONTINUED):</u>**

2    For Defendants ROHM Co., Ltd. and ROHM Semiconductor U.S.A. LLC
       ROHM Semiconductor U.S.A. LLC:

3                  O'MELVENY & MYERS LLP
                 Two Embarcadero Center, 28th Floor

4                  San Francisco, CA 94111-3305
           **BY:  ASHISH SUDHAKARAN, ESQUIRE**

5

6    For Defendants Holy Stone Enterprise Co., Ltd., Holy Stone
       Holdings Co., Ltd., Holy Stone Polytech Co., Ltd. and Milestone

7    Global Technology, Inc.:
                 JONES DAY

8                  555 South Flower Street, 50th Floor
                 Los Angeles, California  90071

9           **BY:  ERIC P. ENSON, ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>Thursday, June 7, 2018</u>                              <u>11:23 a.m.</u> |
| 2 | **P-R-O-C-E-E-D-I-N-G-S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Civil 14-3264, In re Capacitors |
| 5 | Antitrust Litigation; Multi-District Litigation 17-2801; In re |
| 6 | Capacitors Antitrust Litigation (No. III); Civil 17-7046, Avnet |
| 7 | Incorporated versus Hitachi Chemical Company, Limited; and |
| 8 | 17-7047, Benchmark Electronics Incorporated, et al. versus AVX |
| 9 | Corporation, et al. |
| 10 | Counsel. |
| 11 | **MR. SAVARI:**  Good morning, Your Honor.  Joseph Savari |
| 12 | on behalf of the direct purchaser plaintiffs. |
| 13 | **MR. ZAPALA:**  Good morning, Your Honor.  Adam Zapala, |
| 14 | from Cotchett, Pitre & McCarthy, for the indirect purchaser |
| 15 | plaintiffs. |
| 16 | **MR. LIFVENDAHL:**  Good morning, Your Honor.  Eric |
| 17 | Lifvendahl, on behalf of Flextronics. |
| 18 | **MR. WAGNER:**  Good morning Your Honor.  Scott Wagner, |
| 19 | Bilzin Sumberg, on behalf of AAIA, Avnet, and Benchmark. |
| 20 | **MR. HERRERA:**  Good morning, Your Honor.  Nicomedes |
| 21 | Herrera, Joseph Savari Law Firm, direct purchaser plaintiffs. |
| 22 | **MR. TURKEN:**  Good morning, Your Honor.  Robert Turken, |
| 23 | also on behalf of AASI, Benchmark, and Avnet. |
| 24 | **MR. DAVIS:**  Good morning, Your Honor.  Josh Davis, |
| 25 | direct purchaser plaintiffs. |

1      **MR. LAMBRINOS:**  Good morning, Your Honor.  Joseph

2  Savari Law Firm, Demetrius Lambrinos, for the direct purchaser

3  plaintiffs.

4      **MS. GORE:**  Good morning, Your Honor.  Kristen Gore,

5  from Carlton Fields, on behalf of plaintiff Plexus Corporation.

6      **MR. BANK:**  Good morning, Your Honor.  Jeff Bank for

7  defendant Hitachi Chemical.

8      **MS. O'GRADY:**  Good morning, Your Honor.  It's Margaret

9  O'Grady, from WilmerHale, for defendant Nissei.

10      **THE COURT:**  All right.

11      **MR. FLANAGAN:**  Good morning, Your Honor.  Mark

12  Flanagan, also on behalf of Nissei.

13      **MR. FOIX:**  Good morning, Your Honor.  Danyll Foix on

14  behalf of Soshin Electric and Soshin Electronics America.

15      **THE COURT:**  Okay.  Who has the Arizona cases?

16      **MR. TURKEN:**  We have the Arizona cases.  Robert

17  Turken.

18      **THE COURT:**  Did you all reach out to class members

19  recently, or plaintiffs, unnamed plaintiffs?

20      **MR. TURKEN:**  No.

21      **THE COURT:**  Just one second.

22      Oh, it's for Mr. Savari.  Sorry.  I'm getting emails from

23  people.  I don't want that to happen.  I got one yesterday from

24  Arizona, this long denunciation about everything in the world

25  related to the case.

```
1          They're not supposed to be contacting me.  So what can you
2     do to stop this?
3               MR. SAVARI:  Well, first of all --
4               THE COURT:  He was in Arizona, that's why I thought
5     maybe it was -- okay.
6               MR. SAVARI:  So I take it, it was someone in my class?
7               THE COURT:  As part of one of the settlements.  He got
8     a notice about something and I -- the tap has to be turned off,
9     okay.  Whatever you can do.  I don't know what you can do, but
10    if you can, do something.
11              MR. SAVARI:  I think we're unaware of -- we'd like to
12    know who it is, because we've been --
13              THE COURT:  I'm not going to do that because I don't
14    want to get embroiled further with this person.  Just do
15    something.
16              MR. SAVARI:  Okay.
17              THE COURT:  Make it bigger in the notice next time.  I
18    don't think you can do anything about this one, but next time
19    let's say a little more up front or say it twice or three
20    times.  I just -- you know, it's a burden.
21              MR. SAVARI:  Yes, Your Honor.
22              THE COURT:  All right.  Good.
23         All right.  Now, let's talk about the motion to withdraw.
24              MS. O'GRADY:  It's Margaret O'Grady from WilmerHale.
25              THE COURT:  Actually, I'm sorry, it was for Digi-Key.
```

1   Somebody who was -- is IPP or DPP?

2           **MR. SAVARI:** Digi-Key, if I have this right, had filed

3   an individual case and had decided to become part of the class.

4           **THE COURT:** The direct purchaser side?

5           **MR. SAVARI:** Yes.

6           **THE COURT:** All right. So it was the DPP side?

7           **MR. SAVARI:** Yes.

8           **THE COURT:** All right. The people involved with

9   Digi-Key, is that --

10          **MR. SAVARI:** It's a distributor, Digi-Key.

11          **THE COURT:** It's a distributor. It has nothing to do

12  with online privacy protection?

13      **MR. HERRERA:** Your Honor, Nick Herrera. I've spoken

14  several times and had email correspondence with this particular

15  potential class member.

16          **THE COURT:** Oh, you know who it is?

17          **MR. HERRERA:** Yes. He's contacted us several times.

18          **THE COURT:** Do me a favor then, if you know who he is.

19          **MR. HERRERA:** I do.

20          **THE COURT:** Whoever you know, tell him do not

21  communicate with the Court. That was in the notice, and I

22  don't want anymore communications. Okay?

23          **MR. HERRERA:** Absolutely.

24          **THE COURT:** All right.

25      On the withdrawal, yes, I'll grant it. But I need you to

```
 1   stay on and just make sure that Nissei gets the copies of
 2   whatever is filed, okay.
 3          MS. O'GRADY:  Your Honor, we can do that.  And we're
 4   happy to forward them anything that's filed.
 5          THE COURT:  Okay.
 6          MS. O'GRADY:  To the extent that their acknowledgment
 7   or permission is needed for that under the local rules, I can't
 8   represent that we'll be able to get that.  But we are happy to
 9   continue forwarding them documents.
10          THE COURT:  You don't have to do anything.  Just pass
11   it on to them.
12          MS. O'GRADY:  We can do that.
13          THE COURT:  I will issue an order granting withdrawal
14   contingent on you provide -- just send it to them.  That's all
15   you have to do.
16          MS. O'GRADY:  Will do.
17          THE COURT:  All right.
18          MS. O'GRADY:  Thank you.
19          MR. SAVARI:  Your Honor, Joseph Savari.
20      At least for now, we'll just keep serving through the ECF
21   then.
22          THE COURT:  That's fine.
23          MR. SAVARI:  Yeah.
24          THE COURT:  Okay.  Now let's discuss the motion for
25   distribution of funds.  Mr. Savari.
```

 1          **MR. SAVARI:**  Mr. Herrera is going to handle that, Your

 2   Honor.

 3          **THE COURT:**  All right.  So, Mr. Herrera, these are the

 4   settlement checks for the class members; right?

 5          **MR. HERRERA:**  Yes, Your Honor.

 6      We have three requests in our undisputed motion.  The

 7   first is to authorize us to make a distribution within 14 days

 8   to all of the settlement class members that have submitted

 9   valid claim forms that have passed the rigorous but fair audit

10   procedures that we described in our motion papers.

11      It's a particularly opportune time to do that now, since

12   about three weeks ago we received a large check from one of the

13   settling defendants, and we have about $11 million, at this

14   point, to distribute.  And we would like to so with --

15          **THE COURT:**  Is the claims period closed?

16          **MR. HERRERA:**  I beg your pardon?

17          **THE COURT:**  Is the claims period closed?

18          **MR. HERRERA:**  I believe it is, Your Honor.

19          **THE COURT:**  All right.  That's fine.  You can

20   distribute it.  But I would prefer you to wait until the claims

21   period is done.

22          **MR. HERRERA:**  It is done.

23          **THE COURT:**  All right.  Done.

24          **MR. HERRERA:**  Great.  The second request --

25          **THE COURT:**  No, you can distribute it.  The motion is

 1  granted.

 2          **MR. HERRERA:**  Yes, Your Honor.  There are two other

 3  requests within our motion.

 4          **THE COURT:**  Oh, all right.

 5          **MR. HERRERA:**  The second request is for the creation

 6  of a holdback fund for a discreet group of settlement class

 7  members, about 18 of them, at this point, Your Honor, that have

 8  requested -- that failed the audit that we described.

 9          **THE COURT:**  Yes.

10          **MR. HERRERA:**  And they are represented by a single

11  counsel.

12          **THE COURT:**  All of them are?

13          **MR. HERRERA:**  All of them are, by one law firm.

14          **THE COURT:**  Oh, okay.

15          **MR. HERRERA:**  And through that law firm have requested

16  an additional opportunity to provide documentation that may or

17  may not pass the audit procedures.

18          **THE COURT:**  How are you going to calculate the

19  holdback?

20          **MR. HERRERA:**  We're calculating the holdback by

21  assuming that all of the holdback claims are -- pass audit.  So

22  we assume that every single dollar passes.

23      We use that as the denominator for all the claims

24  submitted because the allocation formula that Your Honor

25  approved would have a numerator for each claimant to be the

1  commerce for that claimant, and the denominator would be the

2  cumulative, the total commerce for all claimants that have

3  submitted valid claim forms.

4      So for the purpose of the holdback, we assume that

5  these -- commerce that did not pass audit would be part of that

6  denominator.

7          THE COURT:  All right.  That sounds fine.  Just make

8  sure that your holdback would be a hundred percent of the

9  claims and if it's something less than that you can do

10  something else.

11          MR. HERRERA:  Yes, your honor.

12          THE COURT:  The third request.

13          MR. HERRERA:  The third request is for Your Honor to

14  approve Rust's final invoice of $261,000.

15          THE COURT:  That seems awfully high.  Why is that?

16          MR. HERRERA:  Your Honor, in our preliminary approval

17  papers we asked for 200,000.  And the reason why it's $61,000

18  more is, I think we did -- we made extraordinary efforts to get

19  the type of settlement class participation that we've seen in

20  this case.

21      So part of that involved contacting -- making telephone

22  calls by us and also to some degree by Rust -- settlement class

23  members that had large claims that did not submit a claim form.

24  And in discussing with these claimants we had to rely on the

25  claims administrator to be able to email --

1              **THE COURT:**  All I got was this one-page bill.  I mean,

2    what did they do that cost an extra 60 grand?

3              **MR. HERRERA:**  The extra $60,000 was, I think,

4    responding to many of our requests, where we contacted

5    literally hundreds of direct purchaser plaintiffs beyond what

6    was required by the Court.  Individual contact.  Telephone

7    email.

8         Many of these class members requested additional

9    information.  They wanted their claim forms resubmitted to

10   them.  They had questions concerning the timing and the amount

11   of the distributions, the allocation formula.  And while we

12   handled the bulk of those calls, Rust, the claims

13   administrator, had to do so as well.

14        In addition, Your Honor, one of the things that happened

15   with round one was the transactional data, the claim forms with

16   transactional data that we received from the defendants went

17   relatively smoothly.  In fact, a hundred percent of them are

18   going to be getting distributions.

19        There were certain third parties that submitted hundreds

20   of claim forms that were blank.  And there was no basis for us

21   to believe that they were, in fact, settlement class members;

22   but, nevertheless, we had to provide them with a fair

23   opportunity to make their claim.  And many of them ended up

24   having to rely on the resources from Rust to get claim form

25   information and others -- and other information to get to the

 1   point where we could deny those claims.

 2          **THE COURT:**  What has been the -- thank you.

 3      What has been the claim rate?

 4          **MR. HERRERA:**  We're pleased with the claim rate, Your

 5   Honor.  For round one we have received 716 claims, of which 280

 6   had prepopulated claim forms and are valid.

 7      That represents -- while that represents less than

 8   15 percent by number of the class, it does represent 67 percent

 9   of the commerce that we believe -- the direct purchaser

10   commerce.  So we're gratified with that relatively high

11   participation rate.

12      In round two -- and I know Mr. Savari will talk about

13   that -- we pushed it up even higher.  We now have 77 percent of

14   all commerce in this case that's willing to participate.  And

15   the number, now 400 prepopulated claim forms, has effectively

16   almost doubled the participation rate by individual claimants.

17   So I think that this is extraordinarily successful.

18          **THE COURT:**  In light of that, let's -- 260 is fine.

19   But next time build that in when you estimate what the claims

20   will be.  Now you know --

21          **MR. HERRERA:**  Right.

22          **THE COURT:**  -- what you're going to end up doing, so

23   just bake that in before you tell me what the fee is going to

24   be, okay.

25          **MR. HERRERA:**  Yes, Your Honor.

1        **THE COURT:**  All right.

2       **MR. HERRERA:**  May I put one thing on the record?

3    I spoke with the counsel that represents the holdback, and

4 we have -- we have an orderly and expeditious schedule by which

5 we would present to Your Honor the results of the continuing

6 audit process.  And we hope to wrap that up by September 10th.

7 And if it would be appropriate, I would like to read the dates

8 into the record.

9        **THE COURT:**  Are you anticipating disputes I'm going to

10 have to resolve?

11       **MR. HERRERA:**  No.  What I anticipate is that within

12 this audit process we'll make a determination based upon the

13 protocols that are set forth in our papers.

14    I imagine that if we do not pass all of the claims through

15 audit that counsel will likely contest it.  And so we have a

16 mechanism that would allow for the resolution of any claims

17 that we couldn't resolve in our meet-and-confer process to be

18 resolved with reasonable alacrity.

19        **THE COURT:**  Okay.

20       **MR. HERRERA:**  And what we had in mind, Your Honor, is

21 that by June 25th, the holdback claimants would provide an

22 electronic report of all of their supposedly qualifying

23 purchases.

24    By July 9th, they would provide us with --

25        **THE COURT:**  How about this.  Just do a stipulation.

1        **MR. HERRERA:**  Yes, Your Honor.

2        **THE COURT:**  And have your opponent sign it.

3        **MR. HERRERA:**  Okay.  We'll file that forthwith.

4        **THE COURT:**  All right.

5        **MR. HERRERA:**  Thank you, Your Honor.

6        **THE COURT:**  That's that one.

7     All right.  Final approval of the Hitachi and Soshin

8   settlements.

9        **MR. SAVARI:**  Joseph Savari for the direct purchaser

10  plaintiffs.

11       **MR. BANK:**  Jeff Bank for Hitachi Chemical.

12       **MR. FOIX:**  Danyll Foix for Soshin Companies.

13       **THE COURT:**  All right.  So no objections?

14       **MR. SAVARI:**  No.

15       **THE COURT:**  Everybody is happy?

16       **MR. SAVARI:**  I think they are quite happy.

17     And I just go back to one of the things Mr. Herrera said.

18  We have a very high claims rate, which indicates support from

19  class members --

20       **THE COURT:**  What is it for this one?

21       **MR. SAVARI:**  I beg your pardon?

22       **THE COURT:**  What is the claims rate?  Is the -- was

23  that a blended rate for all of the settlements?

24       **MR. SAVARI:**  The current rate, based on the claim

25  forms we have right now, constitute approximately 78 percent of

1    the -- of the commerce in the class.

2         And we've -- we've looked to see if we could find another

3    case where we had a claims rate that high, and we haven't been

4    able to find one.

5         So we've worked very hard on that.  So we're quite --

6    we're quite proud of that, and we think it's really good work.

7              **THE COURT:**  That is good.

8         There will be a little bit of money left over?  Will there

9    be any unclaimed funds?

10             **MR. SAVARI:**  So far, based on what we are doing, we're

11   trying to get to zero so that it's fully distributed --

12             **THE COURT:**  You're doing kind of a rolling pro rata

13   thing?

14             **MR. SAVARI:**  Yes.

15             **THE COURT:**  All right.

16             **MR. SAVARI:**  We just asked you to send out the first

17   round of checks.

18             **THE COURT:**  Yes.

19             **MR. SAVARI:**  So we will have more information later

20   about whether there's any incidents of unclaimed checks.

21             **THE COURT:**  All right.

22             **MR. SAVARI:**  My experience is, given the size of the

23   checks we're writing, that the likelihood that these checks are

24   going to end up in someone's drawer or not cashed is relatively

25   low.

1        **THE COURT:**  Just give me an example what the average

2   check size is per claimant.

3        **MR. SAVARI:**  Okay.  Here, I have some data.  The

4   average -- so the average check size is $73,000.

5        **THE COURT:**  Really?

6        **MR. SAVARI:**  The biggest is 4.9 million.  We have some

7   checks that are less than a hundred dollars.

8        **THE COURT:**  4.9 to one claimant?

9        **MR. SAVARI:**  Yeah.  So we think that's a significant

10  payout.  And that's -- you know, that represents the value that

11  we've been able to create for the --

12       **THE COURT:**  So the average check has been 73,000?

13       **MR. SAVARI:**  73,000.

14      And so, Your Honor, I think that when we come back when we

15  have more information, I suspect that the amount of residual

16  will be quite low because people are -- I expect they're going

17  to cash the checks.

18      We want to get the second round of checks also out by the

19  end of this year, too, because I think it's important for a

20  whole bunch of reasons to get the --

21       **THE COURT:**  By the end of the year?  By the end of the

22  summer, should be; right?

23       **MR. SAVARI:**  Well, if you approve the Hitachi and

24  Soshin settlement, we're going to be prepared to go through

25  that process and get the checks out faster.  We'd like to get

1    it out by the fall.

2         **THE COURT:**  Yes.

3         **MR. SAVARI:**  Things sometimes slip.

4        Also, Your Honor, I think that now that we've done all

5    this work with Rust, that the expenses -- a lot of these

6    expenses that you commented on were one-time expenses that we

7    had to go through when we were getting this thing up and

8    running.

9         **THE COURT:**  Learning curve expenses, that's fine, but

10   now they know what to do and --

11        **MR. SAVARI:**  I think you'll see that the marginal

12   expenses will drop as a consequence of that.

13        **THE COURT:**  Okay.  Good.

14       Soshin, anything to add?

15        **MR. FOIX:**  No, Your Honor.

16        **THE COURT:**  It's approved.  I need to look at the fees

17   a little bit more.  The settlement is approved.  The final

18   distribution you can start doing.

19       I just have to go through the attachments a little bit

20   more with the fees motion.  I'm not expecting any problems.  If

21   there are, I will let you know.

22       Consider the settlement finally approved.

23        **MR. SAVARI:**  Thank you, Your Honor.  Appreciate it.

24        **THE COURT:**  Thank you.

25        **MR. FOIX:**  Thank you, Your Honor.

1          **THE COURT:**  All right.  This is for Avnet.  Soshin for

2     Avnet.  Motion to dismiss.  Benchmark too.  Are you going to do

3     both?

4          **MR. TURKEN:**  Yes, Your Honor.

5          **THE COURT:**  Anything to add -- is it Mr. Foix?

6          **MR. FOIX:**  Yes, Your Honor.

7          **THE COURT:**  Am I saying it the right way?

8          **MR. FOIX:**  You are.

9          **THE COURT:**  Good.  Anything to add?

10          **MR. FOIX:**  Well, in addition to what we put in the

11     brief, Your Honor, we believe that the two rationales that we

12     advocated for dismissal are both not previously presented to

13     the Court, and that both of them are meritorious and are both

14     grounds for dismissal.

15          The first one is that neither the Avnet nor the Benchmark

16     complaint plausibly allege that Soshin joined and participated

17     in the alleged conspiracy to fix U.S. capacitor prices when

18     Soshin didn't sell capacitors in the U.S.

19          And we acknowledge that this motion is premised on asking

20     Your Honor not to credit the boilerplate allegation that Soshin

21     sold capacitors in the United States.  And there are several

22     reasons why those allegations shouldn't be credited.  We

23     covered them --

24          **THE COURT:**  Well, it's a motion to dismiss, you know.

25          **MR. FOIX:**  Right.  And allegations that are

1  boilerplate or unexplained aren't credited on a Rule 12(b)(6)

2  motion to dismiss.

3  　　　　**THE COURT:**  Well, okay.

4  　　Mr. Turken.

5  　　　　**MR. TURKEN:**  Your Honor, I have to observe the paradox

6  that Soshin is asking this Court to dismiss Avnet's and

7  Benchmark's --

8  　　　　**THE COURT:**  I know what you're going to say.  Yes, I

9  was wondering about that too.  But that's what they're going to

10  do.

11  　　　　**MR. TURKEN:**  But there's an element to the paradox.

12  It's not just the settlement.  No, it's not just the

13  settlement.  It's the fact that the settlement of $3.9 million

14  is justified by Soshin's agreement to provide what the DPP's

15  say is substantial cooperation to prove the conspiracy that

16  Soshin says is implausible.  There's an issue with that.

17  　　And the fact that we're here to address what Soshin

18  argues -- as I said, there are two bases in their motion to

19  dismiss.

20  　　The first basis was virtually verbatim the same issue that

21  Your Honor denied when they filed their motion, their phase two

22  FTAIA motion for summary judgment.  And that is that without

23  the allegations that Soshin sold in the United States, which

24  there is no basis to disregard, they have no -- their claim

25  fails or our claim fails based on the FTAIA.  Well, Your Honor,

addressed that by holding that Soshin could be liable for participating in the conspiracy even if it didn't have any sales in the United States.

The second claim, that there are no plausible allegations of their participation in the conspiracy, putting aside the paradox, when Your Honor denied Soshin's motion to dismiss way back when, they had one allegation of one meeting. In our complaint, we have 17 specific allegations of meetings that Soshin attended, that we believe were conspiratorial.

Now, Soshin may dispute that. Soshin may claim that these were just trade association meetings. But this is a motion to dismiss, and it doesn't seem appropriate for them to be contesting the merits of the allegations on a motion to dismiss.

**THE COURT:** Mr. Foix, what about the cognitive dissonance point?

**MR. FOIX:** Well, I think that's easily explained.

As the settlement agreement stated, Soshin decided to settle because it wanted to reach peace. It didn't want to be inconvenienced anymore by defending against the claims by the DPPs.

It's not an acknowledgment that there was any merit to any of those claims. It was simply a business decision. And the --

**THE COURT:** Maybe I'm wrong, you can tell me, but

1   Soshin did say it would work with the Department of Justice;

2   right?

3         **MR. FOIX:**  Well, that was a provision that was in the

4   settlement agreement.  That's a common provision in settlement

5   agreements like this.

6       I don't think that alone is indicative of Soshin having

7   any belief in the merits of the allegations that were made

8   about the conspiracy.

9       And Mr. Turken made a point about how the Court's FTAIA

10  ruling, I think as he explained it, essentially is duplicative

11  or dispositive of this current motion to dismiss.

12      And I think there's a very important distinction between

13  what was addressed in the FTAIA ruling and what is being

14  presented here.

15        **THE COURT:**  What is that?

16        **MR. FOIX:**  The FTAIA ruling in Your Honor's phased

17  approach looked at whether certain types of sales were within

18  the reach of the Shermann Act.  It did not take the next step,

19  as we understand your ruling, at determining whether parties --

20        **THE COURT:**  You fell into one of the actionable

21  buckets?

22        **MR. FOIX:**  Right.

23        **THE COURT:**  That was the next step.  Did the facts

24  say, "I fell into one of these buckets"?  And you're saying,

25  "The facts don't show that we were within one of these

 1  buckets."

 2          **MR. FOIX:**  Right.  The facts show that we were not

 3  within one of those buckets.  The next step is --

 4          **THE COURT:**  I appreciate all that, but it is a

 5  12(b)(6) motion, Mr. Foix.

 6          **MR. FOIX:**  Yes.

 7          **THE COURT:**  They get the benefit of the doubt.  It's

 8  certainly plausible under Rule 8.  It may be the most

 9  inaccurate thing said in the world, but that's not the test.

10  The test is, is it plausible?

11      It was plausible.  So how do we get to the punchline of

12  dismissal?

13          **MR. FOIX:**  Well, I don't think that Your Honor has

14  ruled to this point that the allegations that we are

15  challenging now were, in fact, plausibly pled.

16      The prior motions to dismiss looked generally at this

17  overall conspiracy.  And Mr. Turken was right.  Soshin filed a

18  motion to dismiss on its own that said the allegations that we

19  allegedly participated in trade association meetings did not

20  plead enough to show we joined and participated in a

21  conspiracy.  Your Honor rejected that argument by Soshin, and

22  we're not making it again today.

23      What we are arguing now is different.  We are arguing that

24  with Soshin not having any sales of capacitors in the

25  United States, it is not plausible to infer that Soshin has

1  joined and participated in a conspiracy to fix the prices of

2  capacitors in the United States.

3      And in Your Honor's phase one ruling, you described and

4  you also pointed out that no parties are disputing that this is

5  a conspiracy focused on fixing prices of capacitors in the

6  United States.  And we are simply saying, I think it's very

7  straightforward, we didn't sell capacitors in the

8  United States.

9      It's not plausible to infer that Soshin participated in a

10  conspiracy to sell capacitors in the United States.  In fact,

11  that would be implausible because the consequence of that

12  conspiracy, if you are to credit it, would be that Soshin would

13  be joining a conspiracy to benefit competitors who would

14  receive higher prices for sales that Soshin is not making.  And

15  that's not economically rational and, therefore, implausible.

16          **THE COURT:**  All right.  Mr. Turken, final word.

17      **MR. TURKEN:**  Your Honor, the allegations are that

18  Soshin participated in a worldwide conspiracy that included the

19  United States.

20      And if Soshin in fact -- if the evidence demonstrates that

21  Soshin participated in that worldwide conspiracy that includes

22  the United States, then it doesn't matter what Soshin

23  specifically sold to.  That's the whole purposes of joint and

24  several liability.

25      This, again, assumes that we are striking the allegations

1      that Soshin sold into the United States, which is completely

2      unjustified.

3          But even if we went to that stage, if we start down the

4      road of saying that, well, if you participate in a worldwide

5      conspiracy, and the conspirators admittedly sold in the

6      United States -- which we know they did with all of the various

7      guilty pleas and all of the evidence -- then joint and several

8      liability only applies to what everybody sold.  So we're not

9      going to have joint and several liability anymore.  Instead,

10     you're only going to be liable for what you sold.

11         And if their comment is, well, it is implausible that they

12     participated in a conspiracy that involved the United States,

13     if they didn't sell to the United States, again, it's a

14     worldwide conspiracy.

15         So plausibility has nothing to do with the notion of joint

16     and several liability in this particular context.  So it

17     doesn't seem to us that we could be going down this road,

18     because if we do then what we're going to have to do is parse

19     out each participant in the conspiracy's sales.

20         And then we're going to have to say, well, since that

21     participant only sold in Europe and in Taiwan, or that

22     participant only sold in the United States and Japan, that

23     we're going to then look at only those sales, that's not what

24     the antitrust laws are built upon.  And that's why the Court's

25     ruling that joint and several liability still survives is still

1    critical.

2          And I'll go back to, again, the very simple standpoint:

3    How is it possible that Soshin is providing substantial

4    assistance to prove a conspiracy that's not plausible?

5          So, Your Honor, we think that that argument just fails

6    from the outset.

7                **THE COURT:**  All right.

8                **MR. FOIX:**  Your Honor, may I respond?

9                **THE COURT:**  Very quickly, yes.

10               **MR. FOIX:**  Yes.  The complaint doesn't allege a

11   worldwide conspiracy.  It alleges a conspiracy to fix prices in

12   the United States.

13         In two paragraphs it says "in the United States and

14   elsewhere."  "Elsewhere" is not defined.  It doesn't say

15   "worldwide."  Elsewhere could be one other country, two other

16   countries.  I don't think you can credit the word "elsewhere"

17   to mean worldwide.

18         The points about joint and several liability, that only is

19   reached if Soshin is found to have jointly participated in the

20   conspiracy, which, as we argued in our briefs and today, we

21   don't think that's plausibly alleged.

22               **THE COURT:**  Okay.  Thank you.  I'll have this out

23   soon.

24         All right.  I think that's it.  Thank you.

25               **MR. SAVARI:**  Your Honor.

 1          THE COURT:  Yes.

 2          MR. SAVARI:  One more thing.  You had asked us to try

 3   to get together with the defendants on a schedule for the rest

 4   of the litigation.

 5          THE COURT:  Yes.

 6          MR. SAVARI:  We've worked very hard.  I think we're

 7   getting quite close.  I'm hoping to get the schedule submitted

 8   to you next week.

 9       I have one question.

10          THE COURT:  Okay.

11          MR. SAVARI:  Which is, we are contemplating a trial in

12   September of -- no, in October of 2019.  It would be good to

13   know right now, or as soon as we could, if that would be

14   available --

15          THE COURT:  You know, it's actually a timely question.

16   I was just looking at this for something else.

17       I think in that time period I am expecting to have a major

18   time conflict in September and October of 2019.  I think it's

19   virtually certain that it's going to happen, and it's going to

20   take up all of my day.

21       So I'm glad you asked.  I would prefer, can we do July of

22   2019?

23          MR. SAVARI:  We're -- if -- we're going to shoot for

24   that.  We're going to have to recalibrate a lot --

25          THE COURT:  I would prefer to do it earlier and not

 1 | later.  The first stop would be first quarter of 2020, and

 2 | that's a lifetime away.

 3 |          **MR. SAVARI:**  It's useful information.

 4 |          **THE COURT:**  I'm glad you asked.  I really would favor

 5 | the summer of 2019.  Strongly favor the summer.

 6 |          **MR. SAVARI:**  We're going to have some work to do.  I

 7 | think that's fair to say.  But we'll talk.

 8 |          **THE COURT:**  All right.  Is that a problem?

 9 |          **MR. SAVARI:**  Thank you.

10 |          **MR. ZAPALA:**  No.  The intervals have been heavily

11 | negotiated, and I think we're going to have to take another

12 | look at those intervals.

13 |          **THE COURT:**  Back them up four weeks or something.

14 |          **MR. ZAPALA:**  Yeah, we'll have to, because there's no

15 | way we can get to the July date without doing so.

16 |          **THE COURT:**  Well, August.

17 |          **MR. ENSON:**  Your Honor, Eric Enson, with Jones Day, on

18 | behalf of the Holy Stone defendants.

19 |     One of the major problems with having a trial in the

20 | summer of 2019 is that as we are currently negotiating the

21 | schedule, the plaintiffs' expert reports would not be due

22 | until -- I think it's December of 2018.  And then we have to

23 | deal with summary judgment as well as rebuttal reports, which

24 | jams things up.

25 |     Having a trial at that time is going to be difficult, I

1    think, given the time frame by which the expert reports are

2    served.

3            THE COURT:  Well, do the expert reports in November.

4    What's wrong with that?

5            MR. SAVARI:  I think it's -- now that we know about

6    September and October on your calendar, I think we need to have

7    a discussion.  And we'll try to get this figured out and get it

8    to you --

9            THE COURT:  I would strongly favor July, or August at

10   the latest, of 2019.  The next stop is going to be after the

11   first of the year.

12           MR. SAVARI:  Okay.

13           THE COURT:  It would be like February 2020.  That's

14   the next stop.

15       I know part of it is a pipeline issue on my end.  But,

16   nevertheless, trial a year from now seems doable.  This case

17   has been around since 2014.

18       If you can't work it out, let me know.  But you should be

19   able to kick things back a mere four to five weeks each and

20   meet the trial deadline.

21           MR. ENSON:  We have been negotiating for quite some

22   time.  We're very close.  This information is helpful.  We'll

23   go back and try to get a schedule and get it to you soon.

24           MR. SAVARI:  Yes.

25           THE COURT:  Why are these negotiations so complicated?

```
 1   Forget I asked.

 2         (Laughter)

 3             MR. ENSON:  We're close, Your Honor.  We're close.

 4         THE COURT:  Thanks for coming in.

 5         THE CLERK:  All rise.  Court is in recess.

 6         (At 11:55 a.m. the proceedings were adjourned.)

 7                           -   -   -   -

 8

 9                      CERTIFICATE OF REPORTER

10         I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:   Friday, June 8, 2018

14

15

16                      Katherine Sullivan

17   _____

18         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                      U.S. Court Reporter
19

20

21

22

23

24

25
```