**[Counsel for Moving Defendants Listed on Signature Pages]**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **IN RE CAPACITORS ANTITRUST LITIGATION** | ) ) ) | MDL No. 2801 |
| _____ | ) ) | Master File No.: 3:17-md-02801-JD |
| This Document Relates to: | ) ) | **CERTAIN DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. LESLIE M. MARX** |
| Case Nos.: 3:14-cv-03264-JD, | ) ) | |
| 3:17-cv-03472-JD, | ) ) | **ORAL ARGUMENT REQUESTED** |
| 3:17-cv-07046-JD, | ) ) | Date: August 29, 2019 |
| 3:17-cv-07047-JD, | ) ) | Time: 10:00 a.m. |
| 3:18-cv-02657-JD. | ) ) | Judge: Hon. James Donato |
| | ) ) ) ) ) | Location: Courtroom 11 |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

  **PLEASE TAKE NOTICE** that on August 29, 2019 at 10:00 a.m., or as soon thereafter as the matter may be heard, the undersigned Defendants[1] will and hereby do move the Court, under Rules 104(a) and 702 of the Federal Rules of Evidence, to exclude the testimony of Dr. Leslie M. Marx, expert for the five Direct Action Purchaser Plaintiffs ("DAPs"), because that testimony is unreliable as defined by those rules and the interpretation of them as specified by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

  This motion is based upon this Notice of Motion; the accompanying Memorandum of Points and Authorities; the declaration of Dr. Laila Haider ("Haider Decl.") and exhibits thereto; the declaration of Dr. Stephen Prowse ("Prowse Decl.") and the exhibits thereto; and the declaration of Justin A. Cohen ("Cohen Decl.") and the exhibits thereto, all filed herewith and incorporated by reference herein;  the complete files and records in these consolidated actions; oral argument of counsel; and such other and further matters as the Court may consider.

**STATEMENT OF ISSUE TO BE DECIDED**

  A. Whether Dr. Marx's econometric model, which forms the entire basis for her damages conclusions, is unreliable and therefore inadmissible under FED. R. EVID. 702.

  B. Whether Dr. Marx's testimony concerning the "reasonableness" or "plausibility" of the DAPs' claim of the existence of a cartel among capacitor manufacturers should be excluded because it is unsupported by the evidence, outside the scope of her expertise, and adds nothing to the record.

---

[1] "Defendants" are AVX Corporation, Elna Co., Ltd., Elna America, Inc., Hitachi Chemical Co., Ltd., Hitachi AIC Inc., Hitachi Chemical Co. America, Ltd., Holy Stone Enterprise Co., Ltd., Holy Stone Polytech Co. Ltd., Vishay Polytech Co., Ltd., Milestone Global Technology, Inc. (d/b/a HolyStone International), Matsuo Electric Co., Ltd., Nichicon Corporation, Nichicon (America) Corporation, Nippon Chemi-Con Corporation, United Chemi-Con, Inc., Rubycon Corporation, and Rubycon America Inc.  The Hitachi Chemical, Holy Stone, Nichicon, and Rubycon Defendants join this motion only as to AASI, Avnet, and Benchmark. AVX joins this motion only as to AASI, Benchmark, and Flextronics.

1    DATED:  June 14, 2019

2                               Respectfully submitted,

3    **WILSON SONSINI GOODRICH & ROSATI**          **K&L GATES LLP**
     Professional Corporation

4                                                  *s/ Michael E. Martinez*
     *s/ Jonathan M. Jacobson*                     Michael E. Martinez (admitted *pro hac*
5    Jonathan M. Jacobson                          *vice*)
     Chul Pak (admitted *pro hac vice*)            Scott M. Mendel (admitted *pro hac vice*)
6    Jeffrey C. Bank (admitted *pro hac vice*)     Steven M. Kowal (admitted *pro hac vice*)
     Justin A. Cohen (admitted *pro hac vice*)     Lauren N. Donahue (admitted *pro hac vice*)
7    1301 Avenue of the Americas, 40th Floor       Brian J. Smith (admitted *pro hac vice*)
     New York, New York 10019                      70 West Madison Street, Suite 3300
8    Telephone:  (212) 497-7758                    Chicago, Illinois 60602
     Facsimile:  (212) 999-5899                    Telephone:  (312) 372-1121
9    jjacobson@wsgr.com                            Facsimile:  (312) 827-8000
     cpak@wsgr.com                                 michael.martinez@klgates.com
10   jbank@wsgr.com                                scott.mendel@klgates.com
     jcohen@wsgr.com                               steven.kowal@klgates.com
11                                                 lauren.donahue@klgates.com
     Jeff VanHooreweghe (Bar No. 313371)           brian.j.smith@klgates.com
12   One Market Plaza
     Spear Tower, Suite 3300                       Daniel W. Fox (SBN 268757)
13   San Francisco, California 94105               4 Embarcadero Center, Suite 1200
     Telephone:  (415) 947-2046                    San Francisco, California  94111
14   Facsimile:  (415) 947-2099                    Telephone:  (415) 882-8200
     jvanhooreweghe@wsgr.com                       Facsimile:  (415) 882-8220
15                                                 daniel.fox@klgates.com
     *Counsel for Defendants Hitachi Chemical Co.,*
16   *Ltd., Hitachi AIC Inc., and Hitachi Chemical*    Philip Van Der Weele (admitted *pro hac*
     *Co. America, Ltd.*                           *vice*)
17                                                 One SW Columbia Street, Suite 1900
                                                   Portland, Oregon 97258
18                                                 Telephone:  (503) 228-3200
                                                   Facsimile:  (503) 553-6227
19                                                 phil.vanderweele@klgates.com

20                                                 *Counsel for Defendants Nichicon*
                                                   *Corporation and Nichicon (America)*
21                                                 *Corporation*

22

23

24

25

26

27

28

1

**JONES DAY**

2

*s/ Jeffrey A. LeVee*
Jeffrey A. LeVee (State Bar No. 125863)

3

Eric P. Enson (State Bar No. 204447)
Kelly M. Ozurovich (State Bar No. 307563)

4

555 South Flower Street, Fiftieth Floor
Los Angeles, California  90071

5

Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539

6

jlevee@JonesDay.com
epenson@JonesDay.com

7

kozurovich@jonesday.com

8

*Counsel for Defendants Holy Stone Enterprise*
*Co., Ltd., Milestone Global Technology, Inc.*

9

*(d/b/a HolyStone International), and Vishay*
*Polytech Co., Ltd.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DENTONS US LLP**

*s/ Bonnie Lau*
Bonnie Lau
One Market Plaza
Spear Tower, 24th Floor
San Francisco, California 94105
Telephone:  (415) 882-5083
Facsimile:  (415) 267-4198
bonnie.lau@dentons.com

*Counsel for Defendant Matsuo Electric*
*Co., Ltd.*

1

**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**

2

3

*s/ Charles Rule*
Charles "Rick" Rule (admitted *pro hac vice*)
Joseph J. Bial (admitted *pro hac vice*)
2001 K Street, NW
Washington, DC 20006
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7430
rrule@paulweiss.com
jbial@paulweiss.com

4

5

6

7

Johan E. Tatoy (admitted *pro hac vice*)
Sara E. Hershman (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10128
Telephone:  (212) 373-3830
Facsimile:  (212) 757-3990
jtatoy@paulweiss.com
shershman@paulweiss.com

8

9

10

11

**KAUFHOLD GASKIN LLP**

12

13

Steven Kaufhold (SBN 157195)
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 445-4621
Facsimile: (415) 874-1071
skaufhold@kaufholdgaskin.com

14

15

16

*Counsel for Defendants Nippon Chemi-Con*
*Corporation and United Chemi-Con, Inc.*

17

**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**

*s/ Heather S. Nyong'o*
Heather S. Nyong'o (CA SBN 222202)
1 Front Street, Suite 3500
San Francisco, California 94111
Telephone:  (628) 235-1000
Facsimile:  (628) 235-1001
heather.nyongo@wilmerhale.com

Thomas Mueller (admitted *pro hac vice*)
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
thomas.mueller@wilmerhale.com

Chris Johnstone (CA SBN 242152)
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
chris.johnstone@wilmerhale.com

*Counsel for Defendants Elna Co., Ltd. and*
*Elna America, Inc.*

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| **MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.** | **SHEARMAN AND STERLING LLP** |
| *s/ Evan S. Nadel* | *s/ Djordje Petkoski* |
| Evan S. Nadel | Djordje Petkoski (admitted *pro hac vice*) |
| 44 Montgomery Street, 36th Floor | David A. Higbee (admitted *pro hac vice*) |
| San Francisco, California 94104 | Ryan Shores (admitted *pro hac vice*) |
| Telephone: (415) 432-6000 | Todd M. Stenerson (admitted *pro hac vice*) |
| Facsimile: (415) 432-6001 | Mark G. Weiss (admitted *pro hac vice*) |
| enadel@mintz.com | Deke Shearon (admitted *pro hac vice*) |
| | 401 9th St., NW |
| Bruce D. Sokler (admitted *pro hac vice*) | Washington, DC 20004 |
| Robert G. Kidwell (admitted *pro hac vice*) | Telephone: (202) 508-8000 |
| 701 Pennsylvania Avenue NW, Suite 900 | Facsimile: (202) 508-8100 |
| Washington, DC 2004 | djordje.petkoski@shearman.com |
| Telephone: (202) 434-7300 | david.higbee@shearman.com |
| Facsimile: (202) 434-7400 | ryan.shores@shearman.com |
| bdsokler@mintz.com | todd.stenerson@shearman.com |
| rgkidwell@mintz.com | mark.weiss@shearman.com |
| | deke.shearon@Shearman.com |
| *Counsel for Defendant AVX Corporation* | |
| | John Cove (SBN 212213) |
| | 535 Mission Street, 25th Floor |
| | San Francisco, California 94105 |
| | Telephone: (415) 616-1139 |
| | Facsimile: (415) 616-1199 |
| | john.cove@shearman.com |
| | |
| | *Counsel for Defendants Rubycon Corporation and Rubycon America Inc.* |

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from each of the above signatories.

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITY ................................................................. 1

I.      DR. MARX'S MODEL ............................................................................................ 2

II.     ARGUMENT .......................................................................................................... 4

     A.     Based on the *Daubert* indicia of reliability, the overcharge model of Dr. Marx is unreliable and hence inadmissible. .............................................. 4

         1.     The results of Dr. Marx's model depend on her arbitrary decision as to which there is no controlling standard. ..................................................... 5

         2.     Dr. Marx's methodology of using a price index as the dependent variable in her regression equations is not generally accepted in the professional economics community and has not been subjected to peer review. ................................................................................................. 8

     B.     Dr. Marx's model is inadmissible because it imposes an artificial pattern on the monthly overcharges of each year that bears no relation to any of the allegations of how the cartel impacted prices. ........................................ 10

     C.     Section III of Dr. Marx's report should be excluded because her AVX/KEMET testimony is unsupported by the evidence and her remaining testimony is outside the scope of her expertise and adds nothing to the record. ...................................................................................................... 11

         1.     Dr. Marx cannot testify that AVX and KEMET were part of a conspiracy among capacitor manufacturers. ............................................ 12

         2.     Dr. Marx cannot offer opinions or testimony purporting to support the existence of a capacitor cartel. ............................................................ 13

III.    CONCLUSION ..................................................................................................... 15

## TABLE OF AUTHORITIES
### CASES

**Page(s)**

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
  135 F. Supp. 2d 1031 (N.D. Cal. 2001) ...............................................................7

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  No. 09 Civ. 2227 (PAC),
  2015 WL 5003528 (S.D.N.Y. Aug 20, 2015),
  *aff'd*, 899 F.3d 87 (2d Cir. 2018),
  *cert. denied*, 139 S. Ct. 1375 (2019) .............................................................9, 13

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...............................................................................................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ........................................................................... *passim*

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014) ................................................................................4

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..............................................................................................5

*Guidroz-Brault v. Mo. Pac. R. Co.*,
  254 F.3d 825 (9th Cir. 2001) ..............................................................................12

*Ilyia v. Khoury*,
  671 F. App'x 510 (9th Cir. 2016) ........................................................................14

*In re Electronic Books Antitrust Litig.*,
  Nos. 11 MD 2293 (DLC),
  12 Civ. 3394 (DLC),
  2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ..............................................10, 11

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  Civil Action Nos. 06-1782, 03-4730, 06-4305, 06-4114, 06-4115,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017) .........................................................10

*JamSports & Entm't, LLC v. Paradama Prods., Inc.*,
  No. 02 C 2298,
  2005 WL 14917 (N.D. Ill. Jan. 3, 2005) .............................................................13

*LinkCo, Inc. v. Fujitsu Ltd.*,
  No. 00 Civ. 7242 (SAS),
  2002 WL 1585551 (S.D.N.Y. July 16, 2002) ......................................................14

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ................................................................................14

*Reed Construction Data Inc. v. McGraw-Hill Companies Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014),
    *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ...................................................................................7

### RULES

Fᴇᴅ. R. Eᴠɪᴅ. 702 ................................................................................................... *passim*

## MEMORANDUM OF POINTS AND AUTHORITY

Dr. Leslie M. Marx is the damages expert for five opt-out plaintiffs: AASI, Avnet, Benchmark, Arrow, and Flextronics (collectively, the "Direct Action Plaintiffs" or "DAPs"). The undersigned Defendants move to exclude the testimony of Dr. Marx under Rule 702 of the Federal Rules of Evidence.  The basis of the motion is that each of Dr. Marx's econometric models (one for each type of capacitor dielectric) – the entire basis for her opinion – is unreliable and inadmissible under Rule 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

Each of Dr. Marx's econometric models depends entirely on what Dr. Marx has described as an "annual cartel indicator variable."  For unexplained reasons, Dr. Marx has arbitrarily chosen to start the variable in January of each year and then have the variable "reset" the following January.  But starting this variable in January has no meaningful nexus to the facts. Despite this, the starting month has an outcome determinative impact on Dr. Marx's results. Indeed, when Dr. Marx's models are tested by changing the starting month for which the annual cartel indicator variable is defined, the models produce absurd outcomes – including a "negative infinity" overcharge – demonstrating that the models are arbitrarily specified and hence not reliable.  The fact the Dr. Marx avoids absurd results only by marking an arbitrary decision in specifying the starting month for her annual cartel variable alone requires exclusion under *Daubert*.

In addition, Dr. Marx's model must be excluded because (1) it is not generally accepted in the professional economics community and has not been subjected to peer review or publication; and (2) the pattern of percentage overcharges her model generates bears no relation to any of the allegations of how the cartel impacted prices.  Finally, Dr. Marx includes impermissible testimony in Section III of her report concerning the "reasonableness" or "plausibility" of the DAPs' claim of the existence of a cartel among capacitor manufacturers. This testimony should be excluded because it is nothing more than quotes from or citations to documentary evidence from public sources or produced by the parties in discovery.

For the reasons that follow, Defendants respectfully request the Court exclude Dr. Marx's purported expert testimony.

## I.    DR. MARX'S MODEL

Dr. Marx has constructed three econometric models, one for each dielectric, namely aluminum, tantalum, and film, to assess purported overcharges in prices paid by DAPs for their capacitor purchases from the defendants.  Haider Decl. ¶ 4.  Each of these models is expressed as an equation, which is referred to as a "regression equation."[2]

Although this motion does not require a deep dive into mathematics or statistics, it is necessary to define a few terms to discuss Dr. Marx's model:

- Dependent Variable: The variable on the left-hand side of the regression equation is the "dependent" variable.  It is called the dependent variable because the model assumes changes in this variable depend only upon changes in the variables on the right-hand side of the equation.  In Dr. Marx's model, and as explained in more detail in connection with the "Monthly Fisher Price Index," the dependent variable is an aggregate measure of the prices of certain capacitors.

- Explanatory Variables: The variables on the right-hand side of the regression equation are called "explanatory" variables, because they are intended to explain changes in the dependent variable on the left-hand side of the regression equation.  Most of the explanatory variables in Dr. Marx's model relate to the supply of and demand for capacitors.

- Annual Cartel Indicator Variable: Dr. Marx's explanatory variables also include an "annual cartel indicator variable."  Unlike other explanatory variables in the model, the annual cartel indicator variable is not related to the supply of or demand for capacitors.  Rather, it is a special variable designed to measure the impact of the assumed conspiracy.  As discussed in section II-A-1 below, Dr. Marx has 14 annual cartel indicator variables.

- Monthly Fisher Price Index: As the dependent variable on the left-hand side of the regression equation, Dr. Marx has created a monthly "Fisher price index."  Cohen Decl., Ex. A,

---

[2] Because the methodology for each of the models is the same, Cohen Decl., Ex. A ¶¶ 97-149, we will, for ease of reference, refer to a single (regression) equation or single model, even though there is a separate (regression) equation for each type of dielectric.

pp. 49-50, ¶ 99.  The Fisher price index generated each month represents an aggregate measure of the cost of a hypothetical shopping cart filled with thousands of capacitors.  There are three separate shopping carts – one shopping cart for each of the three capacitor dielectric types.[3]  Dr. Marx included a given transaction in her shopping cart for a given month only if the *same capacitor was sold to the same customer in consecutive months*; all other transactions were excluded.  Cohen Decl., Ex. A, pp. 49-50, ¶ 99; Ex. B at 30:5-31:9.  Dr. Marx also did not limit her shopping cart, and hence, her analysis to capacitors purchased by the DAPs; her shopping cart includes capacitors sold by defendants to *all* purchasers in the United States.  Crucially, capacitors purchased by the DAPs constitute only about ██% of the capacitors in the shopping cart.  Cohen Decl., Ex. B at 21:22-22:9, 45:11-25.  Dr. Marx then uses her Fisher price index methodology to measure the cost of the shopping cart on a monthly basis, taking into account changes over time as to which capacitors are in the shopping cart and at what prices.  Cohen Decl., Ex. A, pp. 49-50, ¶ 99.

For ease of tracking changes over time, which is what price indices do, the value of each shopping cart is expressed not as a dollar amount but as a simple number – the "index number." The starting index number for each shopping cart is 100, which is for the month of October 2001.  The index number changes each month, depending on what happens to prices in the hypothetical shopping cart and the methodology used to construct the index.  For each of the three shopping carts, Dr. Marx computes a Fisher price index number for 171 consecutive months – from October 2001 through December 2015.  Each of these 171 monthly index numbers is a data point on the left-hand side of the regression equation.

- Conduct Period and Benchmark Period: These are terms that Dr. Marx herself defines.  Cohen Decl., Ex. A, p. 53, ¶¶ 112-14.  The Conduct Period is the period of 147 months from November 2001 through January 2014.  This is the period for which Dr. Marx assumes a cartel was in effect.  The Benchmark Period is for the next 23 months (February 2014 – December 2015).  Dr. Marx assumes that no cartel was in effect during the Benchmark Period,

---

[3] Given that the methodology for each type of capacitor is identical, however, we will sometimes refer to a single shopping cart for ease of reference, just as we sometimes will refer to a single model or a single regression equation.

and that, therefore, prices during this period were not inflated above competitive levels due to the alleged cartel.

- **Monthly Overcharge Percentages:** Using the statistical techniques described in her Report, Dr. Marx comes up with a series of 147 monthly overcharge percentages for each dielectric type (*i.e.*, one overcharge percentage for each month of the Conduct Period). Cohen Decl., Ex. A, pp. 58-59, ¶ 139, Figures 11, 12, and 13. Using Dr. Marx's model for aluminum capacitors for example, the model comes up with an overcharge percentage for a given month in the Conduct Period and assumes that this overcharge percentage applies to all aluminum capacitors sold by all defendants to the DAPs in the United States in that month, even though their purchases constitute only about 11% of the transactions the model is using. The monthly overcharge percentage for that month is then multiplied by the purchases of each DAP for that month to come up with a dollar amount of purported overcharges paid by each DAP for that month. That same process – multiplying the percentage overcharge for a given month by purchases by each DAP for that month – applies to all 147 months in the Conduct Period. Cohen Decl., Ex. A, p. 64, ¶ 150.[4]

## II.     ARGUMENT

### A.     Based on the *Daubert* indicia of reliability, the overcharge model of Dr. Marx is unreliable and hence inadmissible.

Federal Rule of Evidence 702 requires that unreliable expert testimony be excluded. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). In *Daubert*, the Supreme Court identified the several factors for assessing whether an expert's evidence is reliable, including:

- Whether standards exist for controlling the technique's operation;

- Whether the methodology is generally accepted within the scientific community; and

- Whether the technique or theory has been subjected to peer review or publication.

---

[4] The monthly dollar amounts of overcharges each DAP paid, according to the model, are set forth in Appendix E to Dr. Marx's Report. Cohen Decl., Ex. A.

509 U.S. at 593-94.   Each of these indicators of reliability renders Dr. Marx's econometric models—her regression equations—completely unreliable and thus, inadmissible.

### 1.    The results of Dr. Marx's model depend on her arbitrary decision as to which there is no controlling standard.

The linchpin of admissibility under *Daubert* and Rule 702 is that the expert's analysis be reliable.   Expert testimony that is "connected to existing data only by the *ipse dixit* of the expert" is unreliable and must be excluded.   *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997). Here, Dr. Marx's model is inherently unreliable because an objective standard for controlling its operation does not exist.   Specifically, Dr. Marx's definition (or "specification") of her annual cartel indicator variable, corresponding to a series of 12-month periods during the Conduct Period, requires her to choose a starting month for which to define the annual period.   Haider Decl. ¶ 6.   But her choice to use January as the starting month is completely arbitrary in this context, given that her Conduct Period begins in November 2001.[5]   Nevertheless, that arbitrary decision drives the results her model produces.   Indeed, when the sensitivity of her model is tested by using other months as the starting month for defining the annual cartel indicator variable, her model produces results that are either nonsensical or contrary to her ultimate conclusions.   In other words, her model depends entirely on an arbitrary decision as to which there is no controlling standard and therefore should be excluded.

Her arbitrary decision at issue here is simple: choose a month that is going to be the starting month for a series of 12-month periods.   Dr. Marx's model requires a choice of the starting month because her Fisher price index on the left-hand side of the equation is a *monthly* index, but the cartel indicator variables on the right-hand side are *annual* variables.   Therefore, it is necessary to specify the starting month to define the 12-month period covered by each of her *annual* cartel indicator variables.

---

[5] For the year 2001, Dr. Marx's "annual" cartel indicator variable represents only two months – November and December. She arbitrarily reset the variable to January for 2002 and each subsequent years through 2013. For 2014, the "annual" cartel indicator variable only represents one month, January. Her Benchmark Period begins in February 2014. Haider Decl. ¶ 6 n.7.

So, what should the starting month be?  One could make a case for November, since the Conduct Period in Dr. Marx's model begins in November 2001.  One could also make a case for February, given that Dr. Marx's Benchmark Period begins in February 2014.  One could also make a case for April, the month that most Japanese corporations begin their fiscal year.  There is no "right" answer for what month to choose as the starting month, and there is no standard by which to decide the starting month.

The absence of a controlling standard by which to choose the starting month would not matter if the results of the model did not depend entirely on the chosen starting month.  But here, her choice of the starting month for the annual cartel indicator variable is not just important.  It is entirely dispositive as to the estimated overcharge percentages calculated by Dr. Marx.  Simply put, Dr. Marx's methodology is akin to throwing a dart at a board divided into twelve sections (one for each month), and where the dart lands will determine the overcharge percentage.  The following chart shows this dart board effect for Dr. Marx's model for aluminum capacitors.  The "Starting Month" column refers to which month is selected to be the starting month for the specification of the annual cartel indicator variable.  The "Percentage Overcharge" column is the average of the 147 monthly overcharge percentages the model generates based solely on the specification of the starting month for the annual cartel indicator variable.

| Starting Month [a] | Percent Overcharge [b] |
|---|---|
| January (Dr. Marx's Starting Month) | 13.5% |
| February | -226.5% |
| March | -328.4% |
| April | 3.3% |
| May | -2.8e30% |
| June | -205.4% |
| July | 10.1% |
| August | 14.2% |
| September | 26.7% |
| October | 25.2% |
| November | 23.1% |
| December | 19.7% |

Haider Decl. ¶ 9 and Table 1.

As this chart shows, the difference in the monthly overcharge percentages, and hence the average of the 147 monthly overcharge percentages, varies greatly depending solely on which month is chosen as the starting point for her annual cartel indicator variable (or month the dart hits). If the dart hits January (which is the month that Dr. Marx arbitrarily selected as her starting month for the annual cartel indicator variable), the average overcharge is 13.5%.[6] *Id.* But if the dart hits February, the average "overcharge" is *negative* 226.5%. *Id.* And if the dart hits May, the "overcharge" is negative infinity. The range of the numbers on the dart board is less dramatic for tantalum and film, but it is still very substantial – a range of negative 0.7% to positive 29.0% for tantalum, and 1.9% to 10.0% for film. Haider Decl. ¶ 10 & Tables 2 & 3. In any event, regardless of the range, a reliable overcharge percentage should not depend on throwing darts at all. Saying that the annual overcharge is 13.5% if the annual cartel indicator variable is specified from January-December, while the overcharge is negative infinity if the annual cartel indicator variable is specified from May to April is absurd on its face and is just the kind of "junk science" that Rule 702 excludes. Because Dr. Marx's testimony depends entirely on her three regression equations, and because those regression equations are undeniably unreliable, her testimony should be excluded.

As the court put it in *Reed Construction Data Inc. v. McGraw-Hill Companies Inc.*, "where, as here, very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702." 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). The court added:

> "[S]ome judgment is called for in any statistical model and, so long as the model is robust with respect to different choices of arbitrary points, there is no pressing issue. But here the choice of the end-date . . . has an outcome-determinative effect."

*Id. See also Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal. 2001) (granting summary judgment where plaintiff's expert model used "arbitrary" ratios to determine price changes and calculate damages). This is almost precisely the context here. While Dr. Marx's methodology may be "testable," it *fails* the tests given the breadth of

---

[6] Cohen Decl., Ex. A, p. 55, ¶ 122 and Figure 10.

1    inexplicable variance in results depending on the starting month.  *See* Haider Decl. ¶¶ 9-11; *see*

2    *also* Cohen Decl., Ex. C at 311:5-8 ("If I just make reasonable changes or add reasonable

3    variables, the results disappear and you can't rely on them to infer reliability."). Her regressions

4    are undeniably unreliable, without basis, and should be excluded.

      **2.     Dr. Marx's methodology of using a price index as the dependent variable in her regression equations is not generally accepted in the professional economics community and has not been subjected to peer review.**

8          In analyzing potential overcharges in a price-fixing case, it is standard is to use the actual

9    prices charged to the plaintiffs as the dependent variable in a regression equation – *i.e.*, the

10   variable on the left-hand side of the regression equation.  Prowse Decl. ¶ 10.  The damages

11   experts for the other plaintiff groups – Drs. Lamb, Singer, and McClave – all used actual prices

12   in their regression equations; none constructed a price index as did Dr. Marx.  *Id.*  The battle

13   among experts typically comes over which explanatory variables – the variables on the right-

14   hand side of the regression equation – to include in the model and whether the ones included are

15   statistically significant.

16         But here, the fatal flaws in Dr. Marx's model begin on the left-hand side of her equation.

17   Instead of using the actual prices that the defendants charged the DAPs in her regression

18   equation, Dr. Marx constructed a price index based on a hypothetical (and always changing)

19   shopping cart of capacitors sold to all direct purchasers.  However, she can point to no support in

20   the community of professional economists for the usage of a price index instead of actual prices

21   paid as the dependent variable in regression equations designed to estimate overcharges in a

22   price fixing case.  In fact, Dr. Marx admitted that the methodology she uses has not been

23   subjected to peer review or publication.  Cohen Decl., Ex. B at 24:22-25:1 ("▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *see also id.* at 37:15-38:10.  Indeed, the only prior

26   use of this methodology was by Dr. Marx's partners in their litigation support firm, Bates White.

27   *Id.* at 22:20-23:8.

28

1    Another court has already excluded under *Daubert* another novel construct that Dr. Marx

2    and her colleagues created, precisely because no one outside of her group had reviewed, let alone

3    endorsed, the construct.   *See Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09 Civ. 2227

4    (PAC), 2015 WL 5003528, at *3 (S.D.N.Y. Aug 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018),

5    *cert. denied*, 139 S. Ct. 1375 (2019).   In *Anderson News*, the court excluded Dr. Marx's construct

6    of "super-plus factors" from which to infer collusion because: "Aside from works written by Dr.

7    Marx and her co-authors, there is no scholarly or legal authority defining or using the term 'super

8    plus factors.' . . . Moreover, the fact that the term has not been adopted or used by anyone other

9    than Dr. Marx and her colleagues indicates that this term has not been generally accepted by the

10   scientific community."   *Id.*   Like her construct of "super-plus factors" there, Dr. Marx's construct

11   of a monthly price index as her dependent variable here is not based on a generally accepted

12   methodology that has been subjected to peer review or other critique by professionals unrelated

13   to her colleagues at Bates White.

14       Dr. Marx attempts to deflect attention from the novelty of her approach by citing to

15   scholarly articles that endorse the use of price indices, including Fisher price indices, for certain

16   purposes. Cohen Decl., Ex. A, pp. 49-50 & n.211 & p. 50 n.213; Ex. D, pp. 8-9, ¶ 8 nn.16-17.

17   But Dr. Marx fails to mention that none of those articles endorse the use of price indices for the

18   purpose Dr. Marx uses them for: attempting to measure overcharges in a price-fixing case.

19   Prowse Decl. ¶¶ 5-8.

20       The absence of support for the use of a price index to measure overcharges due to alleged

21   price-fixing should come as no surprise, considering what an index measures and does not

22   measure.   A price index is an aggregate measure of a hypothetical shopping cart of products that

23   no one person or entity actually purchases.   A model designed to measure overcharges due to

24   price-fixing, in contrast, has to account for the *actual* prices paid for the products actually

25   purchased by the plaintiffs in question.   Given that defendants produced their data regarding their

26   sales to the DAPs, and that the DAPs produced their purchase data, there is no reason to create

27   an index in the first instance.   Prowse Decl. ¶ 10.   Dr. Marx could have used the actual prices at

28   which the DAPs purchased from defendants on the left-hand side of the regression equation, but

simply chose not to. Moreover, the capacitors in the 171 monthly shopping carts from which Dr. Marx constructed her monthly price indices bear no resemblance to what the DAPs actually purchased. The DAPs purchased only about ██% of the capacitors in Dr. Marx's monthly shopping carts. Cohen Decl., Ex. B at 21:22-22:9, 45:11-25. Put another way, Dr. Marx is claiming that the DAPs overpaid each month for a shopping cart of capacitors, but the DAPs did not even purchase ██% of the products in her shopping cart.

Indeed, when Dr. Marx's model is applied to the DAPs' actual purchases, the resulting overcharges are very different from those Dr. Marx calculates. For example, applying Dr. Marx's model to Avnet's purchases results in negative overcharges for film capacitors, while aluminum overcharges effectively disappear. Cohen Decl., Ex. E at 425:5-12 ("██████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████").

**B.** **Dr. Marx's model is inadmissible because it imposes an artificial pattern on the monthly overcharges of each year that bears no relation to any of the allegations of how the cartel impacted prices.**

Dr. Marx's model is also inadmissible because its result – a series of monthly overcharges – is mathematically rigged to display a pattern that bears no relation to any of the allegations of how the cartel impacted prices. In the context of *Daubert*, the "failure to match the damages model to the theory of antitrust impact renders the expert opinion unfit since it cannot assist the Court at this point in the litigation in applying the Rule 23 requirements or *assist the trier of fact later on to determine damages attributable to the purported antitrust violation*." *In re Pharmacy Benefit Managers Antitrust Litig.*, Civil Action Nos. 06-1782, 03-4730, 06-4305, 06-4114, 06-4115, 2017 WL 275398, at *20 (E.D. Pa. Jan. 18, 2017) (emphasis added); *see also id.* at *19 ("The teaching of *Comcast* is that antitrust plaintiffs must match a damages model to their theory of liability.") (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)); *In re Electronic Books Antitrust Litig.*, Nos. 11 MD 2293 (DLC), 12 Civ. 3394 (DLC), 2014 WL 1282298, at *9-10 (S.D.N.Y. Mar. 28, 2014) (excluding expert opinion showing periodic price movements that are not reliably tied to the facts).

1    Here, Dr. Marx's model is mathematically rigged to produce an artificial pattern in the

2    monthly overcharges that bears no relation to any of the allegations of how the cartel impacted

3    prices.  This artificial pattern, inherent in the mathematics embedded in Dr. Marx's model, is that

4    for any given year, the monthly overcharges will either ***always*** increase month to month, or

5    ***always*** decreases from month to month.[7]  In other words, if the percentage overcharge increases

6    from January to February in a given year, then the percentage overcharge will continue to

7    increase every remaining month of that year.  Likewise, if the percentage overcharge decrease

8    from January to February in a given year, then the percentage overcharge will continue to

9    decrease every remaining month of that year.  Prowse Decl. ¶¶ 11-16, and Exhibits 2-4 thereto.

10   The DAPs can point to no allegations, let alone evidence, of an agreement among the defendants

11   to raise prices by a percentage that would continuously increase month over month in a given

12   year, or continuously decrease month over month in a given year.  The model "relie[s] on

13   unreasonable assumptions unmoored to the record evidence" and "avoid[s] rigorous analysis"

14   and is therefore inadmissible.  *Electronic Books*, 2014 WL 1282298, at *9.

15   **C.**    **Section III of Dr. Marx's report should be excluded because her AVX/KEMET testimony is unsupported by the evidence and her remaining testimony is outside the scope of her expertise and adds nothing to the record.**

16

17

18   In addition to Dr. Marx's quantitative analysis, she includes a qualitative analysis in

19   Section III of her report that purportedly supports (1) the reasonableness of the assumption given

20   to her by counsel that there was a cartel among capacitor manufacturers; and (2) the conclusion

21   that the assumed cartel was effective in elevating prices above what they otherwise would have

22   been.  Ex. A ¶ 44.  But Dr. Marx does not identify or describe any economic methodology she

23   used to actually test the reasonableness of the assumption provided by counsel and Section III

24   does not include evidence Dr. Marx developed or facts of which she has first-hand knowledge.

25

26

27   _____

     [7] This is true for every year for which Dr. Marx's model produces twelve months of

28   overcharges (i.e., 2002-2013), 2001, with only two months of overcharge percentages, and 2014, with only one month of overcharge percentages, are not relevant for this pattern.

### 1.    Dr. Marx cannot testify that AVX and KEMET were part of a conspiracy among capacitor manufacturers.

Dr. Marx admitted that her opinion required that she " ███████████ ████████████████████████████████████████████ " more than 40 entities identified by the DAP's counsel.  Ex. A ¶ 9.  Among the entities on that counsel-supplied laundry list are AVX and KEMET.  Notwithstanding the "assumption" that AVX and KEMET were part of the alleged cartel with defendants, there is no evidence that permits Dr. Marx to testify as if AVX and KEMET, in fact, participated in a conspiracy.  Indeed, among other things, Dr. Marx conceded during her deposition that she was <u>not</u> aware of any facts demonstrating that: (1) AVX attended "group meetings;"[8] (2) KEMET attended "group meetings;"[9] (3) other defendants agreed with KEMET to set prices for capacitors in the United States;[10] or (4) other defendants agreed with AVX to set prices for capacitors in the United States.[11]  Dr. Marx also acknowledged that neither KEMET nor AVX were indicted or entered guilty pleas in connection with any investigation relating to aluminum, tantalum, or film capacitors.[12]

Absent any factual basis on which to opine that Defendants were involved in a cartel for capacitors with AVX or KEMET, she cannot testify or offer opinions on that matter.[13]  *See Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001) (excluding expert opinion where "[t]here was no factual support in the record[.]").

---

[8] Ex. B at 193 (Dr. Marx admits at her deposition that for all of the meetings she identified she cannot " ████████████████████████ "); *see also id.* at 175:1-22 (AVX never attended trade association meetings at issue).

[9] *Id.* at 223:8-225:21 (Dr. Marx cannot identify any meetings that KEMET attended with Rubycon); *id.* at 225:23-226:6 (KEMET never attended ATC, MK, or CUP meetings).

[10] *Id.* at 227:18-24 (out of millions of documents produced in discovery, Dr. Marx could only identify two instances where KEMET was discussed by other defendants at meetings in Japan, but none where KEMET actually participated).

[11] *Id.* at 225:22-226:14, 238:22-239:4.

[12] *Id.* at 190:18-191:12, 238:22-239:4.

[13] When pressed in deposition, Dr. Marx could do nothing more than vaguely refer to two documents that may have reflected some communications between KEMET and one of the Defendants.  *See id.* at 223-227 (mentioning the "two documents" multiple times).  The two documents to which Dr. Marx repeatedly refers are minutes of two meetings that AVX and KEMET indisputably did <u>not</u> attend.  *See* Cohen Decl., Exs. F & G.

2.     **Dr. Marx cannot offer opinions or testimony purporting to support the existence of a capacitor cartel.**

The remainder of Section III merely recites and interprets a cherry-picked set of documents, guilty pleas by certain defendants, and limited testimony.  Her stated purpose in this exercise is to "████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████" Ex. A ¶ 44.  But this testimony is improper and suffers from at least three substantial flaws:

First, Dr. Marx has no independent knowledge of the facts and has not reviewed the complete record or discovery produced by the parties.  Ex. A ¶ 12.  Even for the documents Dr. Marx has reviewed and to which she cited, she concedes she did nothing more than read them. Ex B at 229:4-7 (agreeing that all she can do is just "████████████████████████████

█████████████").  Reading documents – which a lay member of the jury can surely do herself – for the purpose of assessing whether a conspiracy existed, is not proper expert opinion, as Dr. Marx knows from her prior case.  *Anderson News*, 2015 WL 5003528, at *4 (excluding Dr. Marx's opinion where there was "no indication that she performed any actual analysis" and her opinions "merely recit[ed] what is on the face of a document produced during discovery") (citation omitted); *JamSports & Entm't, LLC v. Paradama Prods., Inc.,* No. 02 C 2298, 2005 WL 14917, at *10 (N.D. Ill. Jan. 3, 2005) (An expert's "discussion of the question of anticompetitive conduct [based on] his interpretation of correspondence and other evidence . . . . has failed to persuade the Court that this is proper testimony by an expert in economics. There is nothing in [the expert's] expertise that suggests that he is any more competent than the average juror in interpreting these communications or in divining from them the intent of [the defendants]").

Second, despite her careful choice of words, Dr. Marx's testimony concerning the "reasonableness" of the assumption provided by the DAPs' counsel regarding the existence of the conspiracy is tantamount to her testifying directly that the conspiracy exists,[14] which is a

---

[14] Indeed, despite her claim to the contrary during her deposition (Ex. B at 150:5-7), Dr. Marx's opinion that the assumption provided by counsel concerning the existence of the cartel is "reasonable" or "plausible" is effectively an opinion in favor of the DAPs on liability, given that

1  legal conclusion.  *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135-

2  36 (2d Cir. 2013) ("The ultimate existence of an 'agreement' under antitrust law, however, is a

3  legal conclusion, not a factual allegation.").

4       Third, Dr. Marx's opinions about the "reasonableness" and/or "plausibility" of a

5  conspiracy are confusing to the jury and unfairly prejudice Defendants.  For example, Dr. Marx

6  claims:

7      •   The selected meeting minutes "████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████"  Ex B at 194:24 -
195:9.

10     •   The selected documents provided her with an "████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████"  Ex B at 195:17-196:6.

13 The jury cannot reasonably be expected to distinguish between Dr. Marx opining that a

14 conspiracy among capacitor manufacturers existed versus opining that the assumption that such a

15 conspiracy existed is reasonable.  Instead, the jury will only see an acclaimed Ph.D. economist

16 testifying that, she came to the conclusion that the conspiracy existed.  That question is for the

17 jury to decide, after being informed by all the admissible evidence and witnesses with personal

18 knowledge of the facts.  *See LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL

19 1585551, at *2 (S.D.N.Y. July 16, 2002) (excluding expert testimony based on examination of

20 documents and deposition transcripts because "testimony by fact witnesses familiar with those

21 documents would 'be far more appropriate . . . and renders [the expert witness's] secondhand

22 knowledge unnecessary for the edification of the jury.") (citation omitted); *Ilya v. Khoury*, 671

23 F. App'x 510, 511-12 (9th Cir. 2016) (affirming exclusion of expert testimony that "simply

24 concluded how the jury should find").

25

26

27

28 the DAPs need only prove at trial the existence of the conspiracy by a preponderance of the
evidence.

1

III.      **CONCLUSION**

2

        For the foregoing reasons, Dr. Marx's testimony should be excluded in its

3

entirety.

4

5

DATED:  June 14, 2019

                Respectfully submitted,

6

7

**WILSON SONSINI GOODRICH & ROSATI**          **K&L GATES LLP**

Professional Corporation

8

*s/ Jonathan M. Jacobson*                     *s/ Michael E. Martinez*

Jonathan M. Jacobson                          Michael E. Martinez

9

Chul Pak (admitted *pro hac vice*)            (admitted *pro hac vice*)

Jeffrey C. Bank (admitted *pro hac vice*)     Scott M. Mendel (admitted *pro hac vice*)

10

Justin A. Cohen (admitted *pro hac vice*)     Steven M. Kowal (admitted *pro hac vice*)

                                              Lauren N. Donahue (admitted *pro hac vice*)

11

1301 Avenue of the Americas, 40th Floor       Brian J. Smith (admitted *pro hac vice*)

New York, New York 10019                      70 West Madison Street, Suite 3300

12

Telephone:  (212) 497-7758                    Chicago, Illinois 60602

Facsimile:  (212) 999-5899                    Telephone:  (312) 372-1121

13

jjacobson@wsgr.com                            Facsimile:  (312) 827-8000

cpak@wsgr.com                                 michael.martinez@klgates.com

14

jbank@wsgr.com                                scott.mendel@klgates.com

jcohen@wsgr.com                               steven.kowal@klgates.com

15

                                              lauren.donahue@klgates.com

16

Jeff VanHooreweghe (Bar No. 313371)           brian.j.smith@klgates.com

One Market Plaza

17

Spear Tower, Suite 3300                       Daniel W. Fox (SBN 268757)

San Francisco, California 94105               4 Embarcadero Center, Suite 1200

18

Telephone:  (415) 947-2046                    San Francisco, California  94111

Facsimile:  (415) 947-2099                    Telephone:  (415) 882-8200

19

jvanhooreweghe@wsgr.com                       Facsimile:  (415) 882-8220

                                              daniel.fox@klgates.com

20

*Counsel for Defendants Hitachi Chemical Co.,*

21

*Ltd., Hitachi AIC Inc., and Hitachi Chemical*    Philip Van Der Weele

*Co. America, Ltd.*                           (admitted *pro hac vice*)

22

                                              One SW Columbia Street, Suite 1900

                                              Portland, Oregon 97258

23

                                              Telephone:  (503) 228-3200

24

                                              Facsimile:  (503) 553-6227

                                              phil.vanderweele@klgates.com

25

26

                                              *Counsel for Defendants Nichicon*

                                              *Corporation and Nichicon (America)*

27

                                              *Corporation*

28

1  **JONES DAY**                              **DENTONS US LLP**

2  *s/ Jeffrey A. LeVee*                      *s/ Bonnie Lau*

3  Jeffrey A. LeVee (State Bar No. 125863)    Bonnie Lau
   Eric P. Enson (State Bar No. 204447)       One Market Plaza

4  Kelly M. Ozurovich (State Bar No. 307563)  Spear Tower, 24th Floor
   555 South Flower Street, Fiftieth Floor    San Francisco, California 94105

5  Los Angeles, California  90071             Telephone:  (415) 882-5083

6  Telephone:  (213) 489-3939                 Facsimile:  (415) 267-4198
   Facsimile:  (213) 243-2539                 bonnie.lau@dentons.com

7  jlevee@JonesDay.com
   epenson@JonesDay.com                       *Counsel for Defendant Matsuo Electric*

8  kozurovich@jonesday.com                    *Co., Ltd.*

9
   *Counsel for Defendants Holy Stone Enterprise*

10 *Co., Ltd., Milestone Global Technology, Inc.*
   *(d/b/a HolyStone International), and Vishay*

11 *Polytech Co., Ltd.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

*s/ Charles Rule*
Charles "Rick" Rule (admitted *pro hac vice*)
Joseph J. Bial (admitted *pro hac vice*)
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7430
rrule@paulweiss.com
jbial@paulweiss.com

Johan E. Tatoy (admitted *pro hac vice*)
Sara E. Hershman (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10128
Telephone: (212) 373-3830
Facsimile: (212) 757-3990
jtatoy@paulweiss.com
shershman@paulweiss.com

**KAUFHOLD GASKIN LLP**

Steven Kaufhold (SBN 157195)
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 445-4621
Facsimile: (415) 874-1071
skaufhold@kaufholdgaskin.com

*Counsel for Defendants Nippon Chemi-Con Corporation and United Chemi-Con, Inc.*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

*s/ Heather S. Nyong'o*
Heather S. Nyong'o (CA SBN 222202)
1 Front Street, Suite 3500
San Francisco, California 94111
Telephone: (628) 235-1000
Facsimile: (628) 235-1001
heather.nyongo@wilmerhale.com

Thomas Mueller (admitted *pro hac vice*)
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
thomas.mueller@wilmerhale.com

Chris Johnstone (CA SBN 242152)
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
chris.johnstone@wilmerhale.com

*Counsel for Defendants Elna Co., Ltd. and Elna America, Inc.*

1

**MINTZ, LEVIN, COHN, FERRIS,**
**GLOVSKY AND POPEO, P.C.**

2

*s/ Evan S. Nadel*
Evan S. Nadel

3

44 Montgomery Street, 36th Floor
San Francisco, California 94104

4

Telephone: (415) 432-6000
Facsimile: (415) 432-6001

5

enadel@mintz.com

6

7

Bruce D. Sokler (admitted *pro hac vice*)
Robert G. Kidwell (admitted *pro hac vice*)

8

701 Pennsylvania Avenue NW, Suite 900
Washington, DC 2004

9

Telephone: (202) 434-7300
Facsimile: (202) 434-7400

10

bdsokler@mintz.com
rgkidwell@mintz.com

11

12

*Counsel for Defendant AVX Corporation*

13

14

15

16

17

18

19

20

**SHEARMAN AND STERLING LLP**

*s/ Djordje Petkoski*
Djordje Petkoski (admitted *pro hac vice*)
David A. Higbee (admitted *pro hac vice*)
Ryan Shores (admitted *pro hac vice*)
Todd M. Stenerson (admitted *pro hac vice*)
Mark G. Weiss (admitted *pro hac vice*)
Deke Shearon (admitted *pro hac vice*)
401 9th St., NW
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
djordje.petkoski@shearman.com
david.higbee@shearman.com
ryan.shores@shearman.com
todd.stenerson@shearman.com
mark.weiss@shearman.com
deke.shearon@Shearman.com

John Cove (SBN 212213)
535 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 616-1139
Facsimile: (415) 616-1199
john.cove@shearman.com

*Counsel for Defendants Rubycon*
*Corporation and Rubycon America Inc.*

21

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence
in the filing of this document has been obtained from each of the above signatories.

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

       I hereby certify that I caused a true and correct copy of the foregoing Certain Defendants'

3

Notice of Motion and Motion to Exclude testimony of Dr. Leslie M. Marx to be served via

4

CM/ECF on this 14th day of June 2019.

5

6

DATED:  June 14, 2019                     <u>*s/ Jonathan M. Jacobson*</u>

7

                                      Jonathan M. Jacobson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28