1    **[Counsel for Moving Defendants Listed on Signature Pages]**

2

3                    **UNITED STATES DISTRICT COURT**
4                    **NORTHERN DISTRICT OF CALIFORNIA**

5    **IN RE CAPACITORS ANTITRUST**          )    MDL No. 2801
     **LITIGATION**                           )
6    _____      )    Master File No.:  3:17-md-02801-JD
                                              )
7                                             )    **CERTAIN DEFENDANTS' REPLY**
     This Document Relates to:                )    **BRIEF IN SUPPORT OF MOTION**
8                                             )    **TO EXCLUDE TESTIMONY OF DR.**
               Case Nos.: 3:14-cv-03264-JD,   )    **LESLIE M. MARX**
9                          3:17-cv-03472-JD,  )
                           3:17-cv-07046-JD,  )
10                         3:17-cv-07047-JD,  )    **ORAL ARGUMENT REQUESTED**
                           3:18-cv-02657-JD.  )
11   _____      )

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2    ARGUMENT ...................................................................................................................1

3        I.      BASED ON THE *DAUBERT* INDICIA OF RELIABILITY, THE
              OVERCHARGE MODEL OF DR. MARX IS UNRELIABLE
4                  AND HENCE INADMISSIBLE. ...........................................................1

5              A.      Dr. Marx's model generates absurd results.................................1

6              B.      Dr. Marx's methodology of using a price index as the dependent
                   variable in her regression equations is not generally accepted
7                     in the professional economics community and has not been
                 subjected to peer review...........................................................3

8

9        II.     DR. MARX'S MODEL IS INADMISSIBLE BECAUSE IT IMPOSES
              AN ARTIFICIAL PATTERN ON THE MONTHLY OVERCHARGES
10                 OF EACH YEAR THAT BEARS NO RELATION TO ANY OF THE
              ALLEGATIONS OF HOW THE CARTEL IMPACTED PRICES. ...................5

11       III.    DR. MARX'S "APPLICABILITY ANALYSIS" IS IRRELEVANT...................7

12       IV.    SECTION III OF DR. MARX'S REPORT SHOULD BE EXCLUDED
              BECAUSE HER AVX/KEMET TESTIMONY IS NOT SUPPORTED
13                 BY THE EVIDENCE AND HER REMAINING TESTIMONY
              IS OUTSIDE THE SCOPE OF HER EXPERTISE AND
14                 ADDS NOTHING TO THE RECORD .................................................8

15             A.      Plaintiffs agree that Dr. Marx cannot offer opinions or testimony
                  that AVX and KEMET were part of a conspiracy among
16                    capacitor manufacturers. ...........................................................8

17             B.      Dr. Marx cannot offer opinions or testimony supporting the |
                 existence of a conspiracy among capacitor manufacturers. ......................8
18

19   CONCLUSION ............................................................................................................10

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    No. 09 Civ. 2227 (PAC),
    2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015),
    *aff'd*, 899 F.3d 87 (2d Cir. 2018) ................................................................................. 9

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ..................................................................................... 5

*In re Processed Egg Prods. Antitrust Litig.*,
    81 F. Supp. 3d 412 (E.D. Pa. 2015) ........................................................................... 9

*JamSports & Entm't, LLC v. Paradama Prods., Inc.*,
    No. 02 C 2298,
    2005 WL 14917 (N.D. Ill. Jan. 3, 2005) .................................................................. 10

*Mike's Train House, Inc. v. Lionel, LLC*,
    472 F.3d 398 (6th Cir. 2006) ..................................................................................... 5

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004) ...................................................................... 10

Defendants[1] submit this Reply Brief in support of their Motion to Exclude the Testimony of Dr. Leslie M. Marx under Rule 702 of the Federal Rules of Evidence ("Motion").

## ARGUMENT

### I. BASED ON THE *DAUBERT* INDICIA OF RELIABILITY, THE OVERCHARGE MODEL OF DR. MARX IS UNRELIABLE AND HENCE INADMISSIBLE.

#### A. Dr. Marx's model generates absurd results.

Defendants' Motion to exclude Dr. Marx's testimony explained that her regression equations are unreliable because they depend entirely on the arbitrary choice of a "Starting Month" for her annual cartel indicator variable. For example, for aluminum capacitors, starting in January yields the 13.5% overcharge Dr. Marx calculated. But starting in February yields a negative "overcharge" of 226.5%, and starting in May yields an "overcharge" of negative infinity. The results for tantalum and film are similarly random, although less dramatic. ECF No. 652 at 5-6. These (and many other) absurd results make clear that Dr. Marx's model is unreliable, and, therefore, it cannot provide the basis for a rational damages award.

The Direct Action Purchaser Plaintiffs' ("DAPs") Opposition, ECF No. 773, cannot and therefore does not even attempt to defend Dr. Marx's methodology. DAPs argue instead that Defendants' argument is untimely, *id.* at 10-12, and in any event, her testimony is saved by two unrelated sensitivity analyses, *id.* at 13. Neither argument supports admission of her testimony.

**1. *The challenge to Dr. Marx is timely.*** In their brief, the DAPs maintain that Defendants' challenge to Dr. Marx's testimony is somehow untimely.[2] It is not untimely for three independently sufficient reasons. <u>First</u>, the "Starting Month" flaw in Dr. Marx's analysis is taken from *her own data*. Neither Defendants nor their expert (Dr. Haider) utilized any new or different data. Nor can Dr. Haider's declaration be described as a "new expert report." It is, rather, a statement of what Dr. Marx's data and model demonstrate. There can be no unfair surprise from challenging an expert on the basis of her own data and model.

---

[1] "Defendants" are defined in the same manner as they are in the Motion, ECF No. 652.

[2] DAPs' opposition was a 25-page brief filed in violation of this Court's 15-page limitation. *See* Standing Order for Civil Cases Before Judge James Donato at 4.

<u>Second</u>, Dr. Marx was given advance notice of the error prior to her deposition.  It was pointed out on May 9, 2019 during the deposition of Dr. Haider.  ████████████████████ ████████████████████████████████████████████████████████████████████████  ███████████████████████████████  Ex. H at 465:11-466:2.[3]  As a result, ██████████ ███████████████████  *Id.* at 465:20-21; *see also id.* at 468:22-469:9.  Dr. Marx may not have seen the specific numeric values highlighting her error until her deposition, but it is undeniable that she (and DAPs' counsel) were on notice of the problem in advance and could have easily generated the specific numeric values themselves.  And, yet, at her deposition, she simply ignored the objective results of the math.  Asked whether ██████████████████████████████████████████████ █████████████████████████████████  her answer was ███████  Ex. I at 115:13-19. Dr. Marx was asked about and had time to consider the problem, but either elected not to do so or testified in a manner contrary to the facts.

<u>Third</u>, the defect in Dr. Marx's methodology became evident from reviewing her Reply Report, which, of course, Dr. Marx submitted only after Dr. Haider had submitted her rebuttal report.  To defend her choice to include a lagged dependent variable in her model, Dr. Marx stated that ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████  ██████████████  Ex. D, pp. 21-22, ¶ 46 (under seal).  Testing this incorrect proposition necessitated the inquiry into the significance of the Starting Month in her analysis to determine why and how Dr. Marx's overcharge estimates depend so heavily on her modeling choices.

The essence of the DAPs' argument is that Dr. Marx should be able to give invalid and unreliable testimony because the flaws hidden away in her own model took time to ferret out.  That is not much different from asking the jury to pick a damages number out of thin air.  Nothing in the Federal Rules of Evidence warrants or permits such a result.  In any case, Dr. Marx had several opportunities to address the "Starting Month" issue.

---

[3] "Ex. __" refers to the Declaration of Justin A. Cohen, dated August 23, 2019, filed concurrently with this brief.  So as to minimize duplicative submissions, exhibits numbered A through G were previously submitted to the Court in support of Certain Defendants' Motion to Exclude Testimony of Dr. Leslie M. Marx.  *See* ECF No. 652-1.

**2.** ***Dr. Marx's sensitivity analyses do not address the defect in the Annual Cartel Indicator Variable.*** The DAPs' other argument for allowing Dr. Marx's regressions is that, because her

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ ECF No. 773 at 2.

Not so. Dr. Marx's semi-annual and quarterly sensitivity tests *do not address* the Starting Month defect in her annual indicator variables. Her six-month sensitivity analysis tests whether having two different directions of overcharge percentages in a year (the first starting in January, and the second starting in July) changes the results. Her quarterly sensitivity analysis tests whether having four different directions of overcharge percentages in a year (the first starting in January, and the others starting in April, July, and October) changes the results. As DAPs acknowledge, these analyses allow for the estimated overcharge percentage to change direction (from increasing to decreasing, or vice versa) once within a given year or three times within a given year, respectively. In each case, starting in January, these analyses assume that ████████████████████████████

███████████████████████████████████████████ *Id.* at 20. Neither sensitivity analysis asks the question whether allowing the *annual* overcharge indicator to start in a month *other than January* affects her overcharge percentages. Yet Dr. Marx's own model demonstrates that the choice of the Starting Month for the annual cartel indicator variable not only affects the results; but also the choice is effectively dispositive.

Dr. Marx's regression equations are inherently unreliable because the answer to the question "Do the results depend on the starting month chosen for the annual cartel indicator variable?" is "yes." Dr. Marx's sensitivity analyses answer different questions and, therefore, cannot possibly show those regression equations to be reliable.

**B.** **Dr. Marx's methodology of using a price index as the dependent variable in her regression equations is not generally accepted in the professional economics community and has not been subjected to peer review.**

Defendants' Motion explained that Dr. Marx's use of a Fisher price index as her dependent (or left-hand-side) variable is not generally accepted in the economics community. All of the DAPs' responses to this criticism fail.

1        **1.  *DAPs misstate defendants' criticism regarding Dr. Marx's failure to use actual prices***

2 ***as the dependent variable in her regression equations.*** Defendants' Motion explained that, instead

3 of using the actual prices *that the DAPs paid* as the dependent variable in her monthly regression

4 equations, Dr. Marx used a monthly price index constructed from a hypothetical shopping cart of

5 capacitors sold to *all purchasers in the United States*.  Capacitors purchased by the DAPs comprise

6 only ██% of the capacitors in the shopping cart.  ECF No. 652 at 2-3, 10.  In response, DAPs scold

7 the Defendants, saying: ████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████ ECF No. 773 at 3.

10        But DAPs' argument simply knocks down a straw man.  Defendants agree that Dr. Marx

11 <u>constructed</u> her price indices using actual prices, but that's not the point.  The point is that she should

12 not have used a price index, regardless of how constructed, as the dependent variable, or, at least in

13 a case where each DAP has the burden to prove overcharges on its own purchases, not one in which

14 all of the DAPs' purchases combined constituted *only* ██% of the shopping cart from which the

15 index was constructed.

16        **2.  *The use of a price index as the dependent variable in price fixing cases is not peer***

17 ***reviewed or a generally accepted methodology to calculate damages.*** Defendants' Motion made

18 clear that there was no support in the community of professional economists for the use of a price

19 index as the dependent variable in regression equations designed to measure overcharges in price

20 fixing cases.  This use has never been the subject of a peer-reviewed publication, and DAPs do not

21 contend otherwise.

22        Instead, DAPs attempt to excuse the lack of peer review in two ways.  First, they claim that,

23 "Federal courts both in and outside this District have accepted analyses using Fisher price indices

24 to calculate damages."  ECF No. 773 at 15.  They then cite four exhibits and case names.  *Id.*  None

25 of the "courts" cited is in fact a judicial opinion.  Three of the four are just expert reports from Bates

26 White (the consulting firm at which Dr. Marx is a partner); the fourth is an excerpt from a Bates

27 White deposition.  One cannot tell from these exhibits whether the unreliability problem was even

28 addressed.  To label these as "court acceptances" of the use of a Fisher price index is seriously

misleading.  Moreover, the fact that DAPs can only point to the use of price indices to estimate overcharges in the context of litigation, and not in any context subject to peer review, renders that use suspect.  As the Ninth Circuit said on remand from the Supreme Court in *Daubert*:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. . . . But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).[4]

DAPs' second excuse for the Bates White-only, litigation-only, use of a price index as the dependent variable is to try to flip the burden from showing acceptance in the scientific community to the absence of rejection in the scientific community: "Where are the articles or cases that even question the use of price indices to estimate overcharges in a price fixing case?  There are none."  ECF No. 773 at 16.  But this attempted flip fails as a matter of law.  The Ninth Circuit emphasized that the party proffering the expert opinion has the burden to show acceptance in the scientific community.  *Daubert*, 43 F.3d at 1317-18.  Thus, neither reason the DAPs offer for the lack of peer acceptance of the dependent variable in Dr. Marx's regression equations is valid.

## II.   DR. MARX'S MODEL IS INADMISSIBLE BECAUSE IT IMPOSES AN ARTIFICIAL PATTERN ON THE MONTHLY OVERCHARGES OF EACH YEAR THAT BEARS NO RELATION TO ANY OF THE ALLEGATIONS OF HOW THE CARTEL IMPACTED PRICES.

Defendants' Motion demonstrated that Dr. Marx's model was mathematically rigged to produce results that bear no relation to any of the allegations of how the cartel impacted prices.  Those results are that, for any given year, the percentage overcharge will increase month to month throughout a given year, or it will decrease from month to month throughout the year.  That artificial pattern of increases or decreases in the monthly overcharge percentage bears no relation to any allegations or evidence and hence renders Dr. Marx's model inadmissible.

---

[4] DAPs' cited authority agrees.  "We have been suspicious of methodologies created for the purpose of litigation, because 'expert witnesses are not necessarily always unbiased scientists.'"  *Mike's Train House, Inc. v. Lionel, LLC,* 472 F.3d 398, 408 (6th Cir. 2006) (citation omitted).

1    In response, the DAPs say: (1) "This argument does no more than describe an aspect of any

2    econometric model that uses (i) a lagged price variable; and (ii) annual cartel indicator variables"

3    and (2) "As a mathematical rule, whenever a regression model uses a lagged price [*i.e.*, dependent][5]

4    variable, there will be an upward or downward trend in prices for the length of the cartel indicator

5    variable." ECF No. 773 at 20.  But it is actually the overcharge percentages, not prices, that display

6    this month-to-month trend each year.[6]

7    The problem with the DAPs' argument is not that the math is wrong, but that it does not

8    address the fundamental disconnect between the mathematically-induced pattern of overcharge

9    percentages and any allegations or evidence of how any cartel operated.  There is no evidence of

10   any agreement, for example, to impose percentage price increases that will increase month-to-month

11   for a given year, and then decrease month-to-month the next year.  But that is exactly the pattern

12   that Dr. Marx's model for aluminum capacitors shows for 2002 and 2003, respectively.[7]  And given

13   the choice between a model that fits reality and a model that includes an annual cartel indicator and

14   a lagged dependent variable, Dr. Marx chose the latter.

15   DAPs attempt to justify this choice by claiming that, ████████████████████████████████

16   ████████████████████████████████████████████████████████ ECF No. 773 at 7.

17   But that is just wrong.  The ███████████ mentioned by the DAPs are not imposed by the data, but

18   are a direct result of Dr. Marx's own modeling choices.  Dr. Marx chose to use a monthly aggregated

19   index price as the dependent variable in her model.  She chose to use a lagged dependent variable.

20   And she also chose to use an annual cartel indicator variable that could change only once per year.

21   In trying to defend Dr. Marx's artificial results, DAPs also rely on the results from a variation

22   of Dr. Marx's model that Nichicon's expert, Dr. Prowse, ran.  Dr. Prowse ran Dr. Marx's exact

23   model but without her lagged dependent variable.  According to DAPs, ██████████████████████

24   ████████████████████████████████████ ECF No. 773 at 21.  But that is

---

[5] Because Dr. Marx's dependent variable is a price index number, her lagged dependent variable is also a price index number.  For example, in the regression equation for February 2002, the dependent variable (left-hand-side) is the price index number for February 2002, and the lagged dependent variable (right-hand-side) is the January 2002 price index number.

[6] ECF No. 652-10, ¶¶ 11-16.

[7] *Id.* ¶¶ 14-15.

meaningless.  As Dr. Prowse testified, his "monthly" overcharge percentage is simply the average of Dr. Marx's annual overcharge percentage, which is the output of this iteration of Dr. Marx's model.  Ex. J at 221:21-222:2.  So, of course the value for each month is the same.

Finally, DAPs attempt to distinguish *Pharmacy Benefit Managers* and *Comcast* by saying that there is no disconnect between Dr. Marx's model and the theory of liability she was asked to assume.  After all, the DAPs say, ████████████████████████████████████ ████████████████████████████████████████████  ECF No. 773 at 21.  True, but irrelevant. The DAPs did <u>not</u> ask Dr. Marx to assume a market-wide price-fixing conspiracy in which the monthly percentage overcharge either increased or decreased month-to-month over the course of each year.  Indeed, such an instruction would have been disingenuous given the complete lack of any supporting evidence, and this highlights the absurdity of choices she made to build her model.

## III.  DR. MARX'S "APPLICABILITY ANALYSIS" IS IRRELEVANT.

A fundamental problem with Dr. Marx's model is that she uses a market-wide index to calculate overcharges allegedly suffered by five separate plaintiffs.  But the five DAPs' purchases collectively amount to only ██% of her price index.  DAPs attempt to use Dr. Marx's "applicability analysis" to excuse this inconvenient fact.  The "applicability analysis" does not calculate the individual DAPs' actual overcharges.  Rather, that analysis attempts to show that monthly DAP-specific price index numbers from November 2001 to December 2015 were correlated with the monthly market-wide Fisher index numbers for those months.

But calculating this correlation between two sets of index numbers over time bears no resemblance to using the DAP-specific index numbers as the dependent variable in regression equations to calculate a series of monthly overcharges, which is exactly what Dr. Marx claims her regression equations are designed to do.  Indeed, given that Dr. Marx created DAP-specific price indices, *see* Ex. A, p. 64, ¶ 152, and given that the issue here is the overcharges, if any, suffered by the DAPs, Dr. Marx could have used these DAP-specific indices as the dependent variable in her regression equations.  But she inexplicably did not do so.  The only logical implication here is one adverse to the DAPs: Dr. Marx had every chance to show overcharges specific to the DAPs by using the DAP-specific Fisher price indices she had created as the dependent variable in her regression

1   equations for the express purpose of calculating overcharges, but yet she did not report the results

2   of any such calculations.  That omission says far more than the results of any applicability analysis.

3   **IV.    SECTION III OF DR. MARX'S REPORT SHOULD BE EXCLUDED BECAUSE HER AVX/KEMET
            TESTIMONY IS NOT SUPPORTED BY THE EVIDENCE AND HER REMAINING TESTIMONY IS
4            OUTSIDE THE SCOPE OF HER EXPERTISE AND ADDS NOTHING TO THE RECORD**

5          **A.    Plaintiffs agree that Dr. Marx cannot offer opinions or testimony that AVX and
                   KEMET were part of a conspiracy among capacitor manufacturers.**

6          DAPs acknowledge that Dr. Marx will not offer opinion or testimony concerning "whether

7   AVX and KEMET were or were not part of the conspiracy among capacitor manufacturers."  ECF

8   No. 773 at 22.  This concession acknowledges that Dr. Marx cannot be used to fill the obvious

9   evidentiary gaps in DAPs' claims as they relate to AVX and KEMET.  It also provides an

10  independent basis for the Court to reject DAPs' arguments in opposition to summary judgment

11  based on Dr. Marx's purported comparison of AVX and KEMET's U.S. prices for tantalum

12  capacitors to all Defendants' U.S. prices for tantalum capacitors.  As explained in Defendants'

13  summary judgment reply brief, DAPs rely on an analysis by Dr. Marx comparing AVX and KEMET

14  prices to a market basket – 93% of which was composed of AVX and KEMET sales – to argue that

15  AVX and KEMET were part of the alleged cartel.  *See* Reply Br. in Support of Certain Defs' Mot.

16  for Summ. J., ECF No. 872 at 14.  Putting aside the uselessness of Dr. Marx's so-called comparison,

17  DAPs' concession makes clear that the Court should not rely on Dr. Marx's analyses and opinions

18  regarding AVX and KEMET.

19         **B.    Dr. Marx cannot offer opinions or testimony supporting the existence of a
                   conspiracy among capacitor manufacturers.**

20
21         In Section III of her report, Dr. Marx ████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████

23  ██████████████  Ex. A, p. 18, ¶ 44 (under seal).  But this assumption explicitly includes DAPs'

24  claims that KEMET and AVX were part of the alleged cartel, even though DAPs now concede that

25  Dr. Marx will not offer an opinion regarding KEMET's or AVX's participation in the cartel, and

26  Dr. Marx herself conceded that she was not aware of any evidence demonstrating that KEMET or

27  AVX attended the "group" meetings at issue in this case or that they agreed with other Defendants

28  to set prices for capacitors in the United States.  For these reasons alone, Dr. Marx should not be

permitted to offer testimony or opinion concerning the "reasonableness of the assumption" provided by DAPs' counsel.

DAPs also claim that Dr. Marx's assessment of the reasonableness of the assumption provided by counsel included a "review and econometric analysis of the record in this case" and that this "is entirely appropriate." ECF No. 772 at 24. However, the only "analysis" undertaken by Dr. Marx in Section III was reading select documents provided to her by DAPs' counsel. *See* Ex. B at 229:4-7 ██████████████████████████████████████████

██). Reading and characterizing the documentary evidence is not properly the subject of expert testimony and instead falls plainly within the responsibility of the jury, as Dr. Marx well knows. *See Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09 Civ. 2227 (PAC), 2015 WL 5003528, at *4 (S.D.N.Y. Aug. 20, 2015) (excluding Dr. Marx's opinions where she merely reviewed and recited information on the face of documents produced during discovery), *aff'd*, 899 F.3d 87 (2d Cir. 2018); *see also In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 421–22 (E.D. Pa. 2015) ("[T]he cases are clear that an economist's testimony is not admissible where he or she simply reads and interprets evidence of collusion as any juror might, or where an economist infers intent to collude from mere documentary evidence, unrelated to his or her economic expertise.").

As discussed in the Motion, Section III of Dr. Marx's report can be excluded for the additional reason that it amounts to a legal conclusion cloaked as opinion testimony, which is plainly prohibited, as was made clear by Judge Tigar's decision in *CRT* to which DAPs cite. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-JST (N.D. Cal. Oct. 25, 2016) (Dkt. No. 4980) (the "*CRT Order*") ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law") (citation omitted). After stating this well-recognized rule, Judge Tigar went on to acknowledge that there is a "fine line" between permissible conclusions as to ultimate issues of fact and an impermissible conclusion of law. *CRT Order* at 3. Here, Dr. Marx's testimony that it is "reasonable" or "plausible" to conclude there was a conspiracy among capacitor manufacturers is tantamount to an opinion that such a conspiracy existed – and that the specific market participants included within the assumption provided by counsel (including AVX and KEMET) were part of the conspiracy. Such testimony, lacking any nexus with Dr. Marx's

economic analysis or findings, and where, instead, her only "analysis" is her review of cherry-picked documents given to her by counsel, is impermissible.  ECF No. 652 at 13 n.14; *JamSports & Entm't, LLC v. Paradama Prods., Inc.,* No. 02 C 2298, 2005 WL 14917, at *10 (N.D. Ill. Jan. 3, 2005) (An expert's "discussion of the question of anticompetitive conduct . . . [based on] his interpretation of correspondence and other evidence . . . has failed to persuade the Court that this is proper testimony by an expert in economics.  There is nothing in [the expert's] expertise that suggests that he is any more competent than the average juror in interpreting these communications or in divining from them the intent of [the defendants]").

Similarly, DAPs argument that Dr. Marx is "permitted to testify that the 'climate' of a specific market was consistent with a conspiracy" also fails.  *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 240 (S.D.N.Y. 2004).  Section III of the Marx Report does not address the "climate" of the capacitors market; instead it characterizes and quotes documents, without any actual economic analysis or reference to any economic findings, and then states impermissible legal opinions such as:

- ████████████████████████████████████████████
- ███████████████████████████████
- ████████████████████████████████████████████
- █████████████████████████             ██████████
  ███████████████████████

Finally, DAPs mistake a valid criticism made by defendants in the DPP class action against DPPs' expert, Dr. McClave, as a basis to reject Defendants' arguments here that Dr. Marx cannot offer impermissible legal conclusions based on her reading of documents.  ECF No. 773 at 22-23. But Defendants do not argue that Dr. Marx should not have reviewed the evidence or ignored market realities.  Instead, Defendants' point is that Dr. Marx cannot purport to present that review as "economic analysis" and report the so-called results of that "analysis" as opinions that amount to legal conclusions (e.g., whether it is reasonable or plausible to conclude that the specific conspiracy DAPs' alleged existed, and whether that conspiracy was effective in elevating prices).

**<u>CONCLUSION</u>**

For the foregoing reasons, Dr. Marx's testimony should be excluded in its entirety.

1    DATED:  August 23, 2019                     Respectfully submitted,

2    **WILSON SONSINI GOODRICH & ROSATI**        **K&L GATES LLP**
     Professional Corporation
3

4    *s/ Jonathan M. Jacobson*                   *s/ Michael E. Martinez*
     Jonathan M. Jacobson                        Michael E. Martinez
5    Chul Pak (admitted *pro hac vice*)          (admitted *pro hac vice*)
     Jeffrey C. Bank (admitted *pro hac vice*)   Scott M. Mendel (admitted *pro hac vice*)
6    Justin A. Cohen (admitted *pro hac vice*)   Steven M. Kowal (admitted *pro hac vice*)
     1301 Avenue of the Americas, 40th Floor     Lauren N. Donahue (admitted *pro hac vice*)
7    New York, New York 10019                    Brian J. Smith  (admitted *pro hac vice*)
     Telephone:  (212) 497-7758                  70 West Madison Street, Suite 3300
8    Facsimile:  (212) 999-5899                  Chicago, Illinois  60602
     jjacobson@wsgr.com                          Telephone:  (312) 372-1121
9    cpak@wsgr.com                               Facsimile:  (312) 827-8000
     jbank@wsgr.com                              michael.martinez@klgates.com
10   jcohen@wsgr.com                             scott.mendel@klgates.com
                                                 lauren.donahue@klgates.com
11                                               brian.j.smith@klgates.com
     Jeff VanHooreweghe (Bar No. 313371)
12   One Market Plaza
     Spear Tower, Suite 3300                     Daniel W. Fox (Bar No. 268757)
13   San Francisco, California 94105             4 Embarcadero Center, Suite 1200
     Telephone:  (415) 947-2046                  San Francisco, California 94111
14   Facsimile:  (415) 947-2099                  Telephone:  (415) 882-8200
     jvanhooreweghe@wsgr.com                     Facsimile:  (415) 882-8220
15                                               daniel.fox@klgates.com
16
     *Counsel for Defendants Hitachi Chemical Co.,*
17   *Ltd., Hitachi AIC Inc., and Hitachi Chemical Co.*   Philip Van Der Weele
     *America, Ltd.*                             (admitted *pro hac vice*)
18                                               One S.W. Columbia Street, Suite 1900
                                                 Portland, Oregon 97258
19                                               Telephone:  (503) 228-3200
                                                 Facsimile:  (503) 553-6227
20                                               Phil.vanderweele@klgates.com
21
22                                               *Counsel for Defendants Nichicon*
                                                 *Corporation and Nichicon (America)*
23                                               *Corporation.*
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JONES DAY**

*s/ Jeffrey A. LeVee*
Jeffrey A. LeVee (Bar No. 125863)
Erick P. Enson (Bar No. 204447)
Kelly M. Ozurovich (Bar No. 307563)
555 South Flower Street, Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
jlevee@jonesday.com
epenson@jonesday.com
kozurovich@jonesday.com

*Counsel for Defendants Holy Stone Enterprise
Co., Ltd., Milestone Global Technology, Inc. (d/b/a
HolyStone International), and Vishay Polytech Co.,
Ltd.*

**MORRISON & FOERSTER LLP**

*s/ Bonnie Lau*
Bonnie Lau
425 Market Street
San Francisco, California  94105
Telephone:  (415) 268-6511
Facsimile:  (415) 268-7522
BLau@mofo.com

*Counsel for Defendant Matsuo Electric
Co., Ltd.*

1

2

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

**WILMER CUTLER PICKERING HALE AND DORR LLP**

3

*s/ Charles Rule*
Charles "Rick" Rule (admitted *pro hac vice*)

*s/ Heather S. Nyong'o*
Heather S. Nyong'o (Bar No. 222202)

4

Joseph J. Bial (admitted *pro hac vice*)
2001 K Street, N.W.

One Front Street, Suite 3500
San Francisco, California  94111

5

Washington, D.C. 20006
Telephone:  (202) 223-7300

Telephone:  (628) 235-1000
Facsimile:  (628) 235-1001

6

Facsimile:  (202) 223-7430
rrule@paulweiss.com

heather.nyongo@wilmerhale.com
Thomas Mueller (admitted *pro hac vice*)

7

jbial@paulweiss.com

1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

8

Johan E. Tatoy (admitted *pro hac vice*)

Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

9

Sara E. Hershman (admitted *pro hac vice*)
1285 Avenue of the Americas

thomas.mueller@wilmerhale.com

10

New York, New York 10128
Telephone:  (212) 373-3830

11

Facsimile:  (212) 757-3990

Chris Johnstone (Bar no. 242152)
950 Page Mill Road

12

jtatoy@paulweiss.com
shershman@paulweiss.com

Palo Alto, California 94304
Telephone:  (650) 858-6000

13

Facsimile:  (650) 858-6100

14

**KAUFHOLD GASKIN LLP**

*Counsel for Defendant Elna Co., Ltd. And*

15

Steven Kaufhold (Bar No. 157195)

*Elna America, Inc.*

16

388 Market Street, Suite 1300
San Francisco, California 941111

17

Telephone:  (415) 445-4621
Facsimile:  (415) 874-1071

18

skaufhold@kaufholdgaskin.com

19

*Counsel for Defendants Nippon Chemi-Con*

20

*Corporation and United Chemi-Con, Inc.*

21

22

23

24

25

26

27

28

| | |
|---|---|
| **MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.** | **SHEARMAN AND STERLING LLP** |

| | |
|---|---|
| *s/ Evan S. Nadel* | *s/ Djordje Petkoski* |
| Evan S. Nadel | Djordje Petkoski (admitted *pro hac vice*) |
| 44 Montgomery Street, 36th Floor | David A. Higbee (admitted *pro hac vice*) |
| Telephone:  (415) 432-6000 | Ryan Shores (admitted *pro hac vice*) |
| Facsimile:  (415) 432-6001 | Todd M. Stenerson (admitted *pro hac vice*) |
| enadel@mintz.com | Mark G. Weiss (admitted *pro hac vice*) |
| | Deke Shearon (admitted *pro hac vice*) |
| Bruce D. Sokler (admitted *pro hac vice*) | 401 9th Street, N.W. |
| Robert G. Kidwell (admitted *pro hac vice*) | Washington, D.C.  20004 |
| 701 Pennsylvania Avenue, N.W., Suite 900 | Telephone:  (202) 508-8000 |
| Washington, D.C.  20004 | Facsimile:  (202) 508-8100 |
| Telephone:  (202) 434-7300 | djordje.petkoski@shearman.com |
| Facsimile:  (202) 434-7400 | david.higbee@shearman.com |
| bdsokler@mintz.com | ryan.shhores@shearman.com |
| rgkidwell@mintz.com | todd.stenerson@shearman.com |
| | mark.weiss@shearman.com |
| *Counsel for Defendant AVX Corporation* | deke.shearon@shearman.com |
| | |
| | John Cove (Bar No. 212213) |
| | 535 Mission Street, 25th Floor |
| | San Francisco, California  94105 |
| | Telephone:  (415) 616-1139 |
| | Facsimile:  (415) 616-1199 |
| | john.cove@shearman.com |
| | |
| | *Counsel for Defendant Rubycon Corporation and Rubycon America Inc.* |

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence
in the filing of this document has been obtained from each of the above signatories.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I caused a true and correct copy of the foregoing Certain Defendants' Reply Brief in Support of Motion to Exclude Testimony of Dr. Leslie M. Marx to be served via CM/ECF on this 23rd day of August 2019.

DATED:  August 23, 2019                                    *<u>s/ Jonathan M. Jacobson</u>*
                                                                                    Jonathan M. Jacobson