Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
James G. Dallal (State Bar No. 277826)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:   (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           swilliams@saverilawfirm.com
           jdallal@saverilawfirm.com
           asatyasai@saverilawfirm.com

*Lead Counsel for the Direct Purchaser Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>DIRECT PURCHASER CLASS ACTIONS | Master File No. 3:17-md-02801-JD<br>Civil Action No. 3:14-cv-03264-JD<br><br>**DIRECT PURCHASER PLAINTIFF CLASS'S OPPOSITION TO THE MOTION FOR DECERTIFICATION**<br><br>Date: December 19, 2019<br>Time: 10 AM<br>Dept: Courtroom 11<br>Hon. James Donato |

## **TABLE OF CONTENTS**

Page(s)

I.   INTRODUCTION ................................................................................................1

II.  ARGUMENT ..................................................................................................... 2

    A.   No Requisite Change in Circumstances Has Occurred ................................ 2

    B.   Dr. McClave's Model Shows Impact to More Than 99% of the DPP Class ................. 5

    C.   Defendants Ignore Evidence on Which this Court Relied in Certifying the DPP Class ..................................................................................................... 7

    D.   Dr. McClave Can Identify "Uninjured" Class Members ............................. 7

    E.   Defendants Confuse Lack of Injury and Insufficient Data............................ 9

    F.   Defendants Ignore Controlling Ninth Circuit Case Law .............................11

III. CONCLUSION ................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ........................................................................................................................... 10

*Amgen v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455 (2013) ......................................11

*Andrews v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 889 (9th Cir. 2019) ........................ 2, 12

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) ..................................................8, 9, 10

*In re Capacitors Antitrust Litig. (No. III)*, No. 17-2801, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ....................................................................................................................*passim*

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons*, 502 F.3d 91 (2d Cir. 2007)........................... 11, 12

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ...................................................... 12

*In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188 (E.D. Pa. 2017) ................................. 12

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ................................................................... 5

*Gomez v. Rossi Concrete, Inc.*, No. 08-1442, 2012 WL 294616 (S.D. Cal. Jan. 31, 2012) ........................... 2

*In re Intuniv Antitrust Litig.*, No. 16-12396, 2019 WL 3947262 (D. Mass. Aug. 21, 2019) ...............8, 9, 10

*Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672 (7th Cir. 2009) ............................... 12

*In re Lidoderm Antitrust Litig.,* No. 14-2521, 2017 WL679367 (N.D. Cal. Feb. 21, 2017) ........................ 8

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).......................................... 11, 12

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ................................ 12

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ...................................................... 8, 9

*In re Packaged Seafood Products Antitrust Litig.*, No. 15-2670, 2019 WL 3429174 (S.D. Cal. July 30, 2019)................................................................................................................10, 11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019)................................. 9, 10

*Rodman v. Safeway Inc.*, No. 11-3003, 2015 WL 2265972 (N.D. Cal. May 14, 2015) ............................... 2

*Ross v. Ecolab Inc.*, No. 13-5097, 2015 WL 5681323 (N.D. Cal. Sept. 28, 2015) ....................................... 5

*Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918 (9th Cir. 2019) ................................................ 11

*In re Steel Antitrust Litig.*, No. 08-5214, 2015 WL 5304629 (N.D. Ill. Sep. 9, 2015) ............................. 12

*Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016) ........................................ 11, 12, 13

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) .................................................... 11, 12

# I.    INTRODUCTION

Certain Defendants[1] have filed a Motion for Decertification of Direct Purchaser Plaintiff Class ("Motion for Decertification" or the "Motion"). It distorts of Dr. McClave's testimony, reasserts arguments about his model that Defendants made at class certification, dresses them up as if they were a recent revelation, mischaracterizes the record and the law, and mounts a last-ditch effort to derail this litigation.

Defendants' errors are both substantive—about the evidence and law—and also procedural. A crucial evidentiary error Defendants make is their incorrect assertion that Dr. McClave admitted that he cannot show that certain class members were injured when in fact he explained that he can and he has. A crucial legal error Defendants make is their reliance on case law about uninjured class members that cannot be identified when the class members Defendants allege were uninjured in fact *can* be identified.

In addition, Defendants keep improperly trying to re-litigate common impact and class certification: in Certain Defendants' Joint Motion for Summary Judgment Against Direct Purchaser Plaintiffs' Claims, in Defendants' merits *Daubert* motions, in their failed motion to appoint an independent expert, and now in the Motion for Decertification. Defendants even go so far as to attach again an untimely and unauthorized expert report from an economist, Dr. Jerry Hausman, that they previously submitted in support of a motion to appoint an independent expert—a motion this Court promptly denied.

The Defendants have not made the requisite showing of a change in circumstances that would warrant this Court revisiting its class certification order. In any case, that order was correct. Defendants' latest gambit should not be allowed to disrupt pre-trial preparation or to delay trial.

---

[1] Nippon Chemi-Con Corporation; United Chemi-Con, Inc.; Matsuo Electric Co., Ltd.; ELNA Co., Ltd.; ELNA American, Inc.; AVX Corporation; Holy Stone Enterprise Co., Ltd.; Milestone Global Technology, Inc.; Vishay Polytech Co., Ltd.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Shinyei Technology Co., Ltd.; Shinyei Capacitor Co., Ltd.; Shinyei Corporation of America; KEMET Corporation; and KEMET Electronics Corp.

## II.     ARGUMENT

### A.     No Requisite Change in Circumstances Has Occurred

For a defendant to be entitled to consideration of a motion for decertification, it has to show that circumstances have changed. *See, e.g.*, *Rodman v. Safeway Inc.*, No. 11-3003, 2015 WL 2265972, at *2 (N.D. Cal. May 14, 2015) ("[B]ecause the Court already found that [the Rule 23] requirements were met when it approved class certification, 'decertification and modification should theoretically only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary.'" (quoting 3 William B. Rubenstein et al., Newberg on Class Actions § 7.34 (5th ed. 2013))); *Gomez v. Rossi Concrete, Inc.*, No. 08-1442, 2012 WL 294616, at *5 (S.D. Cal. Jan. 31, 2012) (denying a motion to decertify because defendant did not "present[] newly discover[ed] evidence or an intervening change in the law or demonstrat[e] how the Court committed clear error"). Defendants fail to meet that standard.

Defendants claim that at the concurrent expert proceeding (the "Hearing") Dr. McClave "made a new and fatal admission: that he cannot identify antitrust injury for *40%* of the DPP Class." Motion at 4 (emphasis in original). For this alleged admission, Defendants quote Dr. McClave's agreement with the Court that because 40% of the class members did not make purchases in the benchmark period, it would be inappropriate "to use a customer-specific model for overcharges." *Id*. But what Defendants omit is that Dr. McClave did *not* use what DPPs' experts would characterize as a "customer-specific model." As explained below, *infra* II.B., DPPs' experts' model is not "customer-specific" because it uses data from *all* of the class members to measure the impact on *each* of them. *See, e.g.*, Rebuttal Expert Report of James T. McClave, Ph.D. (April 19, 2019) ("McClave Merits Rebuttal") ECF No. 816, Exh. 177 at 15. It is Defendants' experts that relied on a "customer-specific" model. Indeed, this Court specifically rejected the claim of Dr. Johnson, Defendants' since-abandoned expert from class certification, that a customer-specific model was required—one that undertook a separate regression for each class member using the data only for that class member. *In re Capacitors Antitrust Litig. (No. III)*, No. 17-2801, 2018 WL 5980139, at *8 n.4 (N.D. Cal. Nov. 14, 2018).

Any doubt about this issue was clarified by an exchange between the Court, Dr. Haider, and Dr. Singer at the Hearing:

> THE COURT: Well, is the proposition just 40 percent is too large for the model -- the customer specific model to be used? I think we already covered that.
>
> DR. HAIDER: And that their before/after method cannot establish overcharges.
>
> DR. SINGER: There we passionately disagree. We hopefully can still be friends. This is key, Your Honor, is that those 40 percent, those customers, informed the model parameters as we estimated it. They are in-sample and the model as we have constructed it can make predictions about whether those customers suffered injury as a result of the conduct. I'm going to be crystal clear. It is not a problem for our model. It is a problem –
>
> THE COURT: I -- yes, yes.
>
> DR. SINGER: -- for an alternative model.

Hearing at 111:20-112:9. As the above testimony makes clear, Plaintiffs' model *can* assess impact on class members who bought only during the damages period. *Id*. Dr. McClave was not referring to his model when he used the term "customer-specific" and described its limitations. *Id*. He was criticizing Dr. Haider's alternative approach—and the model that Dr. Johnson used at class certification and this Court rejected. *Capacitors*, 2018 WL 5980139, at *8 n.4.

To be sure, Dr. McClave did say at the Hearing that 40% of the class—accounting for about 1% of class commerce—made purchases only during the damages period and not during the benchmark period. Motion at 2. But that information is not new (nor does it pose a problem for his model). As Defendants are well aware, Dr. McClave's model and its results have remained essentially unchanged since his opening class certification report years ago. *See* Expert Report of James T. McClave, Ph.D. (Nov. 30, 2018) ("McClave Merits Report") ECF No. 816, Exh. 176 at 4, n.7 ("The damages methodology described herein is identical to that presented in my Initial Class Certification Report. *See* Initial Report, Sections 3 and 4. The results here, reflecting updates to the database, are nearly identical."); McClave Merits Dep. ECF No. 811, Exh. TX23 at 15:5-18 ("Q: Okay. What I'm trying to do, Dr. McClave, is save us both a lot of time so I don't have to ask the identical questions about the identical methodology. Okay? That's all I'm trying to do. Okay? . . . . Is there any difference you could

identify today between the methodology you use here to determine impact and damages from the methodology that was in your initial [class certification] report, sections 3 and 4? A. I do not believe there is any difference.").

Dr. McClave has been transparent and specific throughout these proceedings about how he assessed impact to individual class members. Indeed, years ago Defendants' expert at class certification, Dr. Johnson, separated out the data for each class member and purported to find that any analysis undertaken in that way could not show impact to a large percentage of the class, *including to the very 40% of the class members Defendants now claim to have just discovered. See, e.g.*, Expert Report of Dr. John H. Johnson, IV (March 24, 2017) No. 14-3264, ECF 1745-3 at 35, n.117 & 36, Exh. 8 (purporting to identify among other things, the number of class members, by capacitor type, that had "no purchases in the 'Benchmark' Period," and thus for whom impact purportedly "cannot be estimated").[2]

The Court appropriately rejected Dr. Johnson's approach, which in effect attempted to use limitations in the data to preordain a finding of lack of common impact. *Capacitors*, 2018 WL 5980139, at *8 n.4. Defendants' "new" argument is just that old, rejected one: that a lack of common impact automatically follows from various very small class members having purchased capacitors from Defendants only during the damages period, and not during the benchmark period. Accordingly, while the Court is "free to modify [its previous class certification decision] in the light of subsequent developments in the litigation," Defendants have presented no "subsequent developments" that might

---

[2] Dr. Johnson also repeatedly asserted in March of 2017 what Defendants now claim has newly been revealed—namely, that Dr. McClave's model purportedly applied an "average" overcharge when the class member purchased only during the class period (and not the benchmark period). *See, e.g.*, Johnson Rpt. at 44 & n.145 (observing that plaintiff eIQ Energy did not purchase during the benchmark and that Dr. McClave's "'customer specific' analysis assigns the average film overcharge of 7.2% to eIQ Energy"); *id.* at 46 (Dr. McClave's model "cannot account for issues such as . . . DPPs that only made purchases during certain parts of the proposed class period").

form a basis for revisiting the Court's prior decision. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).[3]

### B.   Dr. McClave's Model Shows Impact to More Than 99% of the DPP Class

Defendants reassert their tired argument that Dr. McClave's model cannot assess impact for class members who bought only during the damages period. Motion at 5-8. As Dr. McClave explained in his expert reports, at deposition, and at the Hearing, they are incorrect. His model takes into account data from all class members and calculates the "but for" prices that all of them would have paid without the conspiracy.[4] He then calculates overcharges, if any, by comparing the actual price that each class member paid on each transaction to that but-for price. McClave Merits Rebuttal at 12. The model thus can *and does* assess impact for virtually all class members, including those who bought only during the damages period. *Id.* at 14-16. Further, as Dr. McClave tested empirically—and as Defendants' expert, Dr. Johnson, admitted—the smallest class members were the *least* likely to avoid paying overcharges.

---

[3] For example, in *Ross v. Ecolab Inc.*, No. 13-5097, 2015 WL 5681323 (N.D. Cal. Sept. 28, 2015), which Defendants cite, the class was certified in a state court, under state law, before being removed to federal court—a "subsequent development" in the case. Even then, the motion for decertification was largely denied. *Id.* at *15.

[4] *See, e.g.*, McClave Merits Rebuttal at 15. Dr. McClave explained:

> Dr. Haider claims that I 'inappropriately extrapolate' my findings 'based on a subset of customers to all direct purchasers at issue.' (Haider ¶117) This claim is based on a misunderstanding. Contrary to her claims, customers purchasing only in the Class Period do, as I explained above, contribute to the overcharge estimate. Moreover, Dr. Haider's analysis improperly assumes that all customers who purchased products only during the Class Period were unimpacted by the collusion. This assumption is inappropriate for at least four reasons: (1) the data from these customers contributes to the overcharge estimate; (2) my model accounts for 98.7% of all price variability – including the prices of customers making purchases only in the Class Period – and shows that all or nearly all customers were impacted, even when applied only to customers making purchases in both periods; (3) my analysis shows that the vast majority of customers purchasing in both periods were impacted, and thus unless there is some reason to believe that customers who bought only during the Class Period are less likely to be

*Id.* at 15 & nn. 39-40; Expert Report of James T. McClave, Ph.D. ("McClave Merits Report")

at 12-13 (§5.3).[5] For those two reasons—Dr. McClave's model can and does show impact to class

members who bought only during the damages period and, even if it did not, the reasonable inference

would be they were impacted at least at the same rate as the rest of the class—Dr. McClave's expert

analyses were able to use data covering 99% of the relevant sales to account for 98.7% of the variation in

capacitor prices and to show impact to more than 99% of the class. McClave Merits Report at 3, 9, 10,

11, 13, B-3. These results were also corroborated by Dr. Singer's showing of impact to over 99% of the

class, a showing that Defendants fail to address in their Motion.[6]

---

impacted than customers who bought during both periods (which Dr. Haider does not offer), there is no basis to assume 'no impact' or even a lower level of impact; and (4) customers purchasing in both periods account for more than 99% of the transactions and revenue, meaning that Dr. Haider's assumption of no impact to customers purchasing only in the Class Period applies to small customers accounting for a small fraction of transactions and revenue. These small customers are those that are most likely to be impacted by a conspiracy, based on the economic theory that small customers have less purchasing power than large customers. ( Johnson Report, 39, 43) Dr. Haider's assumption that Class Period only customers somehow all escaped impact (or even disproportionately escaped impact) is contradicted by sound statistical principles, the econometric reliability of my model, and the fact that small customers are least likely to have the ability to avoid the impact of the alleged Conspiracy. I also demonstrated in my previous report 'that overcharges are consistently higher for small customers than for large customers.' (McClave Merits Report, §5.3)").

*Id.*

[5] Johnson Rpt. at 43 ("[A]vailable evidence . . . indicates that large customers could negotiate favorable pricing and would receive volume discounts that smaller customers would not"); *see also* Defs.' Class Opp. at 23 ("Large customers received volume discounts not available to small customers."); Hearing at 50:20-51:3 (Dr. Singer: "What if we find that there is extensive pervasive class-wide injury across the class in general and across all those big customers who bought in both? And we are on the fence about what we think is happening with respect to these 40 percent. These are the smallest buyers. And just basic economics would suggest, Your Honor, that these are the most vulnerable. If there is pervasive impact and it happened to the biggest, then it is logical to conclude that the smallest also suffered injury.").

[6] While some class members purchased only during the damages period and not during the benchmark period, those tended to be the smaller customers, buying at lower volumes, and thus by Defendants' own admission accounted for only 1% of the relevant commerce. Motion at 7 (quoting Hearing Tr. 29:8). Applying a but-for price derived from a model incorporating purchases by relatively larger customers— who are more likely to have purchases over the full span of the benchmark and damages periods—is conservative given that the larger customers have more buying power, and thus suffer less from the Conspiracy. *See supra* nn. 5-6.

### C.    Defendants Ignore Evidence on Which this Court Relied in Certifying the DPP Class

It is also untrue that the Court's class certification opinion relied primarily on Dr. McClave's model in concluding that the DPPs established common impact. To the contrary, the Court relied primarily on the extensive documentary evidence showing classwide impact—evidence that has only increased since class certification, as DPPs demonstrated in opposing summary judgment. *See* Direct Purchaser Class's Opp. to Certain Defs.' Mot. for Summ. J. Against Direct Purchaser Pls.' Claims at 8-10. The Court noted a good argument can be made that this documentary evidence suffices by itself to prove common impact. *Capacitors*, 2018 WL 5980139, at *8. Defendants' Motion disregards the Court's actual reasoning and this crucial evidence.

### D.    Dr. McClave Can Identify "Uninjured" Class Members

Defendants incorrectly claim that Dr. McClave cannot identify the class members Defendants suggest were uninjured. Defendants also rely on inapposite case law that involved class members who were both uninjured and unidentifiable.

Dr. McClave can identify the class members that Defendants contend were uninjured. Even if the small purchasers accounting for 1% of the commerce at issue were uninjured—they weren't—Dr. McClave has already explained that his analysis allows him to identify each class member for which he conducts an impact analysis. McClave Merits Report at 12, n. 30. That is because his analysis proceeds class member by class member and transaction by transaction. *Id.*; McClave Merits Rebuttal at 3. Contrary to Defendants' baseless speculation, Mot. at 7, he therefore *can* identify each of the class members that Defendants assert were uninjured and, if this Court were to determine doing so were appropriate, those class members could be excluded from the DPP class. *Id.* To be sure, DPPs do not propose excluding them. Again, Dr. McClave's model shows they—and the vast majority of other class members—*were* injured. So does the documentary evidence. And Dr. McClave and Dr. Johnson agreed that the smallest class members—which would include the ones who made purchases only during the damages period—were the least likely to avoid overcharges and therefore the most likely to have sustained injuries from Defendants' price fixing. McClave Merits Report at 12-13 (§5.3); McClave Merits Rebuttal at 15. Further, excluding those small class members would have little practical effect on

the aggregate class damages, reducing them by about 1%. So excluding the smallest class members would harm them without benefiting Defendants in any meaningful way. But Defendants are incorrect in asserting that Dr. McClave has not shown he can identify "uninjured" class members. He can identify every class member contained in the massive data set he assembled and determine which ones bought capacitors from Defendants only during the damages period. *See, e.g.*, McClave Merits Report at 12, n. 30.

In contrast, the cases on which Defendants rely involved classes that contained uninjured class members—class members that the data in plaintiffs' possession did not permit them to identify. That was true, for example, in *In re Asacol Antitrust Litigation*, 907 F.3d 42 (1st Cir. 2018), *In re Intuniv Antitrust Litigation*, No. 16-12396, 2019 WL 3947262 (D. Mass. Aug. 21, 2019), and *In re Nexium Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015). Plaintiffs in those cases brought antitrust claims arising from delayed entry of generic drugs. Some of the class members were uninjured because they would have bought the brand version of the drug (at the same or a higher price) even after generic entry. Because generic entry had not yet occurred, or because some class members bought the drug at issue only before it did, it was not possible to identify all of the so-called "brand loyalists" using purchasing data. So, there were uninjured class members who could not be identified and excluded from the class. The First Circuit in *Nexium* nevertheless certified a class containing about 6% uninjured class members, 777 F.3d at 27, while in *Asacol* it refused to certify a class containing about 10% uninjured class members, 907 F.3d at 47, 51, and a trial court in the First Circuit in *Intuniv* denied certification of a class containing about 8% uninjured members. 2019 WL 3947262, at *4, *8; *See also In re Lidoderm Antitrust Litig.,* No. 14-2521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (certifying a class containing about 7% uninjured class members).

This case does not involve any similar difficulty for two reasons. First, unlike in those cases where a significant number of unidentifiable class members were uninjured, here the evidence is to the contrary. Dr. McClave in fact found that more than 99% of the class members were injured, a finding corroborated by other evidence. *See Capacitors*, 2018 WL 5980139, at *8; Direct Purchaser Class's Opp. to Certain Defs.' Mot. for Summ. J. Against Direct Purchaser Pls.' Claims at 8-10. Second,  here Dr. McClave *can* identify the class members that Defendants claim are uninjured—as well as the less than

Case 3:17-md-02801-JD   Document 1006   Filed 11/12/19   Page 13 of 17

1% of class members that Dr. McClave acknowledges his statistical model does not show were injured[7]—enabling this Court to exclude them from the class or to deny them any recovery after trial, if it is so inclined. Defendants have never provided any evidence that Dr. McClave cannot identify purportedly uninjured class members. Thus, even the First Circuit's opinion in *Asacol*—which is an outlier, imposing a higher certification standard on plaintiffs in this regard than any other federal appellate circuit—acknowledged that class certification *is* appropriate if any uninjured class members can be identified using objective evidence after trial, as Dr. McClave's model can do. *Asacol*, 907 F.3d at 52 (distinguishing *Nexium*).

### E. Defendants Confuse Lack of Injury and Insufficient Data

Defendants' Motion is also unsound because it conflates two distinct issues: (a) whether a common impact model indicates some class members were uninjured, or (b) whether the model lacks data sufficient to determine whether those class members were injured. The primary cases on which Defendants rely involved models showing that a significant percentage of proposed classes were *uninjured*. In *Rail Freight*, the court found that 12.7% of the class members were uninjured, not that the data were insufficient to determine injury one way or the other. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623-24 (D.C. Cir. 2019). In *Asacol*, the uninjured percentage was found to be about 10%. *Asacol*, 907 F.3d at 47, 51. In *Intuniv*, the uninjured percentage was 8%. *Intuniv*, 2019 WL 3947262, at *4, *8. *Rail Freight* also noted that a lack of injury to 5 or 6% of a class could be *de minimis* and therefore consistent with classwide impact. *Rail Freight*, 934 F.3d at 625. Here, Dr. McClave's and Dr. Singer's analyses confirm impact to all but less than 1% of class members—a percentage below that *de minimis* threshold.

Moreover, even under Defendants' (incorrect) theory—which again is not new and was previously asserted and rejected in this case—for the small class members that collectively bought about 1% of the relevant commerce at issue, Dr. McClave's model would be only *indeterminate*. The

---

[7] As Dr. McClave has explained, these members reflecting less than 1% of the class likely were injured and the failure to show they were is likely the result of statistical noise. McClave Merits Report at 12 (§5.3).

Civil Action No. 3:14-cv-03264-JD                    9
DIRECT PURCHASER PLAINTIFF CLASS'S OPPOSITION TO THE MOTION FOR DECERTIFICATION

model does not show the class members were *not* injured, as was the case in *Rail Freight*, *Asacol*, and *Intuniv*. This case is thus unlike those cases.

As a result, even under Defendants' (incorrect) theory, this case is similar to *In re Air Cargo*. There, Dr. McClave used the same methodology he uses in this case to establish impact to 96% of class members, a showing that the court determined sufficed for common impact and class certification. *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-1175, 2014 WL 7882100, at *55 (E.D.N.Y. Oct. 15, 2014). However, in *Air Cargo*, unlike here, Dr. McClave lacked the data to assess impact for about 100,000 out of about 300,000 class members because they had made only a single purchase, not multiple purchases during the damages period or in both the damages and benchmark periods. *Id.* at *56. The court in *Air Cargo* responded by extrapolating from the class members for which there was data to the class members for which there was insufficient data, based in part on the very limited commerce at issue for those purchasers (less than 1% of the class commerce) and in part on the reasonable inference that the smallest purchasers have the least bargaining power and are least likely to avoid paying overcharges. *Id.* The same logic would apply here if Dr. McClave's model could not show impact to 40% of the class (it actually can and does): those class members represent only a tiny percentage of the commerce at issue and as the smallest purchasers they are least likely to have avoided paying overcharges. McClave Merits Report at 12 (§5.3); McClave Merits Rebuttal at 15. Limitations on data do not show class members were uninjured.

Numerous other cases support the same point. A recent example is *In re Packaged Seafood Products Antitrust Litig.*, No. 15-2670, 2019 WL 3429174 (S.D. Cal. July 30, 2019), in which Dr. Michael Williams, one of *Defendants' experts in this case*, employed the same methodology Dr. McClave uses here to show common impact. There, Dr. Haider—*Defendants' expert in this case*—made essentially the same critiques of Dr. Williams' analysis as she makes of Dr. McClave's analysis here. The court was unpersuaded and certified the class. In fact, DPPs' showing of common impact in this case was stronger than plaintiffs' evidence in *Packaged Seafood*. First, Dr. Williams was showing common impact to indirect purchasers, not direct purchasers. Second, Dr. McClave has data covering over 99% of class purchases whereas Dr. Williams did not have data to use the impact methodology for a significant percentage of the class—he had data from only two of six food distributors. *Id.* at *19. The court in

*Packaged Seafood* nevertheless determined that the data there were sufficient to support a determination of classwide impact. *Id.* at *22. Again, limitations on data do not equate to uninjured class members.

### F.    Defendants Ignore Controlling Ninth Circuit Case Law

Defendants ignore controlling Ninth Circuit law. Notably, they fail to cite *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016), much less distinguish it. DPPs have consistently cited to that Ninth Circuit opinion. *See, e.g.*, Direct Purchaser Pls.' Mot. for Class Certification (Case No. 14-cv-3264, ECF No. 1693) (June 15, 2017); Direct Purchaser Pls.' Opp. to Certain Defs.' Mot. to Exclude the Expert Testimony of Drs. McClave and Zona (Case No. 14-cv-3264, ECF No. 1743) (July 13, 2017); Direct Purchaser Class's Opp. to Defs.' Mots. to Exclude Testimony of Drs. Singer and McClave (ECF No. 810) (July 26, 2019); Direct Purchaser Class's Opp. to Certain Defs.' Joint Mot. for Summ. J. Against Direct Purchaser Pls.' Claims (ECF No. 803) (July 27, 2019). It involved claims for which, just as in antitrust, impact (or fact of injury) is an element. *Id.* at 1135. The trial court did not find that impact was a common issue but nonetheless concluded that common issues predominated in the case *as a whole*. *Id.* The Ninth Circuit affirmed on that basis. *Torres*, 835 F.3d at 1136. *See also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (holding common issues do not need to predominate as to each element but only in the case as a whole); *Amgen v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 468 (2013) (same); *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 938 (9th Cir. 2019) (same); *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons*, 502 F.3d 91, 108-09 (2d Cir. 2007) (holding common impact is not necessary for predominance in the case as a whole in antitrust litigation).

*Torres* also held that a Rule 23(b)(3) class may contain uninjured class members. *Id.* at 1136. And it clarified that the mere presence of uninjured members in a class does not defeat predominance unless it reveals a flaw "such as the existence of large numbers of class members who were never *exposed* to the challenged conduct to begin with." *Id.* (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014)) (emphasis in original). Defendants do cite *Mazza*, but they fail to acknowledge that the Ninth Circuit denied class certification there because "it [wa]s likely that many class members were *never exposed* to" the harmful conduct at

issue, *Mazza*, 666 F.3d at 595 (emphasis added), as the Ninth Circuit explained in *Torres*, 835 F.3d at 1136 (citing *Mazza*).[8]

Here, this Court determined that common issues predominate—including whether Defendants conspired to fix prices, whether the conspiracy inflated prices generally, and whether DPPs offered a reliable method for calculating aggregate damages. *Capacitors*, 2018 WL 5980139, at *5-10. All of the class members were *exposed* to Defendants' price-fixing conspiracy by buying capacitors from them— indeed many of the Defendants have pled guilty, admitting not only that they conspired to raise prices

---

[8] Defendants also cite *Andrews v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 889 (9th Cir. 2019), which is not to the contrary. In *Andrews*, the trial court "did not address" whether numerous individual issues predominated over common issues, *id.* at 891, and plaintiffs' expert did "not address whether businesses within the class suffered any economic injury or whether the [conduct at issue] caused that injury." *Id.* at 892 (citation omitted). In contrast, this Court determined at class certification that common issues predominate over individual issues and DPPs offered documentary evidence and expert testimony showing that Defendants' price fixing caused injuries to the vast majority of class members. *In re Capacitors Antitrust Litig. (No. III)*, No. 17-2801, 2018 WL 5980139, at *5-10 (N.D. Cal. Nov. 14, 2018).

Defendants' position on the Seventh Amendment—which seems to be that plaintiffs must show harm to all class members—cannot be reconciled with *Torres*. Nor can it be reconciled with numerous other cases certifying classes containing uninjured class members. *See, e.g.*, *Tyson Foods*, 136 S. Ct. at 1049-50 (affirming certification of class containing unidentified, uninjured class members and affirming jury verdict in their favor); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (holding class may contain uninjured members); *Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 677-78 (7th Cir. 2009) (holding class may contain uninjured members as long as there are not a "great many" of them that would inflate aggregate damages).

Defendants are also wrong about Second Circuit law. They cite *Denney* in claiming that "the Second Circuit handles the question of uninjured class members in the context of jurisdiction." Motion at 4, n. 4. Untrue. *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006), did address Article III standing, requiring that all class members were exposed to the relevant conduct—a standard similar to *Torres* and that is met here, as all class members bought the product at issue during the pendency of the alleged conspiracy. But the Second Circuit, like *Torres*, has held that common issues can predominate in an antitrust case as a whole, even if impact is not a common issue. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons*, 502 F.3d 91, 108-09 (2d Cir. 2007). Defendants also cite *In re Steel Antitrust Litig.*, No. 08-5214, 2015 WL 5304629 (N.D. Ill. Sep. 9, 2015), likely because the court there did not conclude that Dr. McClave had shown common impact. *Id.* at *11. But the court did find Dr. McClave's analysis to be "reliable and admissible," *id.*, and it did certify a class. *Id.* at *12. The court's concern was that the "realities of the steel industry reveal that it is unlikely that class members were either impacted at the same levels or suffered the same damages." *Id.* at *11. In contrast, here this Court has concluded that the realities of Defendants' price-fixing conspiracy confirm Dr. McClave's evidence of common impact. *Capacitors*, 2018 WL 5980139, at *5-10. *See also In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 227 (E.D. Pa. 2017) (distinguishing *Steel* and finding common impact).

but also that their conduct inflated Capacitor prices in the United States. *Id.* at *5. And DPPs have offered a reliable method capable of showing impact to all or virtually all class members. *Id*. at *8. Under law of the case, *Torres*, and other binding law, common issues predominate in the case as a whole, the evidence establishes common impact, and no intervening event supports Defendants' Motion seeking to revisit this Court's order certifying the DPP class. That order was and remains proper.

## III.    CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated:  November 12, 2019

Respectfully Submitted,

JOSEPH SAVERI LAW FIRM, INC.


By:     */s/ Joseph R. Saveri*
                   Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
James G. Dallal (State Bar No. 277826)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940

*Lead Counsel for the Direct Purchaser Class*