Heather S. Nyong'o (CA SBN 222202)
heather.nyongo@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
1 Front Street, Suite 3500
San Francisco, California 94111
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Thomas Mueller (*pro hac vice*)
thomas.mueller@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Counsel for Defendants ELNA Co., Ltd. and
ELNA America, Inc.*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>*Direct Purchaser Plaintiffs Action*, 14-cv-03264-JD | Case No. 14-cv-03264-JD<br>MDL No. 2801<br><br>**DEFENDANTS' TRIAL BRIEF** |

## TABLE OF CONTENTS

DEFENDANTS' JOINT TRIAL BRIEF ...................................................................... 1

   I.   EXISTENCE OF THE ALLEGED CONSPIRACY ....................................... 2

   II.  KNOWING PARTICIPATION IN THE ALLEGED CONSPIRACY ............... 5

   III. EFFECT ON IMPORT COMMERCE ......................................................... 5

   IV. INJURY AND DAMAGES ......................................................................... 6

AVX'S SUPPLEMENTAL TRIAL BRIEF .............................................................. 9

SHINYEI'S SUPPLEMENTAL TRIAL BRIEF ...................................................... 12

TAITSU'S SUPPLEMENTAL TRIAL BRIEF ........................................................ 15

NCC'S SUPPLEMENTAL TRIAL BRIEF ............................................................. 18

UCC'S SUPPLEMENTAL TRIAL BRIEF ............................................................. 21

HOLY STONE DEFENDANTS' SUPPLEMENTAL TRIAL BRIEF ...................... 24

## DEFENDANTS' JOINT TRIAL BRIEF

The Direct Purchaser Plaintiffs ("DPPs") allege a vast conspiracy.  In particular, DPPs claim that more than two dozen Japanese, Taiwanese, and American manufacturers of aluminum, tantalum, and/or film capacitors "conspired by directly and indirectly communicating with each other to implement and effectuate an overarching scheme to control and set the prices of their aluminum, tantalum and film capacitors sold to United States purchasers and purchasers worldwide" from January 1, 2002 until December 31, 2013.  DPPs' Third Amended Complaint, 14-cv-3264, ECF No. 1831 ("Complaint"), ¶ 13.  The seven Defendant families[1] that remain in this case deny the existence of the conspiracy alleged in the Complaint, that they knowingly participated in any such conspiracy, or that it caused the harm alleged.

DPPs bring one claim for price fixing in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  To prevail at trial, DPPs must prove, as to *each* specific Defendant, each of the following elements by a preponderance of the evidence:

1.  The existence of the conspiracy alleged by DPPs among or between competitors to fix the prices of aluminum, tantalum, and film capacitors;

2.  That each Defendant knowingly—that is, voluntarily and intentionally—became part of that conspiracy;

3.  That the alleged conspiracy occurred in or affected interstate or import commerce; and

4.  That the conspiracy caused all, or nearly all, DPPs to pay more for aluminum, tantalum, and/or film capacitors billed to or shipped to the United States than they otherwise would have.

*See* Defendants' Proposal for Disputed Final Jury Instruction No. 21: Overview of Antitrust Claims (citing ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 1 Instr. 2 and Ch. 2

---

[1] The remaining Defendants are AVX Corporation, the ELNA entities (Defendants Elna Co., Ltd. and Elna America, Inc.), the Holy Stone entities (Holy Stone Enterprise Co, Ltd., Holystone International, Milestone Global Technology, Inc., and Vishay Polytech Co., Ltd.), Matsuo Electric Co., Ltd., NCC/UCC (Nippon Chemi-Con Corporation and United Chemi-Con, Inc.), the Shinyei entities (Shinyei Kaisha, Shinyei Technology Co., Ltd., Shinyei Capacitor Co., Ltd. and Shinyei Corporation of America), and the Taitsu entities (Taitsu Corporation and Taitsu America, Inc.).

Instr. 1 (2016); Complaint).  At trial, however, the evidence will fall far short of establishing what DPPs have pleaded in their Complaint, DPPs will fail to meet their burden of proving each of these elements of the offense, and based on the evidence the jury will return a verdict of not liable as to each Defendant.

## I.   EXISTENCE OF THE ALLEGED CONSPIRACY

The Complaint alleges the existence of an "overarching" conspiracy with broad membership, a far-reaching objective, and a long and uninterrupted duration spanning over a decade.  Complaint ¶ 13.  The evidence at trial will not establish the existence of the conspiracy alleged in the Complaint.  No percipient witness—even those cooperating with DPPs—will testify that such a broad conspiracy existed.  No document provides direct (or even circumstantial) evidence of such a broad conspiracy.  And the testimony of DPPs' experts will not remedy the failure of proof.

To be sure, four of the Defendants entered plea agreements with the Department of Justice ("DOJ") admitting to having fixed prices of "***certain electrolytic*** capacitors."  *See, e.g.*, *United States v. Elna*, 16-cr-365 (N.D. Cal.), ECF No. 40 ("Plea Agreement"), ¶ 4 (emphasis added).  But as DOJ made clear to this Court, the "affected volume of commerce was ***not*** as broad as all U.S. sales," *id.*, ECF No. 65 ("DOJ Restitution Memo"), at 3 (emphasis added), and the plea agreements themselves do not support—and in fact specifically refute—DPPs' broad conspiracy theory.  *Compare* Complaint, ¶ 12 ("Defendants further agreed to collusively set prices for ***all*** the Capacitors they produce") (emphasis added) *with U.S. v. Holy Stone Holdings Co., Ltd.*, 16-cr-366, ECF No. 16 (N.D. Cal. Aug. 8, 2017) (DOJ Sentencing Memo), at 4 ("Holy Stone's volume of affected commerce is based entirely on sales to the ***one*** United States customer for which Holy Stone Japan was responsible for negotiating prices").  And in any event, most of the Defendants and other alleged co-conspirators were not charged by, and did not enter plea agreements with, DOJ.  In other words, the plea agreements will not satisfy DPPs' burden of proving the existence of the overarching conspiracy they have alleged.

Drilling down on DPPs' allegations, there are numerous specific aspects of the broadly-constructed conspiracy alleged in the Complaint that are unsupported by the evidence.  For example:

**Overarching Nature.**  While the Complaint alleges that there was an "overarching agreement to fix, raise, maintain, and/or stabilize prices" of aluminum, tantalum, and film capacitors, Complaint ¶ 7, no witness has testified at deposition to the existence of a single, overarching agreement.  Nor do the notes of industry meetings—the centerpiece of DPPs' case—evidence a global agreement.  Indeed, these notes do not identify any specific prices in the United States that were agreed to or fixed.  Rather, they focus on Asia and speak in generalities about worldwide demand and price trends.  Aside from the conclusory testimony of DPPs' experts, there is simply no evidence of the alleged overarching agreement.

**Membership.**  DPPs claim that the alleged overarching agreement was entered into by more than two dozen Japanese, Taiwanese, and American manufacturers of "aluminum, tantalum, and film capacitors" who "sell mutually interchangeable commoditized products." Complaint ¶ 1, 7; *see also id.* ¶¶ 32-101, 103 (naming Defendants and alleged co-conspirators). To the contrary, the evidence at trial will show that many of these companies—including AVX, KEMET, Shinyei, Taitsu, Nissei, Nitsuko, Okaya, Shizuki, Soshin, United-Chemi Con, ELNA America, Inc., Holy Stone Enterprise Co, Ltd., and Milestone Global Technology, Inc.—never attended even one of the Asian industry meetings concerning electrolytic capacitors that DPPs claim were the lynchpin of (and mechanism for effectuating) the agreement.  Moreover, experts and lay witnesses will testify that film capacitors represent a completely different market than aluminum and tantalum capacitors, belying the notion of a conspiracy encompassing both, and that DPPs grossly overstate the interchangeability of aluminum, tantalum, and film capacitors, as well as the interchangeability of capacitors within any one of these categories.  In fact, the evidence will show just the opposite—electrolytic and film capacitors are not interchangeable and cannot be substituted for each other in most product applications. The evidence will further show that Defendants sold thousands of different types of capacitors, most of which were non-commoditized (or even bespoke) products not susceptible to price fixing.  In other words, DPPs

allege a conspiracy with a membership that makes no sense, was in no way workable, and has no support in the evidence.

**Object.**  The Complaint alleges that the object of the alleged overarching conspiracy was for the participants to "set prices for ***all*** the Capacitors they produce."  Complaint ¶ 12 (emphasis added).  Again, no witness has testified at deposition that there was an agreement to fix the price of ***all*** capacitors, and no documentary evidence supports this allegation.  As noted above, certain Defendants entered plea agreements with DOJ admitting to having fixed prices of "***certain*** electrolytic capacitors."  *See* Plea Agreement at ¶ 4 (emphasis added).  But as DOJ told this Court, the "affected volume of commerce was ***not*** as broad as ***all*** U.S. sales."  DOJ Restitution Memo at 3 (emphasis added).  As importantly, most of the Defendants were not charged by, and did not enter plea agreements with, DOJ.  The plea agreements, by their own terms, do not support—and in fact refute—DPPs' claim of a conspiracy to fix the price of "all" capacitors.  Finally, as noted above, it makes no sense for manufacturers of aluminum, tantalum, ***and*** film capacitors to agree to fix the price of "all" of their capacitors given that they operated in completely different markets and sold many products that were not interchangeable.  Even DPPs' own damages expert performed separate calculations for each dielectric, and their proffered capacitors industry expert acknowledged that there are 14 factors that bear on whether capacitors are interchangeable.  In short, the object of the conspiracy alleged by DPPs in the Complaint makes no sense as a factual matter.

**Duration.**  DPPs claim the conspiracy alleged in the Complaint began "at least as early as January 1, 2002" and continued uninterrupted for the next twelve years.  Complaint ¶ 1.  Again, there is no evidence to support this broad allegation.  To the contrary, the plea agreements set forth different timeframes and describe the sporadic nature of the pleading Defendants' conduct.  *See* Plea Agreement at ¶ 4 (ELNA "***at times*** engaged in discussions and attended meetings," and "[d]uring ***certain*** … discussions and meetings" agreed to fix prices (emphasis added)).  And again there is no evidence of any participation, for any duration of time, for the non-pleading Defendants.

1   These points and others refute DPPs' claim of a global, overarching conspiracy to fix the

2   price of all capacitors everywhere for more than a decade.

3   **II.      KNOWING PARTICIPATION IN THE ALLEGED CONSPIRACY**

4       DPPs must prove that each Defendant knowingly—that is, voluntarily and

5   intentionally—became part of the conspiracy that DPPs have alleged in this case.  They cannot.

6   Numerous Defendants and alleged co-conspirators never attended or were even aware of the

7   alleged conspiratorial meetings.  No witness from a film-only Defendant will testify that they

8   knowingly joined a conspiracy to set the price of aluminum and tantalum (*i.e.*, electrolytic)

9   capacitors, that they attended the alleged conspiratorial meetings at which DPPs allege the prices

10  of electrolytic capacitors were fixed, or that they knowingly agreed to fix the price of ***all*** of the

11  film capacitors that they did sell.  Likewise, no witness from an electrolytic capacitor-

12  manufacturing Defendant will testify that they knowingly joined a conspiracy to set the price of

13  ***all*** aluminum, tantalum, ***and film*** capacitors.

14      Again, the plea agreements will not prove the conspiracy alleged in the Complaint.  The

15  four pleading Defendants entered plea agreements admitting to having knowingly entered

16  agreements to fix the prices of "***certain electrolytic*** capacitors," Plea Agreement (emphasis

17  added), and no pleading individual or 30(b)(6) representative of a pleading Defendant will testify

18  that, notwithstanding the terms of the plea agreements, they knowingly conspired to fix prices of

19  ***all*** capacitors, both electrolytic and film, for more than a decade.  In any event, the plea

20  agreements can be considered by the jury only for limited purposes, and cannot be used at all

21  against the Defendants that were not charged and did not plead.[2]

22  **III.     EFFECT ON IMPORT COMMERCE**

23      Because the conspiracy alleged by DPPs in the Complaint purportedly took place in Asia,

24  and because the Sherman Act only applies to foreign conduct that "was meant to produce and did

25

26  _____

27  [2] *See United States v. Halbert*, 640 F.2d 1000, 1006-1007 (9th Cir. 1981) (finding error where court failed to instruct the jury that evidence of co-conspirator's guilty plea "can be used only to assess credibility" of the witness, and for failing to tell the jury "in unequivocal language that the plea may not be considered as evidence of a defendant's guilt."); *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (approving limiting

28  instruction that the conviction of one defendant "could not be used against any other defendant for any purpose whatever").

1  in fact produce some substantial effect in the United States," Defendants' Proposal for Disputed

2  Final Jury Instruction No. 29B: Import Commerce – Intent; Substantial Effect (quoting *Hartford*

3  *Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993)), DPPs must prove that Defendants

4  knowingly entered into an agreement that (1) was **_intended_** to produce a substantial effect in the

5  United States and (2) **_did in fact_** produce a substantial effect in the United States.  *Id.* (citing *In*

6  *re TFT-LCD (Flat Panel) Antitrust Litigation,* Jury Instructions, 07-md-01827-SI, (N.D. Cal.

7  June 28, 2012) (Dkt. 6036), at *13-14).  DPPs cannot satisfy either of these requirements.

8  The evidence at trial will show that the industry meetings purported to be at the heart of

9  the alleged conspiracy had little or no intended or actual effect on prices in the United States.

10  Discussions focused on customers in Asia—not customers in the United States.  No witness has

11  testified that any of the conduct at issue targeted U.S. customers.  And there is no evidence of

12  any mechanism by which purported agreements reached at these industry meetings in Asia were

13  incorporated into the pricing considerations of capacitors sold into the United States.

14  **IV.  INJURY AND DAMAGES**

15  Finally, DPPs cannot prove injury or reasonably estimate damages.  The certified class is

16  immense—"**_all_** persons … that purchased Capacitors … directly from **_any_** of the Defendants …

17  from January 1, 2002 to December 31, 2013," that were based in the United States or imported

18  the purchased capacitors into the United States.  MDL ECF No. 493 at 2.  DPPs cannot show that

19  the conspiracy they allege "caused all or nearly all [of these class members] to pay more for

20  aluminum, tantalum, and/or film capacitors billed to or shipped to the United States than they

21  otherwise would have."  Defendants' Proposal for Disputed Final Jury Instruction No. 21:

22  Overview of Antitrust Claims.  Nor can DPPs establish that the amount of damages they allege

23  has "a reasonable basis in the evidence … based on reasonable, non-speculative assumptions and

24  estimates."  Defendants' Proposal for Disputed Final Jury Instruction No. 40: Basis for

25  Calculating Damages.

26  DPPs will rely on experts to attempt to satisfy their burden of proving injury and

27  damages.  None of these experts, however, will even attempt to link any discussions, meetings,

28  or communications in Asia with a price charged in the United States, let alone an inflated price.

Nor will any of these experts identify a mechanism that allowed the conduct in Asia to inflate all prices charged by Defendants in the United States, particularly where Defendants, who made up only a small share of the U.S. market, faced fierce competition from outside suppliers and rival products, such as ceramic capacitors.  One of DPPs' experts, Dr. McClave, purports to show "inflated prices to all or nearly all Class members" by statistically modeling these complex markets and, with the support of little or no record evidence, arriving at estimated, "average" overcharges of 8.9% for aluminum capacitors, 7.0% for tantalum capacitors, and 6.7% for film capacitors.  11/30/18 McClave Report at 8-9.  DPPs then apply these average overcharges to all U.S. sales made by Defendants and alleged co-conspirators over a twelve-year period (a volume of commerce exceeding $6.5 billion) to estimate total damages in excess of $500 million (before trebling).

Defendants will expose the fundamental flaws in Dr. McClave's analysis.  For example, Dr. Haider will explain how Dr. McClave's method for assessing class-wide impact—based on a single average overcharge for each of the three categories of capacitors (aluminum, tantalum, and film)—is incapable of showing impact for any particular customer.  She will also explain why it is improper for DPPs' other expert, Dr. Singer, an economist, to rely on documentary evidence like emails and meeting minutes as a justification for a one-size-fits-all regression model that assumes the same overcharge across all Defendants, all customers, and all 12 years of the alleged conduct for each dielectric.  And Dr. Haider will demonstrate how Dr. McClave's estimated overcharges are identified from *less than half* of the capacitor products sold in the class period and from only a subset of class members.  In fact, as Dr. McClave admitted at the September 17, 2019 concurrent expert witness proceeding, more than 40% of class members did not make *any* purchases in the benchmark period—such that Dr. McClave's methodology fails to establish any injury or overcharges for a substantial portion of the products and class members for which the DPP class claims damages.

In sum, the evidence at trial will demonstrate that DPPs cannot prove that the conspiracy they alleged caused injury to "all or nearly all" class members, nor can they provide an estimate

of damages that is not speculative and unreliable.  This failure of proof will require the jury to return a verdict of not liable as to each and every Defendant.

1

## AVX'S SUPPLEMENTAL TRIAL BRIEF

2      One of the Court's most urgent tasks at trial will be to prevent DPPs from improperly

3 prejudicing the jury into finding AVX liable despite a complete and total absence of relevant,

4 admissible, non-prejudicial evidence implicating it in the alleged conspiracy.

5      AVX has a complete standalone defense in this case: it had nothing to do with the alleged

6 conspiracy.  AVX has never been suspected or accused of participating in the alleged cartel by

7 anyone other than these plaintiffs.  DPPs very clearly allege a conspiracy that took place in

8 Japan.  DPPs concede that AVX did not attend any of the alleged cartel meetings.  DPPs' experts

9 do not opine that AVX actually participated in the conspiracy.  There are zero items of evidence

10 that show AVX joined the conspiracy.  Every Defendant in this case that has pleaded guilty has

11 stated under oath that AVX was not part of the conspiracy to which they pleaded guilty, as has

12 the ACPERA applicant.[3]  To the contrary, the alleged cartel's meeting minutes themselves stated

13 that the American companies AVX and Kemet were not conspirators, and therefore fixing prices

14 with them was "impossible."[4]  Not even the IPPs included AVX in their complaint.

15      Despite the complete lack of any connection between AVX and the alleged conspiracy,

16 AVX was "tacked on" as a defendant in this case for no apparent reason other than it is a

17 capacitor manufacturer located in the U.S. with U.S. revenues subject to damages and/or

18 settlement.  DPPs filed a blanket complaint against the entire industry, regardless of which

19 companies were implicated in the government investigations that triggered their filing of the

20 Complaint.  Because AVX is a U.S. company, DPPs have an obvious economic interest in

21 keeping AVX in the case: it greatly pumps up DPPs' damages estimate, as AVX's revenues

22 account for as much as 20-25% of DPPs' damage claim.

23      As a result, DPPs' litigation strategy, as made clear in their pretrial filings, is to bias the

24 jury against AVX and bootstrap that bias into a damages award.  DPPs will attempt to put on a

25 case against AVX consisting entirely of instances where an AVX employee did some stupid or

26 inadvisable thing *that had nothing to do with the alleged conspiracy*, and then argue to the jury

27

28
_____
[3] AVX Motion for Summary Judgment (MDL Dkt 651) at 5-6.
[4] AVX Motion for Summary Judgment (MDL Dkt 651) at 4.

that if AVX did that stupid thing, then AVX must also have joined the conspiracy.  Indeed, most of these things, if inadvisable, were neither illegal nor unethical.  Worse, most of these things relate to another party (now settled), Kemet, as to which there is also no evidence of actual participation in the alleged conspiracy.  The Court must protect the jury from such evidence.

For example, DPPs will attempt to introduce evidence regarding a European AVX salesperson talking to a European salesperson from Kemet about a European customer.  That evidence has nothing to do with the conspiracy alleged in the Complaint, it has nothing to do with U.S. commerce, and it is inadmissible as irrelevant under FRE 401 and 402, unfairly prejudicial under FRE 403, and improper character/propensity evidence under FRE 404.[5]

As another example, DPPs will attempt to introduce a hearsay-within-hearsay note written in Japanese by a Sanyo employee in which some unnamed person at AVX is characterized as saying there was a price increase for a particular type of capacitor made at the same time as Kemet.  The document is inadmissible on its face as hearsay subject to no exception,[6] but even if an exception applied, the document has nothing to do with the conspiracy alleged in the Complaint, it says nothing about U.S. commerce, and it is inadmissible as irrelevant under FRE 401 and 402, unfairly prejudicial under FRE 403, and improper character/propensity evidence under FRE 404.

As a final and perhaps paradigmatic example, DPPs will seek to introduce a photograph that was taken in the middle of a crowded ballroom at a perfectly legitimate, broadly attended conference, that simply shows an AVX employee (who is an American of Chinese ancestry) sitting next to an employee (who is Japanese) of an alleged cartel member.[7]  The obvious purpose of this document will be to urge the jury to see multiple Asian men sitting together and conclude that "they are all the same."  This purpose is forbidden under Rule 403 even if the document were admissible under Rules 401 and 402—which it is not.  DPPs cannot be allowed to foment pure racial bias by clinging to the slender reed of a joking reference to "the tantalum

---

[5] *See* Defendants' Motion *In Limine* No. 6 to Exclude All Evidence Relating to European Conduct at 1-3 (MDL Dkt XXX).

[6] *See, e.g.,* Defendants' Motion *In Limine* No. 7 to Exclude Out-of-Court Statements Relating to AVX Corporation and Kemet Corporation Declarants at 1-3 (MDL Dkt XX).

[7] *See* AVX Reply in Support of Motion for Summary Judgment (MDL Dkt 851) at 13-14.

mafia" in the cover E-mail—which is a common phrase that DPPs would attempt to color with a tinge of racial prejudice.

Justice requires that the Court keep the jury focused on relevant, probative, non-prejudicial evidence—which will require careful refereeing of Plaintiffs' attempts to introduce irrelevant and prejudicial evidence against AVX.

## SHINYEI'S SUPPLEMENTAL TRIAL BRIEF

This case has been pending for over five years.  Despite extensive discovery, there is no evidence whatsoever that Shinyei participated in any way in DPPs' alleged 12-year conspiracy to fix prices of electrolytic capacitors and film capacitors.  The undisputed evidence is clear:

1. Shinyei manufactures and sells only film capacitors.

2. Shinyei does not manufacture and sell electrolytic capacitors.

3. Electrolytic capacitors are not interchangeable with, and are not substitutes for, film capacitors in nearly all applications.

4. Shinyei did not attend and did not have knowledge of any of the electrolytic capacitor manufacturer meetings, including MK, ATC, CUP, or Presidents' meetings, at which DPPs allege price fixing agreements were reached.

5. Shinyei was never part of the U.S. Department of Justice's ("DOJ") investigation into the electrolytic capacitor industry.

6. None of the plea agreements obtained by the DOJ in its electrolytic capacitor investigation even mentions film capacitors, the film capacitor industry, or Shinyei.

7. The DOJ closed its separate investigation into the film capacitor industry without taking any action against Shinyei or any other party.

8. There is no testimony from any witness and no documentary evidence that Shinyei agreed with any competitors on the prices of any type of capacitor products.

9. Shinyei predominantly manufactures customized film capacitors made according to the customer's specifications, with the majority (and eventually all) of Shinyei's U.S. sales made to one end user pursuant to a contract.

10. Shinyei employed individualized pricing policies for its film capacitor sales.

The evidence is clear that Shinyei did not join any conspiracy and DPPs cannot meet their burden of proof as to Shinyei.

More specifically, there is no direct evidence that Shinyei participated in DPPs' alleged overarching conspiracy to fix prices of electrolytic capacitors and film capacitors.  Nor is there any circumstantial support for inferring that Shinyei participated in DPPs' alleged conspiracy.

1    Again, Shinyei did not manufacture and sell electrolytic capacitors.  The notion that it would

2    nevertheless join and participate for 12 years in a complicated conspiracy to fix prices of highly

3    differentiated products that it did not make or sell is not plausible on its face.  Indeed, Shinyei

4    would not stand to gain any economic benefit from participating in such a conspiracy.  Nor

5    would electrolytic capacitor manufacturers have any economic motive to include Shinyei.

6          DPPs' allegation that Shinyei conspired to fix prices with respect to electrolytic capacitor

7    and film capacitor sales in the United States is further implausible given Shinyei's undisputed

8    sales records.  Not only did Shinyei not manufacture and sell electrolytic capacitors during the

9    class period, but also Shinyei's U.S. sales of film capacitors during the alleged class period were

10   to only two types of customers and for only two end-use markets:  Shinyei sold its film

11   capacitors to television manufacturers for use in cathode ray televisions (CRTs) and to an

12   electronic ballast manufacturer, Universal Lighting Technologies ("ULT"), for use in certain

13   lighting applications.  During the class period, the majority of Shinyei's U.S. film capacitor sales

14   were to ULT.  In fact, by 2007 over 75% of Shinyei's U.S. film capacitor sales were to ULT, and

15   by 2010 and each year after, that figure reached 100%.  Shinyei's closest competitor for those

16   sales was a non-defendant Taiwanese company.  In other words, the majority of Shinyei's film

17   capacitor sales—reaching 100% by 2010—were made to a single customer, *for which Shinyei*

18   *did not compete with any of the alleged conspirators*.  Under these facts, it is utterly implausible

19   that Shinyei would enter into the 12-year conspiracy alleged by DPPs through the end of 2013 to

20   sell electrolytic capacitors (which it did not make) or to sell film capacitors to a broad class of

21   DPPs that were not its customers.

22         The fact that electrolytic capacitors and film capacitors are different products makes the

23   alleged overarching conspiracy even more irrational.  Electrolytic capacitors and film capacitors

24   are not close substitutes in either function or price.  In fact, DPPs' proffered capacitors industry

25   expert acknowledged that there are *14 factors* that bear on whether capacitors are

26   interchangeable.  Because film capacitors and electrolytic capacitors are not generally

27   interchangeable or market substitutes for each other, film capacitors, as a matter of economic

28   principle, would not restrain electrolytic capacitor manufacturers from increasing electrolytic

capacitor prices.  Consequently, there is no economic benefit for electrolytic manufacturers to include Shinyei in a conspiracy to fix the prices of electrolytic capacitors sold to DPPs.

DPPs' theory that Shinyei conspired through information exchanges at electrolytic manufacturer meetings likewise is not plausible.  Shinyei did not attend or know about these meetings, and there is no evidence that any electrolytic capacitor manufacturer provided Shinyei with information from those meetings.  The theory that Shinyei conspired to fix electrolytic capacitor and film capacitor prices through meetings that it never attended and that it did not know were even taking place is completely implausible.

DPPs' anticipated efforts to paint JFC meetings as evidence of their alleged vast conspiracy similarly fails.  DPPs have previously emphasized that certain Defendants manufactured both electrolytic capacitors and film capacitors, and attended both electrolytic meetings and JFC meetings.  But vague assertions and innuendo do not suffice.  And, none of the actual evidence concerning JFC meetings demonstrates any agreement among competitors to fix the prices of electrolytic capacitors or film capacitors, much less any means of monitoring or enforcing such an agreement.  Instead, the evidence shows general information exchanges that are typical of trade associations and not unlawful and certainly not evidence of DPPs' alleged overarching conspiracy.

Nor can DPPs prove injury or reasonably estimate damages, including for the reasons discussed in Defendants' Joint Trial Brief.

Simply put, DPPs cannot meet their burden of proving that Shinyei specifically participated in the alleged 12-year conspiracy to fix prices of electrolytic capacitors and film capacitors sold to DPPs.  Indeed, there is no testimony from any witness and no documentary evidence that Shinyei agreed with any competitor on the prices of any type pf capacitor products.  Accordingly, the jury will have no choice but to return a verdict of "not liable" as to Shinyei.

**TAITSU'S SUPPLEMENTAL TRIAL BRIEF**

Direct Purchaser Plaintiffs ("DPPs") accuse Taitsu Corporation and Taitsu America, Inc. (together, "Taitsu") of joining an overarching, 12-year conspiracy to fix the price of electrolytic and film capacitors despite Taitsu's status as a minor player in the film capacitor industry with no connection to, and little knowledge of, the electrolytic capacitor industry.

A serious flaw with DPPs' (and their experts') approach is that they presume the existence of a conspiracy in the film capacitor industry largely because of purported agreements among certain members of the electrolytic capacitor industry.  The guilty pleas at issue in this matter relate solely to electrolytic capacitors and the electrolytic industry. Taitsu, like all other Defendants that only manufactured film capacitors (together, the "Film-Only Defendants"), did not plead guilty to any conspiracy in the film capacitor industry. Indeed, the Department of Justice closed its investigation into the film capacitor industry without pursuing any criminal, or even civil, action. And no foreign antitrust or competition agencies has taken any action against film capacitor manufacturers, despite having similarly investigated their conduct.

There is simply no basis to infer an agreement by Taitsu to join any conspiracy—much less an overarching conspiracy to fix the price of electrolytic and film capacitors—from any direct evidence of an agreement between electrolytic manufacturers, to the extent any such evidence exists. And DPPs' experts' econometric models do not show that the price of film capacitors had a significant effect on the price of electrolytic capacitors, reflecting how unlikely it is that any electrolytic manufacturer would or did seek any agreement with any film manufacturer (who likewise would have no incentive to participate in any such agreement).

DPPs' experts also ignore the undeniable fact that Taitsu (and the other film capacitor manufacturers) sell hundreds, if not thousands, of disparate products at widely varying prices— often in entirely separate markets and rarely to overlapping customers. And many of the film capacitors sold by Taitsu are custom-made, designed for specific functions, and sold at negotiated prices. These are all characteristics of Taitsu's sales that make collusion between it and any other manufacturer difficult and unlikely, which suggests that class members did not suffer any injury due to their purchase of Taitsu's film capacitors during the class period.

Moreover, DPPs' experts rely on certain structural conditions in the market to argue that there was collusion among Defendants that manufacture film capacitors. Yet, many of the conditions simply are not present or are present only to a *de minimis* extent, relative to other industries in which collusion has occurred. For example, according to DPPs' own experts, the share of all Defendant film capacitor manufacturers in total global film sales is as little as 20% of the global film capacitor market. (ECF No. 2402-7 ¶ 94) ("With respect to film Capacitors, the evidence indicates that the [Defendant film manufacturers] ha[ve] collectively accounted for between 20 percent and 31 percent of global production."). And the share for Taitsu is significantly smaller. Thus, by DPPs' experts' own estimates, up to 80% of the global film capacitor market should have been unaffected by any conspiracy and should have been available to supply DPPs with film capacitors.

The bulk of the evidence upon which DPPs rely to support their presumption of a conspiracy involving the Film-Only Defendants pertains to regular meetings of the JFC trade association, where limited, general information was exchanged—information that does not provide a basis to infer the existence of any agreement to fix prices of film capacitors (let alone electrolytic *and* film capacitors) or even that one would have been possible. Importantly, there is no evidence that any information exchanged at or around JFC meetings would have allowed participants to monitor or enforce any agreement to fix the prices of hundreds if not thousands of disparate film capacitor products. At best, they simply show that certain manufacturers got together a handful of times a year, socialized, and exchanged general information about their companies and the film capacitor industry.

These evidentiary shortcomings force DPPs to rely on hired experts to craft econometric models to argue that an unexplained drop in the price of film capacitors—after the market learned of the investigations into the various capacitor industries in March 2014—implies that, for the preceding twelve-year period, there was an estimated overcharge of approximately 7.0% for film capacitors attributable to a purported film conspiracy. Yet, as the Film-Only Defendants' expert, Dr. Frederick R. Warren-Boulton, opined, when material factors are considered and incorporated into those models, they do not hold up. In fact, there is little to suggest that any

overcharge for film capacitors occurred during the period for which DPPs seek damages. This fatally undermines the merits of DPPs' Section 1 cause of action as well, of course, as their proposed damages model.

Specifically, DPPs' experts' models fail to include or account for important explanatory variables that appear to be the primary determinants of prices for film capacitors, including the prices of ceramic capacitors, capacity utilization, and manufacturing costs. When Dr. Warren-Boulton corrects for DPPs' expert's errors, the estimated overcharge for film capacitors essentially drops to zero. This is particularly true when the models account for just one additional variable—ceramic capacitors—which are close substitutes of film capacitors and are not implicated by any alleged conspiracy.

At trial, Dr. Warren-Boulton will testify that the totality of the factual evidence and the DPPs' experts' models, when utilized correctly, yield the same conclusion that Dr. Warren-Boulton provided in his report and testimony: (1) any purported evidence of collusion in the unrelated electrolytic capacitor industry does not bear on whether there was collusion in the film capacitor industry and no other evidence supports the conclusion that there was collusion in the film capacitor industry; (2) there is no evidence that structural conditions in the film capacitor market were conducive to, much less produced, collusion in that industry; and (3) there is no evidence to support DPPs' claims of any overcharge in the film capacitor industry.

1

### NCC'S SUPPLEMENTAL TRIAL BRIEF

2        The Complaint alleges a single, overarching, and non-stop conspiracy between

3   approximately 22 corporate families encompassing *every aluminum, tantalum, and film*

4   *capacitor* sold into the United States for a period of *12 years*.  *See* DPPs' Third Amended

5   Complaint, 14-cv-3264, ECF No. 1831, at ¶¶ 1, 7.  "Whether such a single conspiracy has been

6   proved is a question of the sufficiency of the evidence."  *United States* v. *Fernandez*, 388 F.3d

7   1199, 1226–27 (9th Cir. 2004).  Defendants' Joint Trial Brief sets out the absence of evidence

8   showing a single overarching conspiracy, and the myriad reasons why that conspiracy did not

9   exist (and could not have existed).  This Brief provides additional, NCC-specific reasons why

10   neither the conspiracy nor NCC's participation in it will be proven at trial.

11        *Limited Membership.*  None of the millions of documents produced in discovery (and

12   certainly none of the thousands of documents on DPPs' exhibit list) shows all defendants coming

13   to an agreement together.  Rather, these documents show that NCC rarely met several of its

14   alleged conspirators and certainly never reached any agreement with them.  At most, the

15   evidence shows a series of disparate meetings or communications with disparate co-defendants

16   involving specific products in different parts of the world.  No witness (lay or expert) and no

17   document can describe the broader conspiracy alleged in the Complaint.  This is entirely

18   consistent with NCC's plea agreement, in which it pled guilty to fixing prices and rigging bids

19   for only "*certain* electrolytic capacitors."  Plea Agreement, *United States* v. *Nippon Chemi-Con*

20   *Corp.*, No. 4:17-CR-00540-JD (N.D. Cal. May 31, 2018), ECF No. 54 ("NCC Plea") ¶ 4(b)

21   (emphasis added).

22        *Limited Geography.*  NCC's participation in most of these meetings related only to

23   ASEAN markets or customers.  The limited scope of these meetings makes sense, in that NCC's

24   "representatives" at these meetings generally (1) lacked the authority to reach the global

25   agreements DPPs allege; or (2) lacked authorization to attend the meetings in the first place.

26   And NCC did not attend a single conspiratorial meeting in the United States.  Nor was UCC—

27   the only Chemi-Con entity that distributed capacitors in the United States—aware of NCC's

28   overseas agreements.  Indeed, NCC's plea agreement reflects this geographic limitation by

specifically excluding capacitors manufactured in the United States.  *Id.* (noting NCC participated in a conspiracy, the "primary purpose of which" regarded "*certain* electrolytic capacitors manufactured *outside of the United States*") (emphasis added).  NCC's narrow agreements with certain (but not all) co-defendants, mostly regarding overseas customers and products, do not permit DPPs to reap a windfall by assuming these limited agreements affected every single capacitor sold *in the United States*.  DPPs fail to provide any mechanism to distinguish between affected and unaffected capacitors and cannot meet their burden.

*Limited Information.*  Not all (or even most) of the information sharing alleged by the DPPs was improper.  Often, and especially at MK meetings, NCC shared only generalized information and forecasts, which were then aggregated before distribution.  DPPs have not sought to distinguish well-recognized and procompetitive activity from the more limited conduct to which NCC pled guilty.

*Limited Commitment.*  While DPPs will be required to show that NCC actually joined and participated in the charged conspiracy, the evidence will show NCC fiercely competing with its alleged co-conspirators.  Indeed, many of the documents on DPPs' own exhibit list show supposed co-conspirators complaining about NCC's conduct in undercutting their prices.

*Limited Impact.*  Not only were price-fixing agreements the exception, not the norm, but affected customers often had the economic strength to resist any price increases.  Competition was significant to sell these components to some of the most sophisticated electronics companies in the world and often involved competing manufacturers not alleged to be co-conspirators.

*Industry Shocks.*  The evidence at trial will show that the effectiveness of the Defendants' alleged conduct—and the resulting alleged harm to the Plaintiff class—was also affected by several extraneous events.  The evidence will show that among other things, the recession of 2008 put significant downward pressure on capacitor prices, leaving manufacturers—including the participants in the challenged industry meetings—unable to impose price increases.  The evidence will show that NCC's profitability dropped sharply in 2008 and did not recover for years.  Any jury verdict will reflect the Defendants' inability to raise prices during this time.

1          Further, two significant natural disasters played a material role in the supply of capacitors

2    during the relevant period.  In 2011, Thailand experienced heavy flooding, such that "65 of

3    [Thailand's] 77 provinces were declared flood disaster zones."  Haider Rep. at 49.  The aftermath

4    of the floods significantly impacted any agreement on pricing, particularly those concerning

5    tantalum capacitors.  The evidence will show that some of the Thai factories limited activity to

6    four days a week, the industry saw excess inventory and a decline in demand in late 2011, and

7    prices dropped in nearly every market soon after the flooding.

8          In addition, and in any event, the evidence will show that NCC's participation in any

9    agreement or agreements to fix prices almost entirely ended with the 2011 Great East Japan

10   Earthquake.  The evidence will show that NCC facilities faced significant damage, and that

11   alleged co-conspirators poached NCC customers by spreading rumors that NCC could never

12   recover.  In dire financial straits, NCC issued an order to win back market share at all costs,

13   including by forcefully undercutting its competitors' prices.  Contemporaneous documents will

14   show these competitors complaining about NCC's actions, demonstrating that the vast majority

15   of pricing agreements had ended by late 2011.  Again, a proper verdict will reflect these events.

16         In sum, the evidence will not establish either the broad alleged conspiracy (and certainly

17   not NCC's participation in any such broad conspiracy) or the harm alleged in the Complaint.

18

19

20

21

22

23

24

25

26

27

28

### UCC'S SUPPLEMENTAL TRIAL BRIEF

Defendant United Chemi-Con, Inc. ("UCC") is an Illinois corporation headquartered in Rolling Meadows, Illinois, with operations in Buena Park, California; Huntsville, Alabama; and Lansing, North Carolina.  UCC is a wholly-owned subsidiary of Defendant Nippon Chemi-Con Corp. ("NCC") and is the only entity in the Chemi-Con family that sold or distributed NCC's capacitors in the United States during the class period alleged in the Complaint.  As the Court has already recognized, UCC is a separate company from NCC; it is staffed predominantly by American employees, and it produces its own capacitors in addition to selling imported capacitors manufactured by other Chemi-Con companies.  Plaintiffs allege that UCC facilitated the effectuation of NCC's conspiratorial agreements in the United States.  Plaintiffs are wrong.

As confirmed by the fact that the Department of Justice did not charge (much less require a plea from) UCC, the evidence will show that UCC did not participate in any conspiratorial meetings or agreements and did not facilitate NCC's participation in any such agreements.  In fact, there is no evidence that UCC agreed to fix prices of *any* capacitors.  UCC's lack of involvement in the conduct alleged in the Complaint is further reflected in market conditions in the United States—and in the capacitor market in particular—showing that the alleged conspiratorial activity would only have *harmed* UCC, which has sufficient market share to retain pricing power of its own.

### I.   UCC Is an Independent Company That Sets Its Own Prices and Whose Behavior Cannot Be Tied to Other Defendants.

As this Court previously held, NCC and UCC are separate entities (*see* Order Den. Def. Nippon Chemi-Con's Mot. to Dismiss for Lack of Personal Jurisdiction at 4, *In re Capacitors Antitrust Litig.*, No. 14-cv-3264 (N.D. Cal. June 11, 2015), ECF No. 738) and UCC does not engage in coordinated activity with NCC.[8]  UCC manufactures its own aluminum electrolytic capacitors ("AECs") at a plant in Lansing, North Carolina ("Lansing") in addition to selling capacitors imported from NCC.

---

[8] Defendants disagree that the legal standard articulated by *Arandell Corp.* v. *Centerpoint Energy Servs, Inc.*, 900 F.3d 623 (9th Cir. 2018) applies here, but even if it does, the evidence will demonstrate that UCC is not sufficiently "coordinated" with NCC to be pulled into the alleged conspiracy by mere virtue of its membership in a corporate family.

Prices that UCC sets for the capacitors it sells are determined independently from NCC. UCC does not consult with NCC or rely on a central pricing list in setting prices. Rather, UCC's sales managers determine the sale price to customers based on a "Unified Sales Cost"—which includes the costs of materials, labor, and overhead, averaged out across the Chemi-Con factories that make the relevant capacitor.

All of the testimony taken in this case—and the documentary evidence produced—confirms that UCC did not attend any of the allegedly conspiratorial multilateral meetings alleged in the Complaint. Nor did UCC participate in any improper bilateral agreements with competitors. In sum, the evidence will not show that UCC participated in the conspiracy alleged in the Complaint.

## II.    UCC's Position in the United States Capacitor Market Indicates That UCC's Participation in the Alleged Conspiracy Would be Contrary to Its Economic Interests.

Market data and expert testimony will also confirm that UCC's participation in the alleged conspiracy does not make economic sense. During the relevant period, 22% of UCC's revenue came from the sale of larger AECs that it manufactures in the United States. These differ significantly in form and function from the smaller capacitors which were produced outside the United States and which were subject to the limited price-fixing agreements that the evidence establishes took place outside the United States. [9]  Very few of the other defendants in this case even sell this kind of large capacitor in the United States.

Importantly, UCC accounted for a substantial share (over 50% by revenue) of the United States market for large AECs, while the other Defendants *combined* controlled between 5–15% of that same market. For this reason, and as Plaintiffs' own expert acknowledges, "UCC *would have had pricing power in the absence of the Cartel*" and it would be the other Defendants—and not UCC—who stood to substantially benefit from a conspiracy. Singer Rebuttal Rep. ¶ 103 (emphasis added). It is therefore unsurprising that *UCC's main competitors are not defendants in this case*: these include companies like Cornell Dubilier, Jianghai, and EPCOS. Indeed,

---

[9] Plaintiffs have themselves testified that large AECs are not interchangeable with and have different uses, and different prices than other capacitors. *See* Lubman Dep. Tr. 567:10–569:12; Lou Dep. Tr. 29:9–13.

Cornell Dubilier itself sold a larger share of revenue of large AECs in the United States than all non-UCC Defendants combined.  All told, the remaining Defendants make up such a small portion of UCC's competition that it would actually harm UCC's economic interests to conspire with them to fix prices.  Doing so would instead create opportunities for UCC's principal competitors to steal sales from UCC.  Consistent with this, the evidence at trial will establish that no one at UCC believed they had any choice but to compete aggressively for the sale of large AECs and that UCC actually competed against—and did not cooperate with—former defendant Nichicon.

As a result, and as UCC's expert, Dr. Janusz Ordover, will explain to the jury, large AECs would not have been impacted by the alleged conduct.  Plaintiffs, however, have produced no analysis of UCC's stand-alone sales data, choosing instead to aggregate UCC and NCC sales even though they are separate companies that make and sell different products.

## CONCLUSION

For the foregoing reasons, the evidence will show that UCC was not part of DPPs' alleged conspiracy.

**HOLY STONE DEFENDANTS' SUPPLEMENTAL TRIAL BRIEF**

Throughout this litigation, DPPs have grouped the Holy Stone Defendants together, despite the fact that liability for price fixing requires evidence of the knowing involvement of each Defendant, considered individually.  DPPs have done this – and relied on inapplicable theories of vicarious liability – because DPPs completely lack evidence of the Taiwanese parent and the United States subsidiary joining the alleged conspiracy.  Thus, the Holy Stone Defendants' trial presentation will necessarily focus on the critical differences between each of the defendant companies as well as the evidence and legal standards applicable to each.

The following facts will be proven at trial.  Defendant Holy Stone Enterprise Co. Ltd. ("Holy Stone Enterprise") is a Taiwanese company headquartered in Taipei.  Defendant Milestone Global Technology, Inc., doing business as Holy Stone International ("Holy Stone International"), is a California company that serves as the North American sales agent for Holy Stone Enterprise.  Defendant Vishay Polytech Co., Ltd., formerly known as Holy Stone Polytech Co., Ltd. ("Holy Stone Polytech"), was incorporated under the laws of Japan in 2010 for the purpose of acquiring the tantalum capacitor manufacturing assets of Hitachi Chemical Co., Ltd. ("Hitachi").  As part of this asset acquisition, which was completed on April 1, 2010, Holy Stone Polytech acquired Hitachi's tantalum capacitor manufacturing facility in Fukushima, Japan and Holy Stone Polytech then hired a number of former Hitachi employees.  In June 2014, Holy Stone Polytech was acquired by an unrelated company, and later renamed Vishay Polytech Co., Ltd.

During its four-year existence, Holy Stone Polytech operated independent of its ultimate parent organization, Holy Stone Enterprise, and its sister organization, Holy Stone International.  For example, Holy Stone Polytech conducted business under its own trade name; operated out of its own offices; hired, fired and paid its own employees; set its own prices to its own customers; held its own assets; paid its own taxes; carried its own insurance; kept its own financial records and followed all of the other corporate formalities distinct entities traditionally follow.

In early-2014, Holy Stone Enterprise and Holy Stone International learned – for the first time – that a handful of Holy Stone Polytech employees had attended industry meetings with other capacitor manufacturers in Japan, starting in October 2010.  These meetings focused on the

1   exchange of data and information relating to the Asian markets for aluminum and tantalum

2   capacitors.  After this first meeting in October 2010, a single Holy Stone Polytech employee,

3   Katsunori Sato, continued to attend until the meetings were disbanded in January 2014.

4   **I.     The Claims Against Holy Stone Enterprise And Holy Stone International Will Fail.**

5          As DPPs essentially conceded on summary judgment, no Holy Stone Enterprise or Holy

6   Stone International employee knew of competitor meetings, participated in the meetings, or

7   engaged in any similar competitor communications outside of the meetings.  The evidence will

8   instead show that these entities were not involved.  Because liability for price fixing "c[an] only

9   be predicated on the knowing involvement of each defendant, considered individually, in the

10  conspiracy charged," *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 463 (1978), DPPs will fail

11  to prove that Holy Stone Enterprise and Holy Stone International joined the alleged conspiracy.

12         Thus, DPPs will pursue various theories seeking to hold Holy Stone Enterprise and Holy

13  Stone International vicariously liable for the conduct of Holy Stone Polytech.  These efforts will

14  also fail.  There is no support for DPPs' claim that Holy Stone Polytech employees acted with the

15  "apparent authority" of Holy Stone Enterprise or Holy Stone International.  Apparent authority

16  exists where a third party reasonably believes that an agent is authorized to act on behalf of a

17  principal, ***as a result of the principal's manifestations***.  Restatement (Third) of Agency § 3.03

18  (2006).  No witness or document presented at trial, however, will suggest that the third parties

19  here (*i.e.,* members of the alleged conspiracy) had any reason to believe Holy Stone Polytech was

20  acting with the apparent authority of Holy Stone Enterprise or Holy Stone International.

21         Likewise, DPPs' claim that the Holy Stone Defendants can be treated as a "single entity,"

22  based on *Arandell Corp. v. CenterPoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018), will not

23  succeed.  In *Arandell*, the court treated a parent and wholly-owned subsidiaries as a single entity

24  based on evidence that "[t]he officers and directors of the Reliant ***parent*** orchestrated [the price-

25  fixing] scheme," by directing its subsidiaries to manipulate prices and send the illegal profits back

26  to the parent.  *Id*. at 628 (emph. added).  No similar evidence will be presented at trial.  There will

27  be no evidence that Holy Stone Enterprise was aware of, let alone "orchestrated," the alleged

28  conspiracy.  *Id*. at 628.  Nor will there be evidence that Holy Stone Enterprise directed Holy

Stone Polytech to pass "rigged and inflated prices" on to "buyers outside of the . . . economic unit." *Id*. at 635.  There will also be no evidence that Holy Stone Polytech "funneled" unlawful profits back to Holy Stone Enterprise or any other entity.  *Id*. at 628.  The absence of this type of evidence will defeat DPPs' "single entity" theory.

## II.    DPPs Cannot Support their Claims Against Holy Stone Polytech.

While more straight forward, DPPs' case against Holy Stone Polytech will also fall short. Holy Stone Polytech did not exist for most of the class period and therefore could not have joined the alleged conspiracy until 2010.  As a matter of law, "a defendant cannot be held liable for substantive offenses committed ***before joining*** or after withdrawing from a conspiracy."  *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) (emphasis added).  Moreover, DPPs cannot hold Holy Stone Polytech liable for prior conduct as a "mere continuation" of Hitachi because only a defendant "who enters a conspiracy late, ***with knowledge of what has gone before, and with the intent to pursue the same objective***, may be charged with preceding acts in furtherance of the conspiracy."  *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) (emphasis added).  At trial, there will be significant evidence that Holy Stone Polytech was a business far different from Hitachi in terms of intent, purpose, management, products, customers, sales and involvement in the alleged conduct.  Indeed, the single Holy Stone Polytech employee involved in competitor meetings while with Hitachi was relegated to quality control at Holy Stone Polytech, and the single Holy Stone Polytech employee primarily involved in competitor meetings never participated while with Hitachi.  In short, evidence at trial will establish that Holy Stone Polytech was far from a mere continuation of Hitachi.  Finally, evidence at trial will demonstrate that Holy Stone Polytech could not have made a conscious commitment to the overarching conspiracy alleged by DPPs.  Holy Stone Polytech sold tantalum capacitors only, it did not sell to United States customers, it did not compete with most other Defendants, and its largest and most important customer was Holy Stone Enterprise.  Moreover, the evidence will establish that the factual basis underlying the plea agreement entered into on behalf of Holy Stone Polytech involved only one set of discussions in the summer of 2010 with only one Defendant regarding several Asian customers, not the conspiracy alleged by DPPs.

1  Dated: January 21, 2020                    /s/ Heather S. Nyong'o

2                                             Heather S. Nyong'o (CA SBN 222202)
                                             WILMER CUTLER PICKERING
3                                            HALE AND DORR LLP
                                             1 Front Street, Suite 3500
4                                            San Francisco, California 94111
                                             heather.nyongo@wilmerhale.com
5

6                                            Thomas Mueller (*pro hac vice*)
                                             thomas.mueller@wilmerhale.com
7                                            WILMER CUTLER PICKERING
                                             HALE AND DORR LLP
8                                            1875 Pennsylvania Avenue, NW
                                             Washington, DC 20006
9

10                                           Chris Johnstone (CA SBN 242152)
                                             WILMER CUTLER PICKERING
11                                           HALE AND DORR LLP
                                             950 Page Mill Road
12                                           Palo Alto, CA 94304
                                             chris.johnstone@wilmerhale.com
13                                           Telephone: (650) 858-6000
                                             Facsimile: (650) 858-6100
14

15                                           Attorneys for Defendants
                                             ELNA CO., LTD. and ELNA AMERICA, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

1

2   Dated: January 21, 2020

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey A. LeVee (State Bar No. 125863)
jlevee@JonesDay.com
Eric P. Enson (State Bar No. 204447)
epenson@JonesDay.com
Kelly M. Ozurovich (State Bar No. 307563)
kozurovich@JonesDay.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone:    +1.213.489.3939
Facsimile:    +1.213.243.2539

John M. Majoras (Admitted Pro Hac Vice)
jmmajoras@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:    +1.202.879.3939
Facsimile:    +1.202.626.1700

Attorneys for Defendants
HOLY STONE ENTERPRISE CO., LTD.,
MILESTONE GLOBAL TECHNOLOGY,
INC. (D/B/A HOLYSTONE
INTERNATIONAL), VISHAY
POLYTECH CO., LTD.


By: */s/ Eric P. Enson*
        Eric P. Enson

Attorneys for Defendants
HOLY STONE ENTERPRISE CO., LTD.,
MILESTONE GLOBAL TECHNOLOGY,
INC. (D/B/A HOLYSTONE
INTERNATIONAL), VISHAY
POLYTECH CO., LTD

1    Dated: January 21, 2020

2                                                 MINTZ LEVIN COHN FERRIS
                                                  GLOVSKY AND
3                                                 POPEO P.C.
                                                  Bruce D. Sokler
4                                                 Robert G. Kidwell
                                                  701 Pennsylvania Avenue NW, Suite 900
5                                                 Washington, DC 20004
                                                  bdsokler@mintz.com
6                                                 RGKidwell@mintz.com

7
                                                  MINTZ LEVIN COHN FERRIS
8                                                 GLOVSKY AND
                                                  POPEO P.C.
9                                                 Evan S. Nadel
                                                  44 Montgomery Street, 36th Floor
10                                                San Francisco, CA 94104
                                                  enadel@mintz.com
11

12                                                By:  _____ */s/ Bruce D. Sokler*  _____

13

14                                                Attorneys for Defendant
                                                  AVX CORPORATION
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: January 21, 2020

Bonnie Lau
Stephen Kam
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile:  (415) 268-7522
blau@mofo.com
stephenkam@mofo.com

David Cross
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue
Suite 6000
Washington, D.C. 20006-1888
Telephone:  (202) 887-1500
Facsimile:   (202) 887-0763
dcross@mofo.com

By:   _/s/ Stephen Kam_____

Attorneys for Defendants
MATSUO ELECTRIC CO., LTD.

Dated: January 21, 2020

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Charles F. Rule
Joseph J. Bial
Eric R. Sega
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
rrule@paulweiss.com
jbial@paulweiss.com
esega@paulweiss.com

Roberto Finzi
Farrah R. Berse
Johan E. Tatoy
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 445-4621
Facsimile: (212) 757-3990

KAUFHOLD GASKIN LLP
Steven Shea Kaufhold
388 Market St, Suite 1300
San Francisco, CA 94111
Telephone: (415) 445-4621
Facsimile: (415) 874-1071
skaufhold@kaufholdgaskin.com

By: _____ */s/ Joseph J. Bial* _____

Attorneys for Defendants
NIPPON CHEMI-CON CORPORATION
and UNITED CHEMI-CON, INC.

1   Dated: January 21, 2020

2                                          DENTONS US LLP
                                           Gaspare J. Bono
3                                          Claire Maddox
                                           Leslie Barry
4                                          1900 K Street, NW
                                           Washington, DC 20006
5                                          Email: gap.bono@dentons.com
                                           claire.maddox@dentons.com
6                                          leslie.barry@dentons.com

7
                                           DENTONS US LLP
8                                          Andrew S. Azarmi
                                           One Market Plaza, Spear Tower, 24th Floor
9                                          San Francisco, California 94105
                                           Email: andrew.azarmi@dentons.com
10

11                                         By: _____ */s/ Gaspare J. Bono* _____

12

13                                         Attorneys for Defendants
                                           SHINYEI KAISHA, SHINYEI
14                                         TECHNOLOGY CO., LTD., SHINYEI
                                           CAPACITOR CO., LTD. and SHINYEI
15                                         CORPORATION OF AMERICA, INC.

16   Dated: January 21, 2020

17                                         BONA LAW PC
                                           Jarod M. Bona
18                                         Aaron R. Gott
                                           4275 Executive Square, Suite 200
19                                         La Jolla, CA 92037
                                           Email: jarod.bona@bonalawpc.com
20                                         aaron.gott@bonalawpc.com

21                                         By: _____ */s/ Jarod M. Bona* _____

22

23                                         Attorneys for Defendants
                                           TAITSU CORPORATION and TAITSU
24                                         AMERICA, INC.

25

26

27

28

## **ATTESTATION**

I, Heather Nyong'o, attest that all other signatures listed, and on whose behalf the filing is submitted, concur in the filing's contents and have authorized the filing.

*/s/ Heather S. Nyong'o*
Heather S. Nyong'o