1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

SAN FRANCISCO DIVISION

13
14
15

| IN RE CAPACITORS ANTITRUST LITIGATION | Master File No. 3:14-cv-03264-JD<br>MDL No. 2801 |
|---|---|
| This Document Relates To:<br>DIRECT PURCHASER PLAINTIFFS ACTION | **JOINT PRETRIAL STATEMENT**<br><br>Trial Date:  March 2, 2020<br>Time: 9:00 a.m.<br>Place:  Courtroom 11, 19th Floor<br>Hon. James Donato |

16
17
18
19
20
21
22
23
24
25
26
27
28

1   **I.      SUBSTANCE OF THE ACTION**

2             ***Plaintiffs' Statement***

3             This is a certified class action asserting claims for damages for violations of the

4   Sherman Act. 15 U.S.C. § 1. Defendants are, or were, the worldwide leaders in the

5   production of certain types of capacitors, a necessary component of every electronic

6   product. From at least as early as January 2002 until at least through the end of December

7   2013, they engaged in a cartel to artificially inflate the prices of capacitors that they sold.

8   This was an effort to stave off inevitable price declines that would have otherwise occurred

9   in a competitive market.

10  **Plaintiffs**

11  Plaintiffs are direct purchasers of capacitors in the United States.

12  **Defendants**

13  The named Defendants are:

14  • AVX Corporation

15  • ELNA Co. Ltd. and ELNA America, Inc.

16  • Fujitsu Semiconductor America, Inc., and Fujitsu Components America, Inc.

17  • Hitachi Chemical Co., Ltd., Hitachi Chemical Company America, Ltd., and

18    Hitachi AIC Incorporated

19  • Holy Stone Enterprise Co., Ltd., Holy Stone International,

20  • KEMET Corporation and KEMET Electronics Corporation

21  • Matsuo Electric Co., Ltd.

22  • Nippon Chemi-con Corporation

23  • NEC TOKIN Corporation and NEC TOKIN America, Inc.

24  • Nichicon Corporation and Nichicon (America) Corporation

25  • Nissei Electronic Co. LTD.

26  • Nitsuko Electronics Corporation

27  • Okaya Electric Industries Co., Ltd. and Okaya Electric America, Inc

28

1    • Panasonic Corporation, Panasonic Corporation of North America

2    • ROHM Co., Ltd. and ROHM Semiconductor U.S.A., LLC

3    • Rubycon Corporation and Rubycon America Inc.

4    • SANYO Electric Co., Ltd., SANYO North America Corporation

5    • Shinyei Kaisha, Shinyei Technology Co., Ltd., Shinyei Capacitor Co., Ltd., and

6      Shinyei Corporation of America, Inc.

7    • Shizuki Electric Co., Ltd

8    • Soshin Electric Co., Ltd. and Soshin Electronics of America, Inc

9    • Taitsu Corporation and Taitsu America, Inc.

10   • Toshin Kogyo Co., Ltd.

11   • United Chemi-Con, Inc.

12   Defendants are horizontal competitors. They each manufacture, sell and distribute

13   capacitors to the members of the direct purchaser class.

14   **Inter-Competitor Meetings, Communications, and Information Exchange**

15   A primary mechanism of the conspiracy was the systematic and regular exchange of

16   highly confidential business information between and among the defendants. This included

17   information that was 1) related to price, output, or cost; (2) current or projected (not just

18   historical); (3) company-specific (not merely aggregated); and (4) communicated directly

19   between competitors (not through a third party). Often the information pertained to

20   particular customers. The information involved several major categories of capacitors—

21   aluminum, tantalum, and film—and various sub-categories of capacitors that the

22   conspirators identified during their conspiratorial meetings (all except for one very small

23   sub-category: tantalum wet). Competitors would not share this sort of information in the

24   absence of a conspiracy.

25   The information exchanges preceded regularly scheduled meetings held either at

26   Defendants' offices or at times at clandestine places at which the participants would orally

27   discuss in more detail the information that had been exchanged. At the beginning of the

28   meeting, there would be a presentation by each company of their performance over the

1   prior period of time (sometimes it was a calendar month, sometimes a quarter), including

2   sales quantity and revenues, along with a discussion of "market conditions," which

3   frequently included a discussion of prices, pricing, the need to coordinate, specific

4   customers, responses to specific requests for quotations (RFQs), costs, and the effect of

5   exchange rates on pricing. At the meetings, the participating companies made reports in

6   sequence of the company codes in the reports that they had provided prior to the meeting,

7   and they were expected to ask and answer questions about the reports in the meeting. The

8   companies shared information about customers (including in Japan and overseas markets),

9   including orders, price negotiations, price adjustments, and overall industrial development

10  trends. They would answer each other's questions about the information. This was typically

11  followed by visits to pubs or izakayas, where drinks would flow and much more

12  information would be exchanged.

13        Defendants also met for "President's Meetings," held twice yearly at expensive,

14  exclusive resorts, far from prying eyes, where the top executives of the defendants could

15  make sure that their plans were being executed faithfully by their subordinates. Explicit

16  discussion of pricing occurred more frequently at Presidents' Meetings, where the

17  participants engaged in high-level planning. For a Presidents' Meeting, in addition to on-

18  site distribution of the standard forms filled out for monthly meetings, the company in

19  charge would also notify participants by email in advance to fill out spreadsheets with the

20  forecast demand forms of capacitors for their important products. The materials completed

21  by the companies would be distributed at the monthly meeting before the Presidents'

22  Meeting for discussion about their correctness. The company in charge would summarize

23  the monthly meeting discussion results and make a five-year demand prediction report

24  based on the forecast demand filled out by the participating companies. This would be

25  discussed and once again confirmed at the meeting.

26         After a meeting, most of the participating representatives would prepare meeting

27  minutes or summaries and disseminate them within their respective companies. In some

28  cases, meeting minutes were circulated in writing to senior executives in charge of

1   branches throughout the world, to assure the worldwide effectuation of the agreements

2   reached in Japan. This information was used in setting prices, determining pricing strategy,

3   and negotiating prices with actual or potential customers. Plaintiffs have been able to

4   document well over 400 regular group meetings and over 2,200 inappropriate inter-

5   competitor meetings, contacts, and exchanges of information. The systematic information

6   exchanges were illegal and permitted the defendants to artificially inflate the prices of

7   capacitors that they sold. The systematic information exchanges were supplemented when

8   necessary with customer-specific agreements, product-specific agreements, bid rigging and

9   other forms of collusion to maintain the effectiveness of the conspiracy.

10       Most of the conspirators participated in meetings in Japan and in other locations in

11   Asia such as Hong Kong and Singapore. A few—including the American companies,

12   conspirators AVX and KEMET—did not attend those meetings, which were conducted in

13   Japanese. AVX and KEMET did, however, communicate regularly, meet, and share

14   competitively sensitive information with the other conspirators. The same executives at

15   AVX and KEMET met repeatedly with the same executives at the other conspirators who

16   attended the regular meetings in Asia. In addition to the meetings, the conspirators—

17   Japanese and American alike—engaged in extensive bilateral and multilateral

18   communications, including emails and phone calls. The conspirators kept notes of some of

19   their meetings and there are written records of other communications. Some of the

20   conspirators' communications instructed the recipients to destroy them. Certainly, much

21   evidence was lost or destroyed pursuant to directions like "delete after reading."

22       Defendants monitored and policed their agreements, and confronted their co-

23   conspirators upon learning about deviations from the agreed upon price increases or that

24   individual co-conspirators were lowering prices. Defendants recognized that their meetings

25   and the scheme of which they were a part were illegal and wrong, and there is explicit

26   discussion at meetings and elsewhere of concern that they could be criminally prosecuted

27   for their activities. In addition, many of the meetings took place away from their business

28   offices in order to conceal the meetings' existence and Defendants' participation in them.

1    Plaintiffs allege and intend to prove a single conspiracy, and no other conspiracy,

2    conspiracies, or conspiracy theories should be mentioned or referred to in this case.

3    Defendants appear to take the position that the guilty pleas entered in the related criminal

4    case all involve separate conspiracies. They may seek to prove that if they wish, but that is

5    not the case that Plaintiffs intend to prove. To be sure, the Japanese meetings at times

6    focused separately on electrolytic and film capacitors, and at times separately on aluminum

7    and tantalum capacitors. The evidence supports a finding of a single conspiracy for various

8    reasons. First, almost all of the group meetings, no matter what type of capacitors were

9    involved, had the same basic structure—including sharing competitively sensitive

10   information between conspirators. Second, it made sense for the conspirators to use the

11   same structure within a single conspiracy for different types of Capacitors. Just as a single

12   business can sell various products, not all of which are substitutes for each other—

13   supermarkets and hardware stores are two of countless examples—a single conspiracy can

14   apply to multiple kinds of products. Indeed, the conspiracy to which many conspirators

15   confessed involved different capacitors of different sizes and uses. Third, some of the

16   conspirators attended both electrolytic and film meetings and manufactured both kinds of

17   capacitors. Fourth, the participants discussed film capacitors at electrolytic meetings and

18   electrolytic capacitors at film meetings. Fifth, there are overlaps between the uses of some

19   electrolytic and film capacitors.

20   This is not an exhaustive list. The admissible evidence, when considered in in its

21   totality, will demonstrate the conspiracy alleged by Plaintiffs. The governing principle was

22   established long ago in *Continental Ore Co. v. Union Carbide & Carbon Co.* and remains

23   true today.

24   "(T)he character and effect of a conspiracy are not to be judged by dismembering it

25       and viewing its separate parts, but only by looking at it as a whole. *United States v.*

26       *Patten,* 226 U.S. 525, 544 (1913), and in a case like the one before us, the duty of

27       the jury was to look at the whole picture and not merely at the individual figures in

28

1      it." *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (6th Cir. 1944).  See

2      *Montague & Co. v. Lowry,* 193 U.S. 38, 45 (1904).

3    370 U.S. 690, 699 (1962).

4      **Guilty Pleas**

5      These defendants pled guilty to criminal violations of the antitrust law. 15 U.S.C. §

6    1:

7        •   ELNA

8        •   Hitachi

9        •   Holy Stone

10      •   Matsuo

11      •   NEC TOKIN

12      •   NCC

13      •   Nichicon

14      •   Rubycon

15      In addition, certain managers and directors were indicted as well. Satoshi Okubo

16    (who worked for ELNA and Matsuo) and Tokuo Tatai (ELNA) both pled guilty to criminal

17    price fixing as individual criminal defendants. Eight others were indicted but have not

18    appeared to answer the charges against them: Takeshi Matsuzaka, Yasutoshi Ohno,

19    Kaname Takahashi, and Takuro Isawa of NCC; Tomohide Date of NEC TOKIN;

20    Masanobu Shiozaki of Nichicon; and Kiyoaki Shirotori and Satoru Miyashita of Rubycon.

21    Defendants' statement below that DPPs have "refused to engage in a meaningful"

22    discussion about stipulating to facts concerning their plea agreements is not correct, as

23    DPPs will explain to the Court at the pretrial conference.

24        ***Defendants' Statement***

25      DPPs allege a single, overarching conspiracy between approximately 22 corporate

26    families of capacitors manufacturers regarding all aluminum, tantalum and film capacitors

27    sold into the United States between 2002 and 2013 in violation of Section 1 of the Sherman

28    Act.  (DPPs' Third Amended Complaint, 14-cv-3264, ECF No. 1831, at ¶¶ 1, 7 (alleging

1    that Defendants conspired "to implement and effectuate an overarching scheme to control

2    and set the prices of their aluminum, tantalum and film capacitors sold to United States

3    purchasers and purchasers worldwide"), 13.)  To prevail on this claim, DPPs must prove

4    (1) the existence of a conspiracy among competitors to fix the prices of aluminum,

5    tantalum, and film capacitors; (2) that each Defendant purposefully or knowingly joined

6    that conspiracy; (3) that the alleged conspiracy occurred in or affected interstate or import

7    commerce; and (4) that the conspiracy caused all, or nearly all, DPPs to pay more for

8    aluminum, tantalum, and/or film capacitors billed to or shipped to the United States than

9    they otherwise would have.  ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 1

10   Instr. 2 and Ch. 2 Instr. 1 (2016); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

11   U.S. 574, 585-86 (1986).  In addition, DPPs have the burden of proving a non-speculative

12   measure of damages.  *Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013

13   WL 5391159, at *5 (N.D. Cal. Sept. 24, 2013) ("fact of injury and measure of damages are

14   separate elements of an antitrust claim."); *Shannon v. Crowley*, 538 F. Supp. 476, 484

15   (N.D. Cal. 1981) ("proof of damages is an essential element of [an antitrust claim].");

16   *Knutson v. Daily Review, Inc.*, 468 F. Supp. 226, 229 (N.D. Cal. 1979) ("Plaintiffs in an

17   antitrust suit have the burden of proving damages.").

18         Whether DPPs have evidence sufficient to prove each of these elements as to each

19   of the Defendants and alleged co-conspirators remains to be decided.  At trial, the evidence

20   will fall far short of establishing what DPPs have pleaded in their Complaint and DPPs will

21   fail to meet their burden of proving each of the elements of the offense, as set forth in

22   Defendants' Trial Brief.

23         As also set forth in Defendants' Trial Brief, the plea agreements entered into

24   between certain Defendants and the U.S. Department of Justice do not support—and in fact

25   specifically refute—DPPs' broad conspiracy theory.  For this reason, Defendants have

26   attempted to reach a stipulation with DPPs regarding presentation of the plea agreements to

27   the jury and the parties' ability to present additional evidence regarding the plea

28

1   agreements.  To date, DPPs have refused to engage in a meaningful discussion of such a

2   stipulation.

3   **II.      RELIEF REQUESTED**

4          ***Plaintiffs' Statement***

5          Plaintiffs seek overcharge damages in the amount of $513,196,560, trebled, the cost

6   of suit and a reasonable attorney's fee, and prejudgment interest against certain defendants.

7   The single damage number will be adjusted based upon the final determination of opt outs.

8   If Plaintiffs prove that the defendants fixed prices in violation of Sherman Act § 1, they

9   may prove and assess damages:

10              [I]n the aggregate by statistical or sampling methods, by the computation of

11              illegal overcharges, or by such other reasonable system of estimating

12              aggregate damages as the court in its discretion may permit without the

13              necessity of separately proving the individual claim of, or amount of

14              damage to, persons on whose behalf the suit was brought.

15   15 U.S.C. § 15d. *See also Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S.

16   555, 563 (1931) (" . . . while [ ] damages may not be determined by mere speculation or

17   guess, it will be enough if the evidence show the extent of the damages as a matter of just

18   and reasonable inference, although the result be only approximate. The wrongdoer is not

19   entitled to complain that they cannot be measured with the exactness and precision that

20   would be possible if the case, which he alone is responsible for making, were otherwise.").

21          Plaintiffs' expert economist and their expert econometrician, in demonstrating price

22   inflation, use commonly-accepted sophisticated statistical techniques showing price

23   inflation for electrolytic and film capacitors and for various sub-categories of capacitors.

24   The expert analyses also show that the conspirators' prices for electrolytic and film

25   capacitors were inflated in every year of the conspiracy (with one exception, prices for

26   tantalum electrolytic in 2008). The conspiracy thus caused the class to pay inflated prices.

27

28

1    ***Defendants' Statement***

2        Defendants respectfully request that a judgment be entered against DPPs and their

3    claims, and that costs be assessed consistent with the jury's verdict in this matter.

4    **III.    UNDISPUTED FACTS**

5        The parties do not dispute the following facts, and will continue to meet and confer

6    in an attempt to agree on other undisputed facts:

7        a.   Capacitors are essential components of electronic products.

8        b.   ELNA America, Inc. was during the Class Period and is a wholly-owned

9             subsidiary of ELNA Co., Ltd.

10       c.   Vishay Polytech Co. f/k/a Holy Stone Polytech Co. was during the Class Period

11            a wholly-owned subsidiary of Holy Stone Enterprise Co., Ltd.

12       d.   Milestone Global Technology, Inc. was during the Class Period and is a wholly-

13            owned subsidiary of Holy Stone Enterprise Co., Ltd.

14       e.   United Chemi-Con Inc. was during the Class Period and is a wholly-owned

15            subsidiary of Nippon Chemi-Con Corp.

16       f.   Shinyei Technology Co., Ltd. and Shinyei Capacitor Co., Ltd. were during the

17            Class Period and are corporate affiliates of Shinyei Kaisha.

18       g.   Shinyei Corporation of America, Inc., was during the Class Period and is a

19            wholly-owned subsidiary of Shinyei Kaisha.

20       h.   Taitsu America, Inc. was during the Class Period and is a wholly-owned

21            subsidiary of Taitsu Corporation.

22   **IV.    DISPUTED FACTUAL ISSUES**

23           ***Plaintiffs' Statement of Disputed Facts***

24       i.   Whether defendants participated in a conspiracy to fix the prices of

25            capacitors.

26

27

28

ii.  Whether the conspiracy caused the prices paid by direct purchasers for
capacitors to be higher than they would have been in the absence of the
conspiracy.

iii.  Whether the defendants offered pretextual, fraudulent, or misleading
explanations for their pricing decisions.

### *Defendants' Statement of Disputed Facts*

Defendants dispute the following material alleged facts:

- The existence of a conspiracy involving all Defendants, and alleged co-conspirators, to fix the prices of all aluminum, tantalum and film capacitors billed to or shipped to the United States during the entire class period;

- That the alleged conspiracy caused all, or nearly all, DPPs to pay more for aluminum, tantalum, and/or film capacitors billed to or shipped to the United States than they otherwise would have;

- That DPPs have provided a reliable, non-speculative measure of damages;

- That Defendant Holy Stone Polytech Co., Ltd. joined the alleged conspiracy in 2010 knowing all that had preceded its involvement and with an intent to continue an unlawful agreement;

- That Defendant Holy Stone Polytech Co., Ltd. employees acted with the apparent authority of Defendant Holy Stone Enterprise Co., Ltd., a Taiwanese parent organization, and Defendant Milestone Global Technology, Inc., a United States sister organization, such that those organizations can be held liable for the conduct of Holy Stone Polytech Co., Ltd. employees;

- That individual Defendants within the same corporate family engaged in "coordinated activity" such that they can be treated as a single "economic unit" for purposes of the Sherman Act, as required by *Arandell Corp. v. Centerpoint Energy Services*, 900 F.3d 623 (9th Cir. 2018), assuming *Arandell* even applies to this case, which Defendants dispute as set forth below;

- That aluminum, tantalum, and film capacitors are interchangeable with, or substitutes, for one another;

- That DPPs are capable of making the showing necessary in order to invoke the co-conspirator exception to the hearsay rule as to certain exhibits and statements DPPs intend to introduce at trial; and

- Any and all other facts DPPs may assert to support the alleged conspiracy, the existence of classwide antitrust injury, and the amount of damages sought.

## V.   DISPUTED LEGAL ISSUES

### *Plaintiffs' Position*

a.   Whether the evidence demonstrates a violation of Sherman Act § 1 by the defendants.

b.   Whether defendants' wholly owned subsidiaries should be deemed the same entities as their parents based on the facts and for purposes of this case under *Arandell v. Centerpoint Energy Servs.,* 900 F.3d 623 (9th Cir. 2018).

c.   Whether the statute of limitations has been tolled based on the discovery rule, fraudulent concealment and 15 U.S.C. § 16(i).

### *Defendants' Position*

In addition to the legal issues associated with the pending individual and joint motions for summary judgment and the motions *in limine* filed by the parties with this Joint Pretrial Statement, the disputed points of law concerning liability and relief include the following:

- Whether DPPs have produced sufficient evidence of certain Defendants and alleged co-conspirators, such as AVX, KEMET, Shinyei, Taitsu, UCC, Holy Stone Enterprise Co., Ltd., Milestone Global Technology, Inc. and others, joining the alleged conspiracy such that the question of their participation may properly be presented to the jury;

1     •   Whether the methodologies set forth by DPPs' economists are legally sufficient

2        to demonstrate that all, or nearly all, class members suffered harm as a result of

3        the alleged conspiracy;

4     •   Whether the applicable, four-year statute of limitations, 15 U.S.C. § 15b, limits

5        any recovery in this action to damages suffered within the four-year period

6        preceding the filing of DPPs' original complaint;

7     •   Whether the doctrine of fraudulent concealment can be applied to private

8        antitrust actions, such as this, where Congress chose to adopt a relatively short

9        statute of limitations period as well as the "injury rule" for such claims; and, if

10       the doctrine is applicable, whether DPPs have satisfied the doctrine's three

11       elements:  (1) that each Defendant took affirmative acts to mislead DPPs; (2)

12       that DPPs did not have actual or constructive knowledge of the facts giving rise

13       to their claim as a result of Defendants' affirmative acts; and (3) that DPPs acted

14       diligently in trying to uncover the facts giving rise to their claim.  *In re*

15       *Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1214 (N.D. Cal. 2015);

16       *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012);

17     •   Whether the "single entity" theory espoused by DPPs and set forth in *Arandell*

18       *Corp. v. Centerpoint Energy Services*, 900 F.3d 623 (9th Cir. 2018), even applies

19       to certain Defendants within the same corporate family, where there is no

20       evidence of those entities engaging in "coordinated activity," as there was in

21       *Arandell*; there is no evidence of relevant parent organizations requiring

22       subsidiaries to pass on "rigged and inflated prices" to "buyers outside of the . . .

23       economic unit," as there was in *Arandell*; there is no evidence that subsidiaries

24       were a necessary component in reaching into the target market, as there was in

25       *Arandell*; and there is no evidence that unlawful profits were "funneled" back to

26       the relevant parent organizations, as there was in *Arandell*;

27     •   Whether a parent company is liable for the acts of its subsidiary, and vice versa,

28       based solely on their place within the same corporate family, despite the law to

the contrary. *United States v. Bestfoods*, 524 U.S. 51, 68 (2003) ("It is a general principle of corporate law deeply ingrained in our legal system that a corporation is not liable for the acts of its subsidiaries.");

- Whether the co-conspirator exception to the hearsay rule is applicable to certain exhibits and statements DPPs will seek to introduce at trial; and

- Whether evidence of alleged unlawful conduct overseas is admissible in the absence of evidence tying that conduct to both the alleged conspiracy and to United States interstate or import commerce.

## VI.  STIPULATIONS

The parties have stipulated that:

a.  Except for expert witnesses and a company representative for each party, witnesses will be excluded from the courtroom during trial.

b.  Documents produced by any party are authentic.

c.  A copy of a document may be used in lieu of an original.

d.  In connection with Defendants' Motion in Limine No. 4, Holy Stone Enterprise Co., Ltd. shall be referred to by that name or as "Holy Stone Enterprise;" Holy Stone Polytech Co., Ltd. shall be referred to by that name, "Holy Stone Polytech," or "HPC"; and Milestone Global Technology, Inc. shall be referred to by that name or as "Holy Stone International.

## VII.  BIFURCATION

The parties do not believe that there is any need for bifurcation or a separate trial of any issues.

## VIII.  SETTLEMENT

### *Plaintiffs' Statement*

Plaintiffs have had some form of settlement discussions with all remaining defendants. Some of those discussions are ongoing. While it is possible that there may be

1  further settlements before trial, Plaintiffs do not believe that the Court needs to take any

2  action concerning settlement.

3          ***Defendants' Statement***

4          Defendants have made great efforts to resolve this matter with DPPs during the life

5  of this litigation, including through the use of mediators and other means.  These efforts,

6  however, have failed.  Nevertheless, Defendants remain open to discussing settlement with

7  DPPs up to and through trial.

8  **IX.    TRIAL LENGTH**

9          ***Plaintiffs' Statement***

10         Trial has been set for five weeks split equally between Plaintiffs and Defendants.

11         ***Defendants' Statement***

12         As previously discussed with the Court, Defendants believe that trial of this matter

13  will require at least five weeks.  Defendants, however, continue to look for ways to

14  streamline their case and shorten overall trial length.

15  Dated: Jan. 21, 2020

16                          JOSEPH SAVERI LAW FIRM, INC.
                            Joseph R. Saveri
17                          Steven N. Williams
                            James G. Dallal
18                          Kyle P. Quackenbush
                            Anupama K. Reddy
19                          601 California Street, Suite 1000
20                          San Francisco, California 94108

21                          By: _____*/s/ Joseph R. Saveri*_____

22

23                          Lead Counsel for the Direct Purchaser Class

24

25

26

27

28

1   Dated:  Jan. 21, 2020

2                                     JONES DAY
                                      Jeffrey A. LeVee
3                                     Eric P. Enson
                                      Kelly M. Ozurovich
4                                     555 South Flower Street, 50th Floor
5                                     Los Angeles, CA 90071
                                      jlevee@jonesday.com
6                                     epenson@jonesday.com
                                      kozurovich@jonesday.com
7
8                                     John M. Majoras
                                      51 Louisiana Avenue, N.W.
9                                     Washington, D.C. 20001-2113
                                      jmmajoras@jonesday.com
10
                                      By:  _____ /s/ Eric P. Enson _____
11

12
                                      Attorneys  for Defendants
13                                    HOLY STONE ENTERPRISE CO, LTD.,
                                      MILESTONE GLOBAL TECHNOLOGY, INC., and
14                                    VISHAY POLYTECH CO., LTD.
        Dated:  Jan. 21, 2020
15
                                      MINTZ LEVIN COHN FERRIS GLOVSKY AND
16                                    POPEO P.C.
                                      Bruce D. Sokler
17                                    Robert G. Kidwell
18                                    701 Pennsylvania Avenue NW, Suite 900
                                      Washington, DC 20004
19                                    bdsokler@mintz.com
                                      RGKidwell@mintz.com
20
21                                    MINTZ LEVIN COHN FERRIS GLOVSKY AND
                                      POPEO P.C.
22                                    Evan S. Nadel
                                      44 Montgomery Street, 36th Floor
23                                    San Francisco, CA 94104
                                      enadel@mintz.com
24
                                      By:  _____ /s/ Bruce D. Sokler _____
25

26
                                      Attorneys for Defendant
27                                    AVX CORPORATION

28

1    Dated:  Jan. 21, 2020

2                                      WILMER CUTLER PICKERING HALE AND
                                       DORR LLP
3                                      Heather S. Nyong'o
                                       1 Front Street, Suite 3500
4                                      San Francisco, California 94111
                                       Heather.Nyongo@wilmerhale.com
5

6                                      WILMER CUTLER PICKERING HALE AND DORR
                                       LLP
7                                      Thomas Mueller (*pro hac vice*)
                                       1875 Pennsylvania Ave NW
8                                      Washington, DC 20006
                                       Thomas.Mueller@wilmerhale.com
9

10                                     WILMER CUTLER PICKERING HALE AND DORR
                                       LLP
11                                     Chris Johnstone
                                       950 Page Mill Road
12                                     Palo Alto, CA 94304
                                       Chris.Johnstone@wilmerhale.com
13

14                                     By:  _____*/s/ Heather S. Nyong'o*_____

15

16                                     Attorneys for Defendants
                                       ELNA CO., LTD. and ELNA AMERICA, INC.
17
     Dated:  Jan. 21, 2020
18

19                                     MORRISON & FOERSTER LLP
                                       Bonnie Lau
20                                     425 Market Street
                                       San Francisco, CA 94105
21                                     blau@mofo.com

22
                                       By:  _____*/s/ Bonnie Lau*_____
23

24                                     Attorneys for Defendants
                                       MATSUO ELECTRIC CO., LTD.
25

26

27

28

1    Dated:  Jan. 21, 2020

2                                    PAUL, WEISS, RIFKIND, WHARTON &
                                     GARRISON LLP
3                                    Charles F. Rule
                                     Joseph J. Bial
4                                    2001 K Street, NW
                                     Washington, DC 20006-1047
5                                    rrule@paulweiss.com
6                                    jbial@paulweiss.com

7                                    KAUFHOLD GASKIN LLP
                                     Steven Shea Kaufhold
8                                    388 Market St, Suite 1300
                                     San Francisco, CA 94111
9                                    skaufhold@kaufholdgaskin.com
10
                                     By:  _____ */s/ Joseph J. Bial* _____
11

12                                   Attorneys for Defendants
13                                   NIPPON CHEMI-CON CORPORATION and UNITED
                                     CHEMI-CON, INC.
14   Dated:  Jan. 21, 2020

15                                   DENTONS US LLP
                                     Gaspare J. Bono
16                                   Claire Maddox
                                     Leslie Barry
17                                   1900 K Street, NW
18                                   Washington, DC 20006
                                     Email: gap.bono@dentons.com
19                                   claire.maddox@dentons.com
                                     leslie.barry@dentons.com
20

21                                   DENTONS US LLP
                                     Andrew S. Azarmi
22                                   One Market Plaza, Spear Tower, 24th Floor
                                     San Francisco, California 94105
23                                   Email: andrew.azarmi@dentons.com

24                                   By:  _____ */s/ Gaspare J. Bono* _____
25

26                                   Attorneys for Defendants
                                     SHINYEI KAISHA, SHINYEI TECHNOLOGY CO.,
27                                   LTD., SHINYEI CAPACITOR CO., LTD. and
                                     SHINYEI CORPORATION OF AMERICA, INC.
28

1

2

Dated:  Jan. 21, 2020

3

BONA LAW PC
Jarod M. Bona

4

Aaron R. Gott
4275 Executive Square, Suite 200

5

La Jolla, CA 92037
Email: jarod.bona@bonalawpc.com

6

aaron.gott@bonalawpc.com

7

By:   _____/s/ Jarod M. Bona_____

8

9

Attorneys for Defendants
TAITSU CORPORATION and TAITSU AMERICA,

10

INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL STATEMENT
MDL. NO. 2801