Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
James G. Dallal (State Bar No. 277826)
Anupama K. Reddy (State Bar No. 324873)
Christopher K.L. Young (State Bar No. 318371)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940
Email:  jsaveri@saverilawfirm.com
        swilliams@saverilawfirm.com
        jdallal@saverilawfirm.com
        areddy@saverilawfirm.com
        cyoung@saverilawfirm.com

*Lead Counsel for the Direct Purchaser Plaintiff Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION | Master File No. 3:17-md-02801-JD<br>Case No. 3:14-cv-03264-JD |
| | **TRIAL BRIEF** |
| THIS DOCUMENT RELATES TO:<br>THE DIRECT PURCHASER CLASS ACTION | Date:        March 2, 2020<br>Time:        8:30 am<br>Judge        Honorable James Donato<br>Courtroom:   11, 19th Floor |

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ................................................................................................. 1

II.     FACTS ................................................................................................................... 1

    A.      Guilty pleas and Leniency Applicant .......................................................... 1

    B.      Lay witness testimony/documents ............................................................... 2

    C.      Experts ......................................................................................................... 4

III.    LEGAL ANALYSIS ............................................................................................. 5

    A.      Elements ....................................................................................................... 5

        1.      Proof of Agreement ......................................................................... 6

        2.      Price-Fixing by Horizontal Competitors is Illegal Per Se .............. 7

        3.      Impact .............................................................................................. 8

        4.      Damages ........................................................................................... 8

        5.      Interstate Commerce ........................................................................ 8

        6.      FTAIA ............................................................................................. 8

    B.      Defenses ....................................................................................................... 9

IV.     REMEDIES ........................................................................................................... 9

    A.      Joint and Several Liability ........................................................................... 9

    B.      Treble Damages ........................................................................................... 9

    C.      Attorneys' Fees ............................................................................................ 9

    D.      Offsets for Past Settlements ....................................................................... 10

V.      CONCLUSION ................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ad Mgmt. v. GTE Corp.*, 92 F.3d 781 788 (9th Cir. 1996) ...................................... 6

*Am. Column & Lumber Co. v. United States*, 257 U.S. 377 (1921) .................................7

*Am. Soc. of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556 (1982)...........................7

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946) .............................................. 6

*Arandell Corp. v. Centerpoint Energy Services, Inc.*, 900 F.3d 623 (9th Cir. 2018) .................................. 6

*Associated Press v. United States*, 326 U.S. 1 (1945) .................................................. 8

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) .................................................. 8

*Blanton v. Mobil Oil Corp.* 721 F.2d 1207 (9th Cir. 1986) ........................................... 8

*In re Capacitors Antitrust Litig.,* No. 14-3264, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016).................................................................................................................. 8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944, 2016 WL 8669891 (N.D. Cal. Aug. 22, 2016)......................................................................................... 9

*City of Atlanta v. Chattanooga Foundry & Pipeworks*, 127 F. 23 (6th Cir. 1902) ............ 9

*Comcast Corp. v. Behrend,* 569 U.S. 27 (2013) ........................................................... 8

*Copperweld Corp v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ...................................... 6

*Fenerjian v. Nongshim Co., Ltd.*, 72 F.Supp.3d 1058 (N.D. Cal. 2014)........................... 9

*Flintkote Co. v. Lysfjord*, 246 F.2d 368 (9th Cir. 1957)...............................................9, 10

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414 (3d Cir. 1993) ...........................10

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354 (9th Cir. 1998) ...........................10

*Image Tech. Servs. v. Eastman Kodak Co.,* 125 F.3d 1195 (9th Cir. 1997) ...................... 8

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) ...................................... 6

*J. Truett Payne v. Chrysler Motors Corp.,* 451 U.S. 557 (1981) .................................... 8

*In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 636 F. Supp. 1138 (C.D. Cal. 1986) ........................................................................................................................10

*Northern Pac. Ry. v. United States*, 356 US. 1 (1958) ......................................................7

*Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014) .......................................................9

*Paper Sys. v. Nippon Paper Indus. Co.,* 281 F.3d 629 (7th Cir. 2002) ............................9

*Perma Life Mufflers v. Int'l Parts Co.,* 392 U.S. 134 (1968) ...........................................6

*S.E.C v. Hilsenrath,* No. C 03-03252, 2008 WL 2225709 (N.D. Cal. May 29, 2008) ..............2

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) ................8

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001)...........................................................7

*United States v. Container Corp.* 393 U.S. 333 (1969) ...................................................6

*United States v. Foster*, 985 F.2d 466 (9th Cir. 1993) ....................................................7

*United States v. Gypsum Co.,* 438 U.S. 422 (1978).........................................................7

*United States v. Montgomery*, 150 F.3d 983 (9th Cir. 1998)...........................................6

*United States v. Paramount Pictures*, 334 U.S. 131 (1948) ...........................................6

*United States v. Real Prop. Located at Section 18*, 976 F.2d 515 (9th Cir. 1992) ..............2

*United States v. Socony Vacuum Oil*, 310 U.S. 150 (1940) ............................................6

*United States v. Zemek*, 634 F.2d 1159 (9th Cir. 1980)...................................................6

*White Motor Co. v. United States*, 372 U.S. 253 (1963) .................................................7

*William Inglis & Sons Baking Co. v. Cont'l Baking Co., Inc.*, 981 F.2d 1023 (9th Cir. 1992)..................10

**Statutes**

Clayton Act ..................................................................................................................9, 10

Foreign Trade Antitrust Improvements Act.........................................................................8

Sherman Act ............................................................................................................. *passim*

**Rules**

Federal Rule of Evidence 201(f)........................................................................................2

Federal Rule of Evidence 801(d) .......................................................................................... 2

Federal Rule of Evidence 803 ............................................................................................... 2

## I.    INTRODUCTION

This case involves a conspiracy to fix the prices of aluminum, film, and tantalum capacitors. There is overwhelming evidence that there was such a price-fixing conspiracy. Many of the conspirators admitted to it, either in pleading guilty or in seeking leniency from the Department of Justice. The real liability issue to be tried is the scope of the conspiracy: how long it lasted; which products it involved; and which of the alleged conspirators participated in it. The Direct Purchaser Plaintiffs ("DPPs") will offer testimonial, documentary and expert evidence to establish that the conspiracy lasted for 12 years (from January 1, 2002 through December 31, 2013), that it involved aluminum, film, and tantalum capacitors, that all of the alleged conspirators participated in it, and that the conspiracy caused the DPP class members to pay over $400 million in overcharges. The seven Defendants who are proceeding to trial should be held jointly and severally liable for that amount, trebled to slightly over $1.2 billion, and then reduced by the amounts of the settlements to date.

## II.    FACTS

The price-fixing conspiracy began no later than 2002 and continued for 12 years. The participants in the conspiracy included: (1) AVX; (2) ELNA; (3) Fujitsu; (4) Hitachi; (5) Holy Stone; (6) KEMET; (7) Matsuo; (8) NCC (Nippon Chemi-Con and United Chemi-Con); (9) NEC TOKIN; (10) Nichicon; (11) Nissei; (12) Nitsuko; (13) Okaya; (14) Panasonic; (15) ROHM; (16) Rubycon; (17)  Sanyo; (18) Shinyei; (19) Shizuki; (20) Soshin; (21) Taitsu; and (22) Toshin Kogyo. They were horizontal competitors. Each made aluminum, film or tantalum capacitors during the relevant period. As the Court is aware, capacitors are electronic components that are commonly used in electrical devices. The conspiracy sold over $5 billion in relevant capacitors billed or shipped to the United States during the relevant period.

### A.    Guilty pleas and Leniency Applicant

Eight of the co-conspirator companies and two of their executives[1] have pleaded guilty to fixing capacitor prices in the United States. Panasonic, which purchased SANYO, sought leniency when it

---

[1] The following companies pleaded guilty: (1) ELNA; (2) Hitachi; (3) Holy Stone; (4) Matsuo; (5) NCC; (6) NEC TOKIN; (7) Nichicon; (8) Rubycon. The following individuals pleaded guilty: Satoshi Ohkubo (ELNA and Matsuo) and Tokuo Tatai (ELNA).

turned the other participants in to antitrust regulators. The guilty pleas and the plea agreements are admissible evidence. Fed. R. Evid. ("FRE") 201. Each entity pleading guilty agreed and admitted, among other things, to the following: (1) "participat[ion] in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere;" and (2) "agree[ing] to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the United States and elsewhere." The jury should be instructed to accept the noticed facts as conclusive under FRE 201(f). The entities pleading guilty are also precluded from contesting the conspiracy under the doctrine of collateral estoppel. *See United States v. Real Prop. Located at Section 18*, 976 F.2d 515, 519 (9th Cir. 1992) ("[I]t is settled law in this circuit that a guilty plea may be used to establish issue preclusion in a subsequent civil suit . . ."); *see also S.E.C v. Hilsenrath,* No. C 03-03252, 2008 WL 2225709, at *4 (N.D. Cal. May 29, 2008).

### B.      Lay witness testimony/documents

Testimony of lay witnesses and hundreds of admissible documents prove the who, what, why and when of the conspiracy.

Beginning in January 2002, the conspirators agreed with one another to elevate capacitor prices to their customers in the United States. The conspirators raised prices when they could and agreed to work with each other to prevent capacitor prices from going down when their customers tried to get lower prices.

Documentary evidence shows over 400 documented group meetings and well over 2,000 instances of illicit communications in furtherance of the conspiracy. At least 211 of the relevant communications were highly suspect under established DOJ and FTC guidelines. The meetings and communications occurred at in-person meetings, telephone calls, and emails. They took place in the United States, Europe, Japan, Taiwan, Singapore, Hong Kong and many other locations around the world. They included regularly constituted meetings among dues-paying members in Japan. The materials are admissible against Defendants on multiple bases, including as nonhearsay (FRE 801(d)), admissions (FRE 803(6)) and as statements made in furtherance of the conspiracy (FRE 803(d)(2)(E)).

Although AVX and KEMET executives appear not to have attended the group meetings in Japan, AVX representatives met often with individuals participating in the conspiracy. So did KEMET

representatives. AVX is owned by Kyocera, a Japanese company. KEMET worked closely with NEC TOKIN, operating it as a joint venture (with NEC), and ultimately purchasing it in its entirety. AVX and KEMET's executives frequently traveled to Asia and met with some of the same executives, mainly at SANYO and NEC TOKIN, who represented their companies at the group meetings in Japan. AVX and KEMET's executives also met repeatedly with each other to collude regarding particular customers.

To facilitate conspiratorial meetings and communications, the conspirators in Japan agreed to a detailed practice, repeated month after month in the regularly scheduled meetings. The meetings, regardless of whether they were largely about aluminum, film or tantalum capacitors, or whether they included some or all of the conspirators, adopted a consistent structure and format. One of the participating companies took responsibility for organizing the next meeting, making arrangements for the room and refreshments, and confirming the date and time. In preparation for the meetings, the conspirators reported confidential business information for their companies, which was collected and put into highly detailed reports by the company that was organizing that month. At the meeting, the materials were provided to the companies attending and each company would discuss the information they provided, answering any questions. The companies would discuss their business, their customers, their prices, their negotiations, their production, and other key competitively sensitive information. Frequently, the discussion progressed to intentions regarding future prices in the market generally, to particular types of customers, and to individual customers. After the meetings, the men in attendance often went to bars or nightclubs for drinking and entertainment. These informal events facilitated discussion of particular customers and negotiations. The group meetings in Japan often discussed confidential information that AVX and KEMET had shared with the Japanese conspirators. In other meetings and communications, AVX and KEMET shared confidential information with each other, including material learned from other conspirators.

By meeting in groups and communicating in formal reports, by phone, by email, in bars, in coffee shops, and on the golf course, the conspirators actively participated in the conspiracy and demonstrated their commitment to its goals and purposes. These exchanges included, for instance, confidential information from particular companies about their past, present and future outputs, costs, and prices. The exchanges were mutual and reciprocal, and made with the expectation—and knowledge from years

of participation—that information would be given in return. In certain cases, explicit agreements were reached at group meetings. Often, side meetings or private one-on-one meetings were arranged to address areas of concern with respect to particular shared customers. There is evidence of price-fixing communications between and among U.S.-based salesmen employed by the U.S. subsidiaries of conspirators with headquarters abroad.

The conspirators used the information exchanged to make pricing decisions, to set prices, and to coordinate with competitors. With respect to sales to U.S. purchasers, pricing decisions were controlled, as a matter of process and practice, by managers and executives abroad who set price targets or minimum prices that included a built-in profit margin for sales to U.S. purchasers. While U.S. salespeople had authority to negotiate prices above the targets, prices below the targets required approval by salespeople outside the U.S., thus establishing a pricing floor and ensuring control of prices from abroad. Certain purchasers also negotiated global prices with the conspirators' senior salespeople.

Conspirators took steps to cover their tracks and conceal their conspiracy. Many emails reporting on illicit communications used codes or were to be "destroyed after reading." Conspirators gave false or pretextual explanations for price increases and other pricing decisions.

The conspiracy continued until one of the conspirators turned the others in, seeking leniency.

C.      Experts

DPPs anticipate presenting four experts at trial. Dr. Adam Fontecchio is a professor of electrical engineering. He will explain to the jury what capacitors are and how they are used. He will also explain from an engineering perspective that many aluminum, film, and tantalum capacitors can be substituted for one another, and that ceramic capacitors are imperfect functional substitutes in many instances for aluminum, film, and tantalum capacitors. His engineering opinions regarding substitutability will support some of the opinions of Dr. Hal Singer.

Dr. Hal Singer is an economist and econometrician. He will explain the basic economics of the capacitors industry and of price-fixing. He will explain that characteristics of the capacitors industry make it susceptible to price-fixing, that the alleged conspirators engaged in communications that economists would conclude are consistent with a conspiracy and inconsistent with competition, and that econometric analyses of industry and sales data are consistent with all of the alleged conspirators having

elevated their prices above competitive levels during the alleged conspiracy. He will rely on the same econometric analyses of industry and sales data to provide evidence that the conspiracy caused all of the alleged conspirators to elevate their prices above competitive levels, that those elevated prices applied to aluminum, film, and tantalum capacitors, and that those elevated prices caused over 99% of class members to pay overcharges. His analysis will also provide evidence that the sales at issue had an impact on U.S. buyers and involved sellers from foreign countries.

Dr. James McClave, an econometrician, will also provide evidence that the alleged conspiracy elevated the alleged conspirators' prices above competitive levels, that it caused over 99% of class members to pay overcharges, and, specifically, that the resulting single damages were over $400 million.

Joseph Russoniello, the former U.S. Attorney, will explain that a decision by the Department of Justice to prosecute or not to prosecute an alleged price fixer is based on the discretion of prosecutors and many factors. Contrary to evidence to be offered by Defendants, such a decision does—or does not—mean that an alleged conspirator did not conspire or that the alleged conspirator should not be found liable in a civil proceeding.

## III.   LEGAL ANALYSIS

DPPs allege that Defendants violated the federal antitrust law by agreeing, conspiring, contracting, or combining to fix prices, rig bids, or otherwise suppress competition in the markets for aluminum, film and tantalum capacitors and that this conspiracy caused an increase in the prices of aluminum, film and tantalum capacitors that were billed to or shipped to the United States. DPPs assert that this increase in prices caused them injury.

### A.   Elements

DPPs' claims arise under Section 1 of the Sherman Act, 15 U.S.C. § 1. To establish a violation, the DPPs must prove the following: (1) the existence of agreement, conspiracy, contract, or combination among at least two entities to set, fix, raise, maintain, or stabilize prices, rig bids, or otherwise suppress competition in the markets for aluminum, film and tantalum capacitors; (2) that each defendant purposefully or knowingly became part of that conspiracy, contract, or combination; (3) that the alleged conspiracy, contract, or combination occurred in or affected interstate or import commerce; and (4) the anticompetitive conduct was a substantial factor in causing the DPPs to pay more for aluminum, film

and tantalum capacitors billed to or shipped to the United States than they otherwise would have. *United States v. Socony Vacuum Oil*, 310 U.S. 150, 224-26 n.59 (1940); *Copperweld Corp v. Indep. Tube Corp.*, 467 U.S. 752, 760 (1984); *Am. Ad Mgmt. v. GTE Corp.*, 92 F.3d 781 788 (9th Cir. 1996).

### 1.  Proof of Agreement

DPPs must prove a "contract, combination, . . . or conspiracy" between one or more separate entities. *Copperweld,* 467 U.S. at 767-68. Under the antitrust law, an agreement is "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). That the parties to an agreement did not have identical motives is no defense. *Perma Life Mufflers v. Int'l Parts Co.,* 392 U.S. 134, 142 (1968). "[A]quiescence to an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948). A person can become a member without full knowledge of all of the details of the agreement or conspiracy, the identity of all of its members, or the parts such members played. The members need not have agreed on the details of the conspiracy, so long as they agreed on or mutually understood the essential nature of the plan. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. *United States v. Container Corp.* 393 U.S. 333, 335 (1969) ("[W]hen a defendant requested and received price information it was affirming its willingness to furnish such information"); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators"); *United States v. Montgomery*, 150 F.3d 983, 998 (9th Cir. 1998); *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980) ("general test [for a single conspiracy] also comprehends the existence of subgroups or subagreements").

Corporations and their subsidiaries are considered a single entity for purposes of determining agreements under the antitrust law. *Copperweld*, 467 U.S. at 771-72. A corporate and subsidiary may not conspire with one another and they are to be considered a single unit. *See Arandell Corp. v. Centerpoint Energy Services, Inc.*, 900 F.3d 623, 631-32 (9th Cir. 2018) ("*Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive

scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which is it a part") (emphasis added). A corporation is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly-owned subsidiaries because they are treated as a single entity. Through its agents, however, a corporation is capable of conspiring with other persons or independent corporations. *Am. Soc. of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 565-66, 572-74 (1982) (a principal "may be held liable [under the antitrust law] for the acts of [its] agents even though the organization never ratified, authorized or derived any benefit whatsoever from the fraudulent activity of the agent and even though the agent acted solely for his private employer's gain.").

Proof of the agreement can be through direct or circumstantial evidence. DPPs here allege that one aspect of the illegal agreement was the agreement and understanding to exchange nonpublic confidential information. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (It is generally understood that "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement.") (Sotomayor, J.); *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921) ("Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . . . This is not the conduct of competitors, but is so clearly that of men united in agreement, express or implied, to act together and pursue a common purpose . . . ."). Once there is proof of a conspiracy "'evidence of only a slight connection to the conspiracy' is sufficient to convict for participation in the conspiracy." *United States v. Foster*, 985 F.2d 466, 469 (9th Cir. 1993), *quoting United States v. Taylor*, 802 F.2d 1108, 1116 (9th Cir. 1986).

### 2.    Price Fixing by Horizontal Competitors is Illegal Per Se

Price-fixing agreements are per se violations of the antitrust law. They are considered illegal without further analysis. *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.14 (1978); *White Motor Co. v. United States*, 372 U.S. 253, 260 (1963) ("price-fixing arrangements . . . have . . . been held to be per se violations of the antitrust laws; and a trial to show their nature, extent and degree is no longer necessary."); *Northern Pac. Ry. v. United States*, 356 US. 1, 5 (1958) (under the per se rule, certain agreements or practices are presumed illegal "without elaborate inquiry as to the precise harm they have cause or the business excuse for their use."). Therefore, Defendants may not offer proof that the

restraints were reasonable, efficient, based on good motives or may have produced good results. *Associated Press v. United States*, 326 U.S. 1, 17 n.15 (1945).

### 3. Impact

To prevail, DPPs must prove that the conspiracy caused some anticompetitive harm, such as the elevation of the conspirators' prices above competitive levels. *Blanton v. Mobil Oil Corp.* 721 F.2d 1207, 1215 (9th Cir. 1986). Drs. Singer and McClave have used econometric analyses to provide evidence that the conspiracy elevated the prices that class members paid to the conspirators above competitive levels.

### 4. Damages

With respect to damages, once liability is shown, plaintiffs bear a less stringent burden. *Comcast Corp. v. Behrend,* 569 U.S. 27, 35 (2013); *J. Truett Payne v. Chrysler Motors Corp.,* 451 U.S. 557, 566-67 (1981); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-64 (1931); *Image Tech. Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1221 (9th Cir. 1997). DPPs' expert econometrician, Dr. James McClave, will offer proof at trial using a statistical analysis of the alleged conspirators' transactional sales data that the total overcharge damages to the DPP class from the alleged conspiracy was slightly over $400 million.[2]

### 5. Interstate Commerce

The sales of the capacitors at issue in this case took place both in interstate commerce and in foreign commerce with the U.S., satisfying the requirement of commerce "among the several States." 15 U.S.C. § 1.

### 6. FTAIA

This Court has held that capacitors shipped or billed to U.S. qualify as import commerce for purpose of the Foreign Trade Antitrust Improvements Act ("FTAIA") and therefore are not precluded by that statute. *In re Capacitors Antitrust Litig.,* No. 14-3264, 2016 WL 5724960 at *3-4 (N.D. Cal. Sept. 30, 2016). They are therefore permitted under U.S. antitrust law. This Court certified a class that includes only purchasers that bought capacitors that were billed or shipped to the United States. DPPs, in proving their case, will rely only on sales that were billed or shipped to the United States. The FTAIA

---

[2] Calculating the precise amount requires a determination of the commerce attributable to those class members that have opted out of the class, a calculation that DPPs are currently finalizing.

does not bar claims or damages based on any of those sales. Import commerce also constitutes commerce "with foreign nations." 15 U.S.C. § 1.

### B.    Defenses

Defendants assert that the four-year statute of limitations bars class members' claims based on purchases before July 18, 2010, four years before the filing of the complaint in this action. DPPs may pursue their claims dating back to January 1, 2002 for three independent reasons: (1) the conspirators fraudulently concealed their conduct by meeting secretly, using codes, destroying records of conspiratorial communications, and providing pretexts for elevated prices to their customers, *see In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944, 2016 WL 8669891, at *9 (N.D. Cal. Aug. 22, 2016); (2) the conspiracy continued from Jan. 1, 2002 to Dec. 31, 2013, *see Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); and (3) the class members did not discover the conspiracy until after July 18, 2010. *See Fenerjian v. Nongshim Co., Ltd.*, 72 F.Supp.3d 1058, 1077 (N.D. Cal. 2014).

## IV.    REMEDIES

### A.    Joint and Several Liability

Each participant in an agreement, contract, understanding or a conspiracy that violates the antitrust laws is jointly and severally liable for all of the damages resulting from the conspiracy. *See City of Atlanta v. Chattanooga Foundry & Pipeworks*, 127 F. 23, 26 (6th Cir. 1902), *aff'd*, 203 U.S. 390 (1906). This means that each participant in the agreement, contract, understanding or conspiracy is fully liable for all of the damages caused by the conspiracy and not solely for damages caused by that individual conspirator. *Id.* That liability includes overcharges on sales by settling and non-settling conspirators and allows for recoveries by purchasers from settling or non-settling conspirators. *Paper Sys. v. Nippon Paper Indus. Co.,* 281 F.3d 629, 634 (7th Cir. 2002) (Easterbrook, J.).

### B.    Treble Damages

Section 4 of the Clayton Act provides that plaintiffs' damages are trebled. 15 U.S.C. § 15(a); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 398 (9th Cir. 1957).

### C.    Attorneys' Fees

Under Section 4 of the Clayton Act, a prevailing plaintiff is entitled to reasonable attorney's fees and costs. 15 U.S.C. § 15(a). The statutory fee award under Section 4 of the Clayton Act is mandatory.

*See Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1357 (9th Cir. 1998); *see also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 419 (3d Cir. 1993) ("under the Clayton Act fee awards are mandatory but available only to plaintiffs who prove an antitrust violation.").

### D.   Offsets for Past Settlements

The amount of any past settlements should be deducted from the damages awarded at trial after trebling. *Flintkote*, 246 F.2d at 398; *William Inglis & Sons Baking Co. v. Cont'l Baking Co., Inc.*, 981 F.2d 1023, 1024 (9th Cir. 1992) ("settlement payments should be deducted from the damages after they have been trebled."); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 636 F. Supp. 1138, 1151-52 (C.D. Cal. 1986).

## V.   CONCLUSION

Trial will show Defendants entered into a price-fixing conspiracy in violation of Section 1 of the Sherman Act. The purpose and effect of the conspiracy was to raise, fix and stabilize capacitor prices paid by DPPs. DPPs are entitled to the overcharges caused by the conspiracy, in addition to attorney's fees and expenses, subject to automatic trebling.

Dated: January 21, 2020

Respectfully Submitted,

JOSEPH SAVERI LAW FIRM, INC.

By:      */s/ Joseph R. Saveri*
            Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
James G. Dallal (State Bar No. 277826)
Anupama K. Reddy (State Bar No. 324873)
Christopher K.L. Young (State Bar No. 318371)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:   (415) 395-9940

*Lead Counsel for Direct Purchaser Plaintiff Class*