1   Joseph R. Saveri (State Bar No. 130064)
    Steven N. Williams (State Bar No. 175489)
2   Joshua P. Davis (State Bar No. 193254)
    James G. Dallal (State Bar No. 277826)
3   Anupama K. Reddy (State Bar No. 324873)
    Christopher K.L. Young (State Bar No. 318371)
4   JOSEPH SAVERI LAW FIRM, INC.
    601 California Street, Suite 1000
5   San Francisco, California 94108
    Telephone:  (415) 500-6800
6   Facsimile:   (415) 395-9940
    Email:  jsaveri@saverilawfirm.com
7           swilliams@saverilawfirm.com
            jdallal@saverilawfirm.com
8           areddy@saverilawfirm.com
            kquackenbush@saverilawfirm.com
9           cyoung@saverilawfirm.com

10  *Lead Counsel for the Direct Purchaser Class*

11

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14  | IN RE CAPACITORS ANTITRUST | Master File No. 3:17-md-02801-JD |
    | LITIGATION | |
15  | | Case No. 3:14-cv-03264-JD |
16  | THIS DOCUMENT RELATES TO: | **PROFFER OF EVIDENCE IN SUPPORT** |
    | THE DIRECT PURCHASER CLASS ACTION | **OF ADMISSIBILITY OF ADVERSE** |
17  | | **INFERENCE REGARDING FIFTH** |
    | | **AMENDMENT DEPOSITION** |
18  | | **TESTIMONY OF ANTHONY OLITA** |

19

20

21

22

23

24

25

26

27

28

**ANTHONY OLITA'S FIFTH AMENDMENT TESTIMONY**
**TO BE ADMITTED ON MARCH 12, 2020**

1. **Olita's testimony concerning his responsibility for the sales, marketing and distribution of capacitors for defendant United Chemi-Con ("UCC") during the relevant time period in the United States.**

   a. **Substance of Question and Answer ("Q & A").** Olita invoked the Fifth Amendment and refused to answer questions with respect to his responsibility over the sale, pricing, marketing, and distribution of capacitors during his employment by UCC. *See* Ex. A (Olita Dep., 16:3-19, 26:4-7).

   b. **Foundation for attributing the witness to defendant UCC ("Foundation").** Olita testified that he was a current employee of UCC. Ex. A at 7:20-7:21; *see also* Ex. B at p. 2 (UCC's Initial Disclosures identifying Olita as an individual likely with discoverable information concerning "UCC's pricing, sales, manufacturing and distribution of capacitors.").

   c. **Independent Evidence:** According to UCC's corporate representative, Olita became UCC's Vice President of Sales in approximately 2003 or 2004. *See* Ex. C, Watlock Dep. at 67:21-67:23. The representative also testified that UCC's salespeople reported to the Vice President of Sales, who reported to UCC's President, who reported to NCC's Board of Directors, and that Olita reported to UCC's President. *Id.* at 62:13–63:18. Olita thus had responsibility at UCC for pricing, sales, manufacturing, and distribution of capacitors for nearly the entire class period.

   d. **The substantial need for the adverse inference ("Substantial Need").** Direct Purchaser Plaintiffs ("DPPs") allege that the purpose and effect of the conspiracy was to raise capacitor prices to purchasers in the United States. DPPs were entitled to investigate UCC's participation in and furtherance of the goals of the conspiracy. Olita had a key sales role at UCC and had in-person contacts with competitors. Olita's eyewitness testimony was essential and his invocation of the Fifth Amendment denied DPPs vital knowledge regarding UCC's participation in and furtherance of the conspiracy. DPPs were thus prejudiced by the denial of an important avenue for information.

2. **Olita's testimony that NCC, through its wholly owned United States subsidiary, UCC, sold capacitors that NCC manufactured outside the United States to customers located in the United States.**

a.    **Q & A:** Olita was questioned regarding whether UCC, as NCC's wholly owned U.S. subsidiary, sold capacitors that were manufactured outside the U.S. by NCC to customers located in the U.S. Olita refused to answer invoking the Fifth Amendment. *See* Ex. A (Olita Dep., 17:12-16, 18-23).

b.    **Foundation:** UCC's Initial Disclosures (Ex. B at 2); Olita was employed by UCC at the time of his deposition (Ex. A, Olita Dep. at 7:20-7:21); and Olita became UCC's Vice President of Sales in approximately 2003 or 2004 (Ex. C, Watlock Dep. at 67:21-67:23).

c.    **Independent Evidence:** UCC sold capacitors to U.S. customers that were made outside the United States by NCC at factories in Asia and elsewhere. *See* Ex. C, Watlock Dep. at 26:1-28:18; 85:12-85:17. According to UCC's corporate representative, there was also coordination between the sales departments of NCC and UCC. *Id*. at 64:24-65:17.

d.    **The substantial need for the adverse inference ("Substantial Need"):** DPPs are entitled to investigate the scope of UCC's participation in the price-fixing conspiracy. A central part of this question is the scope of UCC and NCC's sales relationship and whether UCC sold capacitors manufactured outside the U.S. by NCC. Olita was a key U.S. salesman during nearly the entire class period and also had contacts with competitors about pricing to U.S. customers. Only Olita had extensive, personal knowledge of UCC's sales to U.S. customers and NCC's direction and control over them, as well as NCC's and UCC's sales relationship during the class period. DPPs had a substantial need for information on these subjects, but Olita refused to answer questions concerning them and prejudiced DPPs by invoking his Fifth Amendment rights.

**3.    Olita's testimony about UCC's competitors with respect to sales of capacitors to customers located in the United States, and that they included Nichicon, SANYO and AVX.**

a.    **Q & A.** Olita was questioned regarding whether Nichicon, SANYO or AVX were competitors of UCC with respect to the sale of capacitors located in the United States. Olita refused to answer, invoking the Fifth Amendment. *See* Ex. A, Olita Dep. at 17:24-18:3; 18:19-18:20; 19:10-19:12.

b.    **Foundation.** Olita was employed by UCC at the time of his deposition (Ex. A, Olita Dep. at 7:20-7:21); and UCC's corporate representative testified that Olita became UCC's Vice President of Sales in approximately 2003 or 2004, and that SANYO was a competitor of UCC's. Ex. C, Watlock Dep. at 19:3-19:17; 67:21-67:23; *see also* UCC's Initial Disclosures (Ex. B at 2).

c.  **Independent Evidence.** UCC "is the Chemi-Con entity responsible for manufacturing, selling, or distributing capacitors in the United States." *See* ECF 2578, at page 3, ¶6. Nichicon, SANYO, and AVX also sold capacitors to U.S. customers, and SANYO was a competitor of UCC's. Ex. C, Watlock Dep. at 19:3-19:17. Russell Edwards of Nichicon America testified that UCC was a competitor of Nichicon's and had contacts with Olita and other UCC employees. *See* Ex. D (Edwards Dep. at 155:12-155:24). UCC also produced notes of a meeting on April 26, 2005, between Chemi-Con personnel, including Olita, and AVX. *See* Ex. E (TX 529). The notes state in part that UCC's Olita asked at the meeting, "How do we avoid competing with each other?" and AVX's Executive Vice President Marshall Jackson proposed "to share information from time to time, perhaps on monthly basis, about market and customer development so we do not intrude on each other." *Id*.

d.  **Substantial Need.** A central issue in this case is whether or not UCC and AVX participated in the price-fixing conspiracy to raise prices of capacitors sold to U.S. purchasers. The identity of UCC's competitors is critical to this inquiry and DPPs were entitled to pursue it. Olita had detailed personal knowledge of this issue given his key sales role at UCC during the class period and firsthand participation in the underlying April 26, 2005 AVX/Chemi-Con meeting. DPPs were entitled to question Olita about who UCC's competitors were in the United States during the class period, about UCC's competition for capacitor business generally in the United States, and Olita's role in meetings with competitors, and DPPs were prejudiced by Olita's refusal to testify on Fifth Amendment grounds.

**4.**  **Olita's testimony about his pricing communications and information exchanges with competitors in the United States regarding capacitors.**

a.  **Q & A.** Olita invoked the Fifth Amendment when asked whether he ever met or communicated with any representative of any of UCC's competitors regarding capacitors, including whether he ever coordinated—or reached an agreement or understanding on—pricing of capacitors with them, including before the announcement of a price increase, or during trade association meetings or social gatherings. *See* Ex. A, Olita Dep. at 20:18-21:13; 28:13-28:25; 29:1-29:23.

b.  **Foundation.** *See* material cited and summarized above that supports attributing Olita's statements to UCC. *E.g.*, Ex. B at 2; Ex. C, Watlock Dep. at 19:3-19:17; 67:21-67:23.

   c.     **Independent Evidence.** Olita met and communicated with competitors about pricing and other commercially sensitive issues. *See* Ex. E (TX 529), Ex. F (TX 2887), Ex. G (TX 2864). On November 11, 2009, co-conspirator Nichicon America's Russell Edwards forwarded Olita an online market trend article and, in the email, Edwards asked Olita to "Stop granting interviews with the press. We are trying to raise prices." Ex. F (TX 2887). Edwards admitted at his deposition to having had direct contacts with Olita, and having known Olita since the 1990s. Ex. D, Edwards Dep. at 155:16-19; 156:9-156:24. Edwards also admitted to meeting Olita at "social events sponsored by customers or distributors" and he that he discussed "market conditions in the capacitors market" with Olita, and even "assume[d]" that he had done so. Ex. D, Edwards Dep. at 157:3-157:25.

   d.     **Substantial Need.** DPPs are entitled to inquire into UCC's participation in the price-fixing conspiracy. Olita had a key sales role at UCC and had direct bilateral contacts with competitors. Whether Olita's competitor contacts had illicit purposes, *i.e.*, meeting to coordinate or agree on the prices of capacitors with his competitors, are at core issue in this case. DPPs were entitled to pursue Olita's eyewitness testimony about his competitor meetings and to ask him questions about records concerning them.

**5.     Olita's testimony regarding price increase communications to U.S. customers after receiving confirmation from Chemi-Con in Japan (NCC) that competitors based in Japan had agreed to increase prices applicable to customers in the United States.**

   a.     **Q & A.** Olita invoked the Fifth Amendment as to questions about whether he had ever informed customers of UCC about a price increase of capacitors after having communicated about that increase with representatives of any of UCC's competitors, and also about records showing NCC directing UCC to increase prices. Ex. A, Olita Dep. at 21:14-21:25; 47:2-47:15; 47:21-48:21; 57:24-58:6; 58:24-59:8; 84:13-85:1; 86:14-87:9.

   b.     **Foundation.** *See* material cited and summarized above that supports attributing Olita's statements to UCC. *E.g.*, Ex. B at 2; Ex. C, Watlock Dep. at 19:3-19:17; 67:21-67:23.

   c.     **Independent Evidence.** In an email thread dated in August 2011, Tsuneo Ohta, UCC's President, confirmed with NCC's Noriaki Kakizaki, Executive Managing Director, Sales Headquarters, Kakizaki's "instruction that we have to start to use an exchange rate of $=74 Yen for New quotations." Ex. H (TX 2871). Olita is copied on that email. *Id*. UCC's Ohta then noted in a follow-up email to Olita

that "According to the information today, Nichicon HQ will increase their internal price to all overseas group companies by 5% from Sep/01/11." *Id*. The same email thread also reflects an internal NCC and UCC discussion of a price increase, including one to U.S. distributors involving Olita ("…this may be too high of a price increase for the distributors"). *Id*. Also, an email dated in March 2006 shows that NCC's Kakizaki, who said he had been informed that Rubycon had started an action for a price increase, instructed Olita and others to increase price to customers without losing any business. Ex. I (TX 2851). Kakizaki testified that he was stationed in the U.S. between 2004-2008 and that in March 2006 he had responsibility for the United States. Ex. J (Kakizaki Dep. at 113:17-113:22). Kakizaki admitted that this email (Ex. I, TX 2851) reflected a desire to increase prices by 5%. Ex. J, (Kakizaki Dep. at 114:9-116:4). Other emails evidence instances where Olita was instructed to implement price increases based on agreements and understandings reached with competitors. For example. an email from Kakizaki to Olita dated in August 2006 with the subject line, "Nichicon starts price increase," states in part "According to NCC information today, Nichicon President, Ippei Takeda made a following PRICE increase instruction internally." Ex. L (TX 2857). Both NCC and Nichicon have pleaded guilty to fixing the prices of capacitors in the United States during this period.

        d.   **Substantial Need.** One of the central issues in this case is whether UCC participated in and furthered the goals of the alleged price-fixing conspiracy at the direction or under the control of its parent NCC. DPPs seek to establish that price agreements reached outside the United States by NCC with other co-conspirators were implemented and executed with respect to purchasers in the United States. A reason Olita may have pursued price increases to customers in the United States was that agreements reached in Japan by NCC and its co-conspirators intended to target customers in the United States or the U.S. market generally. Defendants, including NCC and UCC, deny these factual allegations, and the answer to the question of UCC's implementation of the price-fixing agreements reached in Japan is not apparent from the record. There are also conflicts in the evidence on these issues. DPPs were entitled to inquire of Olita and obtain his eyewitness testimony about NCC's direction and control over UCC's pricing of capacitors to U.S. customers and UCC's implementation of the price-fixing agreements reached in Japan by NCC with its co-conspirators. Ohta, who sent price increase emails to Olita, also invoked the Fifth Amendment and refused to answer questions at his duly

noticed deposition, further foreclosing avenues of investigation. DPPs have been prejudiced by Olita's refusal to substantively testify.

**6.     Olita's testimony about his participation in Dell online auctions, and that he communicated with representatives of U.S. affiliates of co-conspirators to confirm and implement pricing agreements in the U.S. reached by NCC and its co-conspirators.**

a.     **Q & A.** Olita was questioned about his participation in Dell online auctions, as well as his communications and meetings with representatives of other capacitor manufacturers in the United States, but Olita refused to answer, invoking the Fifth Amendment. Ex. A (Olita Dep. at 40:22-41:4; 42:2-43:2; 54:13-55:7; 55:12-56:12; 72:1-72:14; 72:16-72:23; 73:6-75:20).

b.     **Foundation.** *See* material cited and summarized above that supports attributing Olita's statements to UCC. *E.g.*, Ex. B at 2; Ex. C, Watlock Dep. at 19:3-19:17; 62:13-63:18; 67:21-67:23.

c.     **Independent Evidence:** An email thread dated in June 2003 shows that Olita participated in Dell auctions on UCC's behalf (Ex. K, TX 2849), and UCC's corporate representative also testified that Olita participated in Dell auctions. Ex. C, Watlock Dep. at 269:5-269:13. Emails also reflect communications between Olita and Nichicon America's President Russell Edwards about pricing and other matters. An email thread dated June 29, 2010 includes an email authored by Olita in which Olita states that he had met with Edwards at customer Jabil's Global Supplier Conference the week prior, and the email states among other things: "We both discussed our need for increasing prices to the customers and he agreed… Now is the time to make some of our lost money back." Ex. G (TX 2864; *see also* Ex. M (TX 2863). Also, on November 11, 2009, Edwards forwarded Olita an online market trend article by email entitled "PURCHASING PRICE AND SUPPLY NEWS." Ex. N (TX 2862). In the email, Edwards directed Olita's attention to a sub-article entitled "Aluminum prices to remain low in 2010," and asked Olita to "Stop granting interviews with the press. We are trying to raise prices." *Id*. Edwards testified that this was an email he sent to Olita in the ordinary course of his job duties at Nichicon America, but that he could not recall "talking about raising prices of capacitors" with Olita around the time this email was sent. Ex. O, Edwards Dep. at 174:9-177:4. Olita also sent an email on or about July 17, 2016, stating in part that Rubycon had issued a 30 percent price increase to Sony. Ex. P (TX 2856).

d.     **Substantial Need.** One of the central issues in this case is the scope of UCC's participation in the price-fixing conspiracy and its impact on prices paid by U.S. customers like Dell. As DPPs allege, the purpose and effect of the conspiracy was to raise capacitor prices to purchasers in the United States. Olita, who had a key sales role within UCC, was a direct participant in bilateral contacts with Edwards including as an author and recipient of collusive emails. DPPs are entitled to inquire whether Olita coordinated bids for the Dell auction or coordinated with other U.S. affiliates of co-conspirators such as Edwards to other customers. When questioned about this, including with respect to particular records of such communications, Olita invoked his Fifth Amendment rights and refused to answer the questions. DPPs were denied Olita's eyewitness testimony and were thus prejudiced by his Fifth Amendment invocations.

7.     **Olita's testimony concerning his contacts with Russell Edwards, a top executive of Nichicon America, about the raising, fixing and stabilizing of capacitor prices to purchasers of capacitors in the United States.**

a.     **Q & A.** Olita invoked the Fifth Amendment to questions about agreements and understandings reached with Russell Edwards, President of Nichicon America, including agreements to implement coordinated prices increases in furtherance of the conspiracy and questions about plans to increase prices in a coordinated fashion. Ex. A (Olita Dep. At 73:6-75:20).

b.     **Foundation.** *See* material cited and summarized above that supports attributing Olita's statements to UCC. *E.g.*, Ex. B at 2; Ex. C, Watlock Dep. at 19:3-19:17; 62:13-63:18; 67:21-67:23.

c.     **Independent Evidence.** *See* Exs. G, M, H (TX 2863, TX 2871, and TX 13951), discussed above. Olita met in-person with Edwards at a supplier conference. Edwards was in possession of a price increase letter authored by Kakizaki. In an email confirming the conversation, Olita wrote to Ohta confirming that Edwards had agreed to send a similar price increase letter to Nichicon America's customers "immediately." Ex. M (TX 2863).

d.     **Substantial Need**. One of the central issues in this case is whether UCC participated in the price-fixing conspiracy alleged. DPPs allege the purpose and effect of which was to raise capacitor prices to purchasers in the United States. One of the other central issues is whether UCC and other co-conspirators participated in acts in furtherance of the conspiracy in the United States. Olita met with Edwards in person, learned directly from Edwards that Edwards was in possession of Kakizaki's price

increase letter, and relayed information back to Ohta he received firsthand from Edwards. Ohta, the recipient of that email, also invoked the Fifth Amendment and refused to answer questions at his duly noticed deposition. DPPs are entitled to pursue this inquiry and have been prejudiced by Olita's refusal to provide substantive testimony regarding his firsthand knowledge of this issue by invoking the Fifth Amendment. DPPs need to know what transpired and his version of the events. The only way to obtain this information is through eyewitness testimony.

**8.**      **Olita's testimony concerning a meeting he attended with other executives of NCC, UCC and ECC, and AVX, at which the two companies agreed not to compete with one another and to exchange information with each other in the future.**

a.      **Q & A.** Olita was questioned about a meeting between competitors on April 26, 2005, between individuals from AVX, NCC, UCC, and ECC, including Olita's statement (memorialized in the minutes of the meeting) "How do we avoid competing with each other?" in addition to other details of the meeting. Ex. A (Olita Dep. At 97:14-99:8).

b.      **Foundation.** *See* material cited and summarized above that supports attributing Olita's statements to UCC. *E.g.*, Ex. B at 2; Ex. C, Watlock Dep. at 19:3-19:17; 62:13-63:18; 67:21-67:23.

c.      **Independent Evidence.** Olita attended the meeting along with other executives and representatives of Chemi-Con (NCC, UCC, ECC) and AVX. TX 529.

d.      **Substantial Need.** One of the central issues in this case is whether UCC and AVX participated in the price-fixing conspiracy, the purpose and effect of which was to raise capacitor prices to purchasers in the United States and lessen or reduce competition. Olita had a key sales role in UCC and was a direct participant in this meeting between AVX and Chemi-Con personnel. Olita's statements at the meeting were memorialized in the meeting minutes. DPPs are entitled to inquire as to Olita's statements and firsthand experience at the meeting. When questioned about this, including with respect to particular records of such communications, Olita, who was a firsthand participant in the meeting, invoked his Fifth Amendment rights and refused to answer the questions, denying DPPs Olita's eyewitness testimony. The only way for DPPs to obtain this information is through eyewitness testimony and DPPs are prejudiced by Olita's refusal to provide substantive testimony.

Dated: March 10, 2020                     JOSEPH SAVERI LAW FIRM, INC.


By:   /s/ Joseph R. Saveri
                    Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
James G. Dallal (State Bar No. 277826)
Anupama K. Reddy (State Bar No. 324873)
Christopher K.L. Young (State Bar No. 318371)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

*Lead Counsel for the Direct Purchaser Class*